**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  08-20895-CR-UNGARO/SIMONTON**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**vs.**

**DAVID ROTHMAN,**

    **Defendant.**

_____/

**ORDER FINDING DEFENDANT DAVID ROTHMAN COMPETENT TO STAND TRIAL**

This matter arose upon the Preliminary Motion to Determine Competency to Stand Trial filed by counsel for Defendant DAVID ROTHMAN (DE # 166, filed 12/30/08).  This motion has been referred to the undersigned Magistrate Judge by the Honorable Ursula Ungaro, United States District Judge (DE # 174).  Several preliminary hearings/status conferences have been held in connection with this motion, following which the undersigned granted the motion to the extent that it requested a court-ordered competency evaluation, and appointed Enrique M. Suarez, Ph.D., to conduct the evaluation.  A competency hearing began on February 10, 2009, and was continued on February 12, 2009.  Prior to the resumption of the hearing on February 12, 2009, the government filed a Memorandum of Law Regarding Competency Determination (DE # 268).  The defendant responded to this memorandum after the conclusion of the hearing (DE # 270), and the government replied with a supplemental memorandum (DE # 271). The defendant's Motion to Strike (DE # 272) the government's supplemental memorandum was denied; however, the Court ruled that the arguments contained in that motion would be considered in connection with the competency determination (DE #

279).

Based upon the testimony and exhibits introduced into evidence at the evidentiary hearing, and for the reasons set forth below, the undersigned Magistrate Judge finds and concludes that defendant David Rothman is competent to stand trial. As set forth in more detail below, this determination is based upon a review of the totality of the testimony regarding observations of Dr. Rothman and his communications with the various experts, and a determination that the results of the forensic evaluation conducted by Dr. Suarez, the court-appointed expert, are more credible than the results of Dr. Eisenstein, the defense expert; and Dr. Suarez' detailed and comprehensive focus on the issue of competency to stand trial is such that his opinion even outweighs the opinions of the treating physicians concerning the effect of any cognitive impairment on Dr. Rothman's competency to stand trial.

I.  BACKGROUND

The following description of the charges, as well as the evidence that the government has disclosed in discovery, is set forth in some detail since the complexity of the case, as well as the nature of the evidence, are factors that must be considered in determining whether Dr. Rothman is competent to stand trial.

The Indictment in this case charges defendants Juan Marrero, Orlando Pascual, Jr., Belkis Marrero, David Rothman, Luz Borrego, Eda Milanes, Keith Russell, and Jorge Pacheco with conspiracy to commit health care fraud between August 2004 and November 2006, in violation of 18 U.S.C. § 1349 (Count 1); and with executing and attempting to execute a scheme to defraud the Medicare program, in violation of 18

2

U.S.C. §§ 1347 and 2 (Counts 2 - 7).[1]

The Indictment alleges that these defendants were involved in various capacities with two medical clinics, M&P Group of South Florida, Inc. and Medcore Group, LLC, which purported to provide injection and infusion treatments to patients diagnosed with HIV/AIDS or cancer; and, which billed Medicare for those services. Not all defendants were involved with both clinics. According to the Indictment, Defendants Juan Marerro, Orlando Pascual, Jr. and Belkis Marrero owned and controlled both of these clinics, and defendant Rothman was a physician who was employed by both clinics. However, defendant Borrego was a medical assistant employed only by Medcore. Defendants Milanes and Pacheco were medical assistants employed only by M&P; and, defendant Russell was a physician employed only by M&P.

According to the Indictment, the defendants conspired to defraud the Medicare program by submitting false and fraudulent claims regarding those purported treatments. Specifically, the Indictment alleges that kickbacks and bribes were paid to Medicare beneficiaries at both clinics; that the injection and infusion treatments were not medically necessary; and, that medical records were fabricated to show that patients had received specific doses of injection or infusion, when the patients had not actually received the treatments or medications reflected on those documents.

With respect to Dr. Rothman's role in the conspiracy, the Indictment alleges, "David Rothman would conduct a cursory examination of the Medicare beneficiaries and would sign the required documentation, including medical and billing records, in order

---

[1] The Indictment also charges Defendants Juan Marrero, Orlando Pascual, Jr., and Belkis Marrero with various money laundering offenses related to the above health care fraud offenses. Defendants Juan Marrero, Orlando Pascual, Belkis Marrero and Luz Borrego have entered guilty pleas and are awaiting sentencing.

to make it appear that the injection and infusion treatments billed by Medcore and M&P were medically necessary and provided, when, in fact, they were not."  (DE # 1, at 6 ¶ 9)

The Indictment also includes six substantive counts which charge the commission of acts in execution of the scheme to defraud Medicare.  These counts list six specific claims that were submitted to Medicare for payment in connection with medically unnecessary, and non-rendered injection or infusion treatments with respect to two patients–G.B. and R.C.  Defendant Rothman is charged in four of the substantive counts which allege that the following claims were submitted by Medcore as acts committed in execution of the scheme to defraud:

| | | |
|---|---|---|
| Count 2: | treating patient G.B. with an intramuscular injection of gamma globulin on November 20, 2004; | |
| Count 3: | treating patient G.B. with an injection of Filgrastim on March 19, 2005; | |
| Count 5: | treating patient R.C. with rituximab on July 9, 2005 | |
| Count 6: | treating patient R.C. with an intravenous injection of Immune Globulin on September 15, 2005. | |

During the course of various hearings, as well as during the course of the guilty plea proceedings, the Government has clarified and elaborated upon its theory of the case and the evidence is seeks to introduce at trial.[2]  Specifically, the Government intends to prove that these two clinics were established for the express purpose of defrauding Medicare by billing for medically unnecessary treatments and that <u>none</u> of

_____

[2]  In addition to the hearings related to this competency determination, the undersigned Magistrate Judge has held hearings on various motions filed by various defendants on January 7, 2009 (DE # 184), January 28, 2009 (DE # 240), January 30, 2009 (DE # 248), and February 6, 2009 (DE # 262).  At each of these hearings the government has elaborated on its theory of the case and the evidence it seeks to use at trial.  The factual bases to support the guilty pleas entered by defendants Pascual, Borrego, Juan Marrero, and Belkis Marrero are contained, respectively, in DE ## 178, 228, 229, and 230.

the treatments for which Medicare was billed by these clinics were medically necessary. Thus, the Government contends that all of the certifications of medical necessity, which are part of every claim submitted, are false.  The Government also contends that the evidence will show that the claims were also false because none of the claimed services were actually rendered with respect to the patients.  Specifically, the Government stated at the hearing that its evidence will show that the clinics did not purchase enough of the medications to provide the claimed treatments to all of the patients for whom they billed, and there was a systematic reduction of the amount of medication actually provided to each patient.  In addition, some patients signed certifications of treatment for multiple visits in a week when, in fact, they only were present at the clinic once a week.  Finally, the government contends that all patients received kickbacks.  The government has provided the defendants with the names of all relevant patients, as well as superbills reflecting the treatments for which Medicare was billed.  There are no patient files, however.

Dr. Rothman apparently worked primarily at Medcore, and then went to work at M&P for a brief period of time.[3]  The factual basis supporting the guilty plea entered by Orlando Pascual states that Pascual, along with the Marrero co-defendants, owned and operated Medcore and M&P, and that co-defendant Juan "Tony" Marrero had hired Dr.

_____

[3]  The government's proffer in response to the motions to exclude 404(b) evidence states that Belkis Marrero would testify that when she was starting M&P she told her friend that she needed to find additional help because she had lost Dr. Rothman. The friend then sent Dr. Russell, as well as medical assistants Milanes and Pacheco to work at M&P beginning in March 2006 (See DE # 244).  A government exhibit listing claims for treatment billed by M&P, which was admitted at the hearing on the motion to exclude its expert physician witness, reflects that Dr. Rothman is listed as the prescribing physician for claims submitted by M&P for treatments in November and December 2005 (Govt. Ex. 2).

Rothman as the Medcore's medical director.  "Rothman's primary job at Medcore was to conduct cursory examinations of the patients and sign medical records authorizing the provision of injection and infusion treatments, even though such items were not medically necessary and for the most part were never even provided." (DE #178 at 1-2). The factual proffer also states that Dr. Rothman was paid "$3,000.00 per week to authorize the bogus treatments."  (DE # 178).  The indictment alleges that Defendant Luz Borrego was a phlebotomist who worked at Medcore and provided the unnecessary injection and infusion treatments, and fabricated medical and billing records which falsely stated that Medcore patients had received specific dosages of medications, when, in fact they had not (DE # 1 at 6-7, ¶¶ 10-11).[4]

Dr. Russell was the physician who purportedly examined the patients at M&P, and prescribed the treatments.  Defendants Pacheco and Milanes, who are husband and wife, worked at M&P as medical assistants and were responsible for helping to provide the purported treatments to patients.

Since there are no patient files, the government intends to rely on the testimony of the co-defendants who have pled guilty, the testimony of certain patients, and the expert opinion of Dr. Wohlfeiler,[5] a physician specializing in the treatment of HIV/AIDS

---

[4]  The factual basis filed in support of the plea of guilty entered by defendant Borrego states that "Medcore was operated for the purpose of defrauding the Medicare program;" that "To obtain 'patients' for Medcore, Borrego and other co-conspirators entered into kickback arrangements with approximately 20 Medicare beneficiaries;" and that "Borrego provided the unnecessary injection and infusion treatments to the Medicare beneficiaries at Medcore.  Borrego was also responsible for making the medical records, including superbills, appear to support the treatments.  Defendant Borrego and her co-conspirators knew that the Medicare beneficiaries purportedly treated at Medcore did not need the injection and infusion treatments." (DE # 228).

[5]  The details surrounding this expert opinion are set forth in the separate Order which denied motions to exclude his testimony (DE # 274).

patients, to establish that the treatments were not medically necessary.

The government has proffered that there were a total of 20 patients for whom M&P submitted claims; and, the total amount of these claims was $1,259,291.00.  There were approximately 30 to 40 patients for whom Medcore submitted claims, and the amount of these claims totaled $4,040,895.00.  The government proffered that M&P was established after Medcore was closed, and that patients transferred to M&P from Medcore.  Billing records provided by the government in discovery identify every patient, diagnosis and treatment made with respect to the fraudulent claims that are the subject of this case.

## II.  FRAMEWORK FOR ANALYSIS

At the outset, it is important to note that the issue in this case regarding the competency of defendant Rothman is whether he has a mental disease or defect that renders him unable to assist properly in his defense.  As stated at the evidentiary hearing, there is no dispute that he understands the nature and consequences of these proceedings.

The determination of competency to stand trial is governed by Title 18, United States Code, Section 4241.  Subsection (a) of that statute provides that the Court shall order a hearing regarding a defendant's competency to stand trial "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  The Court has the authority to order that a psychiatric or psychological examination be conducted, and that a report be filed with the court, prior to the date of such hearing.  18 U.S.C. § 4241(b).  In the case at bar, the undersigned Magistrate Judge

determined that such reasonable cause existed, and appointed Enrique Suarez, Ph.D., to conduct the examination.

The statute further provides that this examination, report, and hearing are to be conducted and prepared in accordance with the provisions of 18 U.S.C. § 4247. 18 U.S.C. §§ 4241(b), 4241(c).

Psychiatric and psychological examinations are governed by 18 U.S.C. § 4247(b), which provides in pertinent part:

> A psychiatric or psychological examination ordered pursuant to this chapter shall be conducted by a licensed or certified psychiatrist or psychologist, or, if the court finds it appropriate, by more than one such examiner. Each examiner shall be designated by the court. . . .

Pursuant to 18 U.S.C. § 4247(c), report of examination shall include:

> (1) the person's history and present symptoms;
> (2) a description of the psychiatric, psychological, and medical tests that were employed and their results;
> (3) the examiner's findings; and
> (4) the examiner's opinions as to diagnosis, prognosis, and–
>      (A) . . . whether the person is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

Once there is an evaluation, the proceedings are governed by 18 U.S.C. § 4241(d), which provides that if, after a hearing, "the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.... for such a reasonable period of time, not to exceed four months, as is necessary to

determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward."   Thus, the initial burden of persuasion is on the defendant to establish by a preponderance of the evidence that he is not competent.[6]

Section 4241 codified the competency principles set forth in *Dusky v. United States*, 362 U.S. 402 (1960), wherein the Supreme Court held that the standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him."   *United States v. Wiggin*, 429 F.3d 31, 36 n. 8 (1st Cir. 2005).   In determining whether the defendant has sufficient present ability to consult with his lawyer, courts have considered the following factors: 1) the state of the defendant's memory, since he should be able to relate pertinent facts, names and events to his attorneys (although the defendant need not

---

[6]   The defendant has agreed that he has the burden of establishing, by a preponderance of the evidence, that he is not presently competent (DE # 270).   *United States v. Izquierdo*, 448 F.3d 1269, 1276-77 (11th Cir. 2006).   The undersigned notes that 18 U.S.C. § 4241(d) was enacted in 1984; the predecessor statute governing competency determinations, 18 U.S.C. § 4244 (1949) did not mention a burden of proof, and had been construed by the former Fifth Circuit Court of Appeals to place the burden of proving competence to stand trial on the government.   *United States v. Makris*, 535 F.2d 899, 906 (5th Cir. 1976).   As recognized by the government, and agreed-to by defense counsel, based upon the new statute which specifically addresses the burden of establishing incompetence, and the Eleventh Circuit's holding in *Izquierdo*, the holding in *Makris*, which construed a different statute, no longer applies.   The undersigned recognizes, however, that if it were the government seeking to establish the incompetence of a defendant who claimed to be competent, then the government would have the burden of proof.   The present statute does not speak in terms of whether the government or defendant has the burden of proof; it only mandates that whoever is seeking to prove incompetence has the burden.

remember every fact that trial might encompass);[7]  2) the extent to which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources; 3) an adequate ability to review and evaluate documents and other written evidence bearing on the case; 4) an appreciation of the Government's evidence against him; 5) the ability to consider the wisdom of taking a course other than standing trial on the merits; 6) the ability to decide objectively whether to exercise his constitutional right to take the stand, and if he does take the stand, the ability to testify in an intelligent, coherent and relevant manner; 7) the ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses; and 8) the ability to discuss the testimony with his attorneys and to postulate questions to the witnesses through counsel.  *United States v. Passman*, 455 F. Supp. 794 (D.D.C. 1978) (citations omitted).

Further, as to an amnesiac defendant, courts should evaluate the nature and extent of the defendant's impairment and determine its impact by considering  the following factors: 1) the defendant's ability to take the stand and testify and otherwise participate in his defense; 2) whether the amnesia is temporary or permanent; 3) whether the crime and the defendant's whereabouts can be properly reconstructed without the defendant's testimony, including any facts giving rise to a defense; 4) whether access to government files would aid in preparing for trial; and, 5) the strength of the government's case against the defendant. *United States v. Rinchack*, 820 F.2d 1557, 1569 (11th Cir. 1987) (*citing United States v. Swanson*, 572 F.2d 523, 526 (5th Cir. 1978)).

---

[7] Indeed, even defendants with amnesia have been found competent to stand trial. *See e.g., United States v. Rinchack*, 820 F.2d 1557 (11th Cir. 1987); *United States v. Swanson*, 572 F. 2d 523  (5th Cir. 1978).

This need to evaluate the nature and extent of the defendant's impairment and determine its impact is applicable in the context of defendants who claim other mental defects as well.   As stated in *United States v. Liberatore*, 856 F. Supp. 358, 360 (N.D. Ohio 1994),

> In itself, the mere presence of a mental disease or defect is not sufficient to render a defendant incompetent....the disease or defect must be of sufficient magnitude to compromise defendant's mental capacities to the point that he functions below the level established in *Dusky*. This inquiry is a difficult one because it does not follow a bright line rule that any diagnosis of mental disease or defect is enough to demonstrate legal incompetency. The diagnosis of existence must be coupled with evidence of degree, to wit significant impairment.

In *United States v. Hogan*, 986 F.2d 1364, 1373 (11th Cir. 1993), for example, the Eleventh Circuit Court of Appeals affirmed the district court's finding that minor defects in a defendant's cognitive abilities related to "Alzheimer changes" did not render him incapable of providing rational assistance to his attorney.   In doing so, the Court noted that even perfectly competent defendants often do not fully comprehend the intricacies of some of the theories offered by their lawyers, and stated, "all that is required is that [the defendant] had a rational as well as factual understanding of the proceedings against him and had sufficient present ability to consult with his attorney with a reasonable degree of rational understanding." *Id.  Accord Median v. Singletary*, 59 F. 3d 1095, 1107 (11th Cir. 1995)(stating neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial); *United States v. Housh*, 89 F. Supp. 2d 1227 (D. Kan 2000) (stating head injury alone not enough to find incompetency and engaging in evaluation of severity of defendant's deficits to find defendant competent).  *United States v. Davis*, 166 F.3d 1222 (10th Cir. 1999)(same); *United States v. Robinson*, 253 F. 3d 1065, 1068 (8th Cir. 2001)(holding limited intellectual

11

functioning not sufficient to find incompetence where defendant able to consult with lawyer with reasonable degree of rational understanding).

Finally, the undersigned notes that although medical professionals properly determine whether a defendant has a disorder or is malingering, competency is a legal concept.  "In the final analysis, the determination of competency is a legal conclusion; even if the experts' medical conclusions of impaired ability are credited, the judge must still independently decide if the particular defendant was legally capable of reasonable consultation with his attorney and able to rationally and factually comprehend the proceedings." *United States v. Makris*, 535 F.2d 899 (5th Cir. 1976).

III.    THE CONTENTIONS OF THE PARTIES

The defense contends that Defendant Rothman is suffering from Dementia of the Alzheimer's Type and Major Depression, and that this disease has rendered him unable to assist properly in his defense.[8]  Specifically, the defense claims that, based upon Defendant Rothman's impaired executive and cognitive functioning resulting from the above conditions, Defendant Rothman does not have the present ability to consult with counsel with a reasonable degree of rational understanding; that he does not have the capacity to testify relevantly on his own behalf in a cogent fashion; that he does not have the ability to relate what is occurring during the trial from one day to the next, or to what has happened in the past; that he is unable to read facial expressions or participate meaningfully in jury selection; that he does not have the capacity to focus on and listen to testimony regarding the key issue in this case of medical necessity; that he does not

---

[8]  As previously stated, the defense presently does not assert that defendant Rothman is unable to understand the nature and consequences of these proceedings, although this assertion was made in the Preliminary Motion to Determine Competency (DE # 166 at 4, ¶ 10).

have the ability to recall the patients he treated at Medcore or M&P, and that photographs and patient information provided by the government have not refreshed his recollection; that Dr. Rothman's memory of events that are the subject of this Indictment is impaired to the extent that he unable to disclose to counsel the facts pertinent to the charges, and he will have extreme difficulty adequately relating to defense counsel whether the witness is testifying accurately; that Dr. Rothman will be unable to assist counsel in compiling the facts of the case and inferences from those facts in terms of helping to structure a closing argument; and that he is unable to make rational, cogent or instant trial decisions.

In response, the government contends that defendant Rothman is not suffering from dementia, and that although his intellect may have declined from its peak, defendant Rothman presently has a sufficient ability to consult with his counsel and assist in his defense.  The government relies upon the opinion of Dr. Suarez to support its claim that the defendant does not have dementia; but also contends that the Court does not need to resolve that dispute because the evidence establishes that Defendant Rothman has the capacity to reasonably and properly assist his counsel in his defense since he is able to provide relevant factual information to his counsel, articulate a defense, adequately participate in the trial, and testify relevantly.  The government claims that Defendant Rothman's competence is established not only by the expert opinion of Dr. Suarez, but by looking at the information that Defendant Rothman was able to communicate during the course of the various examinations.

IV.    THE PSYCHOLOGICAL AND NEUROLOGICAL EVALUATIONS

At the evidentiary hearing, the defendant presented the testimony of neuropsychologist Barry Crown, Ph.D., neuropsychologist Hyman Eisenstein, Ph.D.,

neurologist Kenneth Fischer, M.D., neurologist Jeff Gelblum, M.D., and psychologist Michael Rappaport, Ph.D.  In addition, the defense introduced as exhibits the report of M.E. Heard, M.D. regarding a PET scan of defendant Rothman's brain performed by Elite Imaging (DX 1); and, the Curriculum Vitae and expert reports prepared by the above witnesses (DX 2 through DX 11).  The court-appointed expert, neuropsychologist Enrique Suarez, Ph.D., was examined by both counsel, and his Curriculum Vitae and expert report were admitted into evidence (GX 1 and GX 2).  Dr. Eisenstein and Dr. Suarez both performed forensic evaluations and rendered specific opinions in their reports regarding defendant Rothman's competence to stand trial.  The remaining experts were treating physicians and psychologists.  There was no dispute that these witnesses were qualified to testify as expert witnesses in their respective fields, and the undersigned Magistrate Judge finds that they are all qualified to do so.

The following is a synopsis of the testimony and reports presented at the evidentiary hearing.

1.  Michael Rappaport, Ph.D.

Dr. Rappaport is a clinical and forensic psychologist who has been in practice in Miami, Florida since 1983.  His experience and credentials are listed in his Curriculum Vitae (DX 10), which is incorporated herein by reference.  At the present time, Dr. Rappaport's practice is primarily in the area of therapy; previously his practice was primarily forensic in nature.  Dr. Rappaport has performed thousands of competency evaluations in the past.  In the case at bar, Dr. Rappaport testified as a treating psychologist for Defendant Rothman and has not performed a forensic evaluation with respect to competency to stand trial.  Dr. Rappaport testified that as a treating psychologist he is required to act only in the best interests of his patient, and it would be

14

unethical for him to offer an opinion regarding Rothman's competency to stand trial.  Dr. Rappaport's testimony was offered only for the purpose of establishing when he began treating Defendant Rothman, and that he referred Defendant Rothman to Dr. Crown for testing, as well as his familiarity with Dr. Crown's report.[9]

Dr. Rappaport first saw Defendant Rothman in June of 2006 as the result of a referral from defense counsel.  Defense counsel asked Dr. Rappaport if he would be able to see Rothman in a "supportive role" because Rothman was about to be indicted and counsel wanted Dr. Rappaport to help Rothman deal with this situation.  Initially, Dr. Rappaport saw Rothman once a week.  Approximately three or four months ago, he reduced the sessions to every other week because it was apparent that there was little he could do to help Rothman other than offer supportive psychotherapy.

Dr. Rappaport issued a one-paragraph letter report to defense counsel on October 27, 2008.  This report contains the following opinion:

> I have been seeing your client David Rothman since June 1, 2006.  After spending a couple of sessions with Dr. Rothman it became evident that he likely has some organic problems.  I encouraged him to go for a neurological examination which he did and as you know he has serious neurological impairment.  It is my belief that the stress of the current situation will aggravate his underlying problems [and] will cause him to decompensate and at an even faster rate.  Dr. Rothman is an extremely bright man who has learned to compensate for his impaired judgment.  This continued stress of the current problems could cause him to decompensate into a state where he will not be able to assist his attorney in his defense and thus make him incompetent.

---

[9]  The government interposed a relevancy objection to Dr. Rappaport's testimony when it was made clear that he would not be offering an expert opinion regarding competency.  Based upon the above proffer, the undersigned overruled the general objection, and instructed the government to interpose objections on a question by question basis, if appropriate.

(DX 11).

At the evidentiary hearing, Dr. Rothman elaborated upon this opinion and his treatment of Rothman.  After spending approximately ten hours of treatment with Rothman, Dr. Rappaport decided to refer Rothman to Dr. Barry Crown for further evaluation.  This determination was based upon Dr. Rappaport's belief that the cognitive functioning demonstrated by Rothman was not even near the level of somebody with Rothman's past accomplishments, *i.e.*, a person who had come from another country at age 15 and learned English, obtained an engineering degree, and practiced medicine as a board-certified obstetrician/gynecologist.  Specifically, Dr. Rappaport stated that as conversations with Rothman became more complex, Rothman had difficulty.  When Dr. Rappaport referred to matters that they had discussed in a prior session, Dr. Rappaport would have to refresh Rothman's memory.  Dr. Rappaport also noticed that Rothman appeared to have a memory impairment regarding matters such as what he had eaten for breakfast the preceding day.  He also noted that Rothman reported that he had minimal social interactions with persons outside his family, that he didn't watch the news, and that he didn't read the newspaper.  Dr. Rappaport believed that Rothman was using all his energy to cover up his deficits, and tried to hide the fact that he had lost his edge.

Dr. Rappaport referred Rothman to Dr. Barry Crown since Dr. Crown is a neuropsychologist, and Dr. Rappaport is only a psychologist.  Neuropsychologists are trained to perform tests to determine whether there are cognitive problems that have an organic basis in the brain.  Dr. Crown then referred Rothman to a neurologist, Dr. Jeff Gelblum, for medical treatment.  Dr. Rappaport also saw the PET scan that was performed on Rothman.  Dr. Rappaport stated that these results validated his impression that Rothman had an organic problem.

Dr. Rappaport discussed this with Rothman, and testified that Rothman understood the seriousness of the diagnosis of probable Alzheimer's disease, and realized that at some point he would not be able to take care of himself, not be able to drive, and not remember his children's names.   Dr. Rappaport explained that Rothman was able to understand very well what this diagnosis meant because he is a trained physician.  Dr. Rappaport stated that Rothman had the capacity to understand this despite this diagnosis because he still retained his long term memory; and, Alzheimer's first affects short term memory function concerning matters such as what a person had for breakfast the preceding day.  In addition, Dr. Rappaport stated that there is a redundancy factor, so the more times a person has done something in the past, the more likely the person is to remember it.  He opined that Rothman would have a very difficult time remembering all of the patients he treated and what he did for them, but would recall his wife's name because he probably has used it ten or fifteen times a day.  With respect to the information contained in the PET scan report (DX 1), Dr. Rappaport stated that Rothman knew the meaning of the medical terms in the report such as "parietotemporal," "mesiotemporal," "anterior singulate gyri," and "hypometabolism" because these are all standard medical terms.  Rothman's difficulties were with short term memory functions.

When asked his opinion regarding how well Rothman would be able to remember events from the years 2004 and 2005, Dr. Rappaport opined that Rothman would have a great deal of difficulty remembering single events from that time period, although he would be able to recall repetitive events, such as the name of a receptionist if he greeted her every day.  Dr. Rappaport stated that when he referred to short-term memory, he was referring to events as far back as three or four years, and that he believed Rothman would have great difficulty recalling the details and events concerning the specific patient on a

specific day during that time.  Even if Rothman saw a patient three times a week for a period of months during 2004-2005, Dr. Rappaport believed that Rothman would have great difficulty recalling that patient unless there was some particular striking feature or event.  Dr. Rappaport further testified that if would be an extremely difficult cognitive task for Rothman to recall the routine prescribing of medications for a particular patient three or four years ago.

Government counsel asked Dr. Rappaport several questions regarding discussions of Rothman's present legal situation.  Dr. Rappaport testified that Rothman would learn things about his case from his attorney, and would be upset about it when he saw Dr. Rappaport.  For example, Rothman told Dr. Rappaport when he learned that patients were being injected with saline solution rather than medication that he was extremely troubled by that and could not believe that anybody would do something like that.  Rothman was able to explain that he was upset that he learned patients that were under his care weren't receiving the treatment he ordered.  In response to the question regarding whether Rothman understood what treatment he had ordered, Dr. Rappaport responded, "Well, we didn't do a patient by patient.  I mean he was ... certified as a HIV doctor.  There is a protocol for treating HIV patients.  The government will pay for those ... medications, those are things that he was doing over and over again."  When Dr. Rappaport asked Rothman if he didn't realize that people were opening clinics that had no affiliations and no credentialing committees, Rothman responded that he didn't know that was happening, and that he did not watch the news about those events.  Rothman told Dr. Rappaport that he had been involved in working at multiple HIV clinics that he believed were legitimate medical practices.

Finally, Dr. Rappaport opined that the stress of the trial would cause Rothman's

depression and cognitive functioning to become worse.  Dr. Rappaport concluded that
Rothman met the diagnostic criteria for dementia, or Alzheimer's disease, which includes
an impairment in cognitive functioning.  Dr. Rappaport believed that Rothman's executive
functioning is impaired.  Dr. Rappaport testified that executive functioning is the ability to
exercise judgment in social and business situations, and Rothman's impairment in this
area is demonstrated by the poor judgment he exercised in financial situations, and by
going from HIV clinic to clinic, i.e. working at one HIV clinic and then leaving to work at
another one and repeating this process.  In Dr. Rappaport's opinion, Rothman met the
diagnostic criteria for dementia of the Alzheimer's type, which is contained in the DSM IV;
and, this condition is aggravated by the stress of the present situation and will worsen
over time.

Dr. Rappaport disagreed with the conclusion of Dr. Suarez, discussed *infra.*, that
Rothman was malingering.  At the outset, he noted that the malingering rate among
people accused of crimes is approximately between 12% and 18%.  He has not found any
evidence of malingering on the part of Rothman, and on the contrary, he testified that
Rothman does everything he can to pretend that everything is okay.  Dr. Rappaport
testified that a diagnosis of malingering is very subjective, and that psychologists who
believe that large portions of the population of criminal defendants are malingering are
more likely to find malingering.   Dr. Rappaport testified that in his opinion the only way
to tell whether someone is malingering is to observe them over a very extended period of
time.  Dr. Rappaport was especially troubled by a diagnosis of malingering in a case like
this were there is a PET scan that shows brain damage.

2. <u>Barry M. Crown, Ph.D.</u>

Dr. Crown is a clinical and forensic neuropsychologist who has been in practice

since 1969.  His experience and credentials are listed in his Curriculum Vitae (DX 2), which is incorporated herein by reference.  He is a Diplomate of the American Board of Professional Neuropsychology, with added qualifications in the areas, *inter alia*, of geriatric neuropsychology and forensic neuropsychology.  His practice is limited to evaluations, and he has conducted neuropsychological evaluations for forensic purposes since 1971.

In March 2007, Defendant Rothman was referred to Dr. Crown by his treating psychologist, Dr. Rappaport, and Dr. Crown conducted his examination on March 12, 2007.  He did not conduct a forensic examination; the purpose was to evaluate Rothman's brain function and behavior because Dr. Rappaport found Rothman to be difficult and confused about simple information.  Dr. Crown prepared a report regarding his findings from this examination (DX 3).  On December 29, 2008, Dr. Crown prepared an Addendum to this report based upon his review of additional medical records; specifically the records of neurologist Jeff Gelblum, M.D., and a PET scan (DX 3).  His testimony at the evidentiary hearing was based upon the above information, and on additional information he received from neuropsychologist Hyman Eisenstein, Ph.D., who performed a forensic neuropsychological examination of Rothman on January 8, 15, 21, and February 4, 2009.

Dr. Crown's March 2007 report reflects that he used numerous tests in conducting his evaluation.[10]  Dr. Crown concluded that Rothman had a neuropsychological

---

[10]  Dr. Crown's report reflects the following examination procedures: Reitan-Indiana Aphasia Screening Test; Shipley Institute of Living Scale; Wechsler Test of Adult Reading (WTAR); Reynolds Intellectual Assessment Scale (RIAS); Comprehensive Trial-Making Test (CTMT); Test of Memory and Malingering (TOMM); Rey 15 Figure Test; Repeateable Battery for the Assessment of Neuropsychological Status (RBANS-Form A); GAMA Test; Wide Range Achievement Test-3 (Arithmetic); Finger Oscillation Test; Hand Dynamometer; signature sample; clinical interview and behavioral observations in structured and unstructured situations.

impairment with difficulties consistent with a primary non-dominant hemisphere disturbance, which for Dr. Rothman is the right side of the brain.  This is the part of the brain that is the non-verbal hemisphere and is involved with temporal sequencing, the ability to read people's facial expressions, and the ability to respond appropriately.  An impairment of this part of the brain significantly affects one's ability to make rational choices.  Dr. Crown also concluded that Rothman had functional problems in the area of language-based critical thinking, attention and concentration, and that his reasoning and judgment were impaired.  Stated more simply, Dr. Crown testified that Rothman had problems with "if-then" statements; that is, determining the natural sequence of events where if "this" occurs, then "that" will follow.  Dr. Crown's conclusion in March 2007 was that Rothman had a mild cognitive impairment, which is the first stage in the diagnosis of Alzheimer's disease; and, that there was a possible dementing degenerative process, meaning that there was a progressive disorder of the brain that was leading to dementia.

Dr. Crown explained the results of the variety of tests that he administered.  On both tests designed to measure effort and motivation, Rothman scored at the highest level indicating that he was motivated to do as well as he could on the tests.  The Wechsler intelligence test administered by Dr. Crown reflected a verbal IQ of 112 and a performance IQ of 109, with a full scale IQ of 112, which was within the average range.  The Reynolds intelligence test produced a Verbal Index of 104 and a Non-Verbal (performance) Index of 77, with a full scale index of 92, which is in the 30th percentile.

With respect to neurological findings, the report lists five factors that were evaluated as follows: Immediate Memory: 73%; Visuospatial: 86%; Language 39%; Attention: 21%; and Delayed Memory: 86%.  The composite score was 66%.  Dr. Crown's report noted that there was a great deal of variability in Rothman's profile, indicating

comparative decline in language processing and attentional mechanisms which may serve as an impediment to concentration and information storage.  At the hearing, Dr. Crown explained that he was referring to the fact that the brain is a whole unit with multiple factors playing a role in decision making or executive function, and that some of the parts may have gone awry and affected other aspects of decision making.

The report also reflected that Rothman was within the average range on the Comprehensive Trial-Making Test, which involves visual scanning, initiation and maintenance of set, and conceptual flexibility.  The GAMA Test, which is a non-verbal measure, produced a profile in the Average to Very Superior range, with a GAMA IQ of 121 (92nd percentile).

The Category Test is a measure of the ability to learn new information and apply that information in problem-solving situations.  Rothman scored in the 8th percentile, which is severely impaired.

Dr. Crown testified on direct examination that in his opinion, based on his tests and the subsequent reports he has seen, Rothman will not be able to assist properly in his defense at trial.[11]  Dr. Crown opined, "He really wasn't able to when I saw him in 2007.

---

[11]  In his Addendum Report prepared on December 29, 2008, Dr. Crown reported that he had referred Rothman to neurologist Jeff Gelblum, M.D., who initially found a hypertensive encephalopathy with episodic unsteadiness and blurry vision, and who referred Rothman for hypertension management.  Further medical study led to the diagnosis of memory disorder secondary to diffuse microvascular cerebral ischemia, for which Dr. Gelblum prescribed Namenda, a medication for dementia.  He also noted the PET scan results with a diagnosis of probable Alzheimer's disease.  Dr. Crown described the forensic implications as follows: "He has had and continues to have significant cognitive impairments impacting reasoning, judgment, and memory.  His cognitive abilities are diminished. . . . Dr. Rothman can be expected to deteriorate with continuing diminished cognitive capacities.  Based upon these findings, it is likely that Dr. Rothman would be unable to adequately consult and assist his attorney in preparation of a defense or at trial.  He would have difficulties sustaining attention and concentration over long durations and his ability to appropriately organize and sequence information is

He had significant declines already in temporal sequencing, and in tone reading and in face reading and then one year later, the PET scan has confirmatory information, that physiologically these problems exist in the same area.  So it is my opinion that Doctor Rothman has a progressive dementing disorder that particularly impacts these areas of functioning.  So he would have great difficulty."  Dr. Crown did not believe that Rothman could assist his attorney by participating rationally in the decision making process at trial.  In addition, Dr. Crown opined that  Rothman's attention and concentration were impaired to the extent that if he was speaking to his counsel and somebody dropped a book, or walked past him, it would constitute a distraction that would cause him to lose focus.

Dr. Crown also opined that Rothman does not have the capacity to rationally disclose to counsel facts pertinent to the trial regarding events that occurred three to four years ago.  The difficulties noted with temporal sequencing show that Rothman can't place things in sequence and order of time and space, and that he would become disoriented regarding the decision making that occurred during a particular time.   Dr. Crown did not assess Rothman's ability to remember events that occurred during that time frame, however.

Dr. Crown also opined that Rothman does not have the capacity to testify relevantly.  Specifically, Dr. Crown stated that he does not believe that Rothman has the capacity to organize and efficiently sequence information.  Rothman's ability to testify on direct examination would be dependent on his reasoning and judgment, memory, concentration, retention, and attention.  Dr. Crown opined that it is unlikely he would be

_____

in question."  (DX 3).

able to adequately and efficiently recall information, and that this would be the case even if he were prepared the night before he testified.  Dr. Crown testified that Dr. Rothman could discuss something on one day, and then "it would not be out of the question for him to have forgotten" it the next day.  Dr. Crown stated that cross-examination would be even more difficult.  Dr. Crown based this opinion on the fact that this is analogous to learning new information and being able to respond, and that on the Category Test which measures this ability and which he administered in March 2007, Rothman was severely impaired.

Dr. Crown observed Rothman in the courtroom during his testimony, and in his opinion, Rothman was not attentive, and would not be able to repeat the testimony he heard.

Dr. Crown testified on cross-examination that the results of his tests in March 2007 did not necessarily mean that Rothman was incompetent, and that he had not performed a competency evaluation at that time.  When asked specifically by the Court whether he was able to render an opinion regarding whether Rothman was competent to stand trial as of March 2007, Dr. Crown specifically stated, "I don't really know."  His opinion that Rothman is not presently competent is based upon the fact that his test results in March 2007 reflected a neurodegenerative disorder and a cognitive decline, and that those findings were confirmed by Dr. Gelblum and the PET scan, that Alzheimer's disease is a progressive disease, and that Dr. Eisenstein's forensic evaluation determined that Rothman had declined.  Dr. Crown testified that Alzheimer's progresses at different rates with different individuals, but the typical span of time from onset to death is ten years.

3.  <u>Jeffrey Gelblum, M.D.</u>

Dr. Gelblum is a neurologist who is a Diplomate of the American Board of

Psychiatry and Neurology.  His credentials are set forth in his Curriculum Vitae, which is incorporated herein by reference (DX 8).  In brief, he graduated from medical school in 1985, and has been in private practice since 1991, following his residency in neurology at the University of Miami School of Medicine from 1986 through 1989, and his post-residency fellowship in Neuromuscular diseases.  Approximately 20 to 25% of his adult neurology practice is dementia based.  At the present time, he is treating several hundred patients for dementia.

Dr. Gelblum first saw Rothman on March 29, 2007, based upon a referral from Dr. Barry Crown.  Based upon this examination, Dr. Gelblum prepared a letter report of his findings to Dr. Crown (DX 9).  He noted that Rothman had complaints of occasional memory disturbance, blurry vision, and unsteadiness.  This led to concern regarding a diffuse type of brain disorder since there are different areas of the brain that control the modalities of memory, vision and balance.  He reviewed the results of the testing performed by Dr. Crown, which indicated that there was a non-dominant hemisphere dysfunction.  This is the non-language side of the brain, which for Rothman is the right side of the brain.

Dr. Gelblum explained that the dominant hemisphere of the brain involves fluency, repetition and comprehension.  Therefore, patients whose dominant hemisphere is not diminished will be fluent, be able to comprehend sentences and be able to repeat things. The non-dominant hemisphere deals with more abstract capabilities, such as the ability to understand complex situations, the ability to read facial expressions, to sense danger and process information.  These processes are typically referred to as executive function. The non-dominant hemisphere is the higher intellectual capacity region of the brain.

In treating Rothman, Dr. Gelblum relied upon the psychometric evaluation

performed by Dr. Crown.  Dr. Gelblum testified that it was his job to use that data and determine if he could uncover any other contributory causes.  Dr. Gelblum also conducted a physical examination of Rothman, and ordered a brain MRI, to rule out a vascular type of dementia that could be caused by high blood pressure and high cholesterol.   The report of this examination also provides the following information with respect to higher cortical functions: "He is awake, alert and oriented times 3.  Affect is pleasant with intact insight and judgment.  There is no left/right confusion nor dyspraxia. Patient has some slight dyscalculic abnormality on subtraction." (DX 9).  The determination of insight and judgment was made by using a simple questions rather than formalized testing; for example, Dr. Gelblum will ask the patient what he would do if he was walking down the street and saw a stamped addressed envelope, and the appropriate response would be to put it in the mailbox.  When Dr. Gelblum described Rothman's affect as pleasant, he meant that he was not brooding, rageful or angry.  The ability to know left from right is a dominant parietal lobe function.  Although Dr. Gelblum initially testified that Rothman's insight and judgment were the same the last time he saw him as at the initial meeting, he later corrected this and stated that both had deteriorated.

Dr. Gelblum testified that the "dyscalculic abnormality" referred to the fact that Rothman was unable to accurately perform a series of subtractions by 7.  That is, Dr. Gelblum asked Rothman to start at 100 and subtract a series of 7's, which should result in 93, then 86, etc.  Since arithmetic and mathematical capabilities are a non-dominant brain hemisphere attribute, and since based upon Rothman's background he should have been able to do this easily, this test reflected a deterioration of this part of the brain, *i.e.*, a non-dominant parietal lobe dysfunction.

After the first visit to Dr. Gelblum in March 2007, Rothman did not return to Dr.

Gelblum for a follow-up visit until after the summer.  At the follow-up visit in September 2007, Dr. Gelblum prescribed Namenda to slow the rate of regression.  There is no cure for Alzheimer's dementia, and the best that one can hope for is to maintain functionality for a period of two to three years in terms of stabilization, and then the decline continues. In 2008, Dr. Gelblum also prescribed Exelon in conjunction with Namenda, but this medication had to be discontinued due to gastrointestinal side effects.  Dr. Gelblum also prescribed Lexapro for depression.  Dr. Gelblum treated Rothman until November 2008, and during the course of treatment the dosages of these medications was increased.  Dr. Gelblum testified that he thought there was a decline in Rothman's functioning despite the ongoing treatment.  His opinion regarding this decline is based upon seeing Rothman on a monthly or bi-monthly basis, and observing a slow and steady decline of affect and insight.  Dr. Gelblum also opined that depression was common among patients with Alzheimer's dementia.  Dr. Gelblum does not believe that Rothman's condition regarding either Alzheimer's dementia or depression will improve with any treatment.  With respect to depression, Dr. Gelblum testified that it is very difficult to treat with medication in Alzheimer's patients because their brains are resistant to responding to such treatment.

Dr. Gelblum testified that he spoke to Rothman regarding his possible intolerance to Aricept because Rothman had previously tried another medication in the same family of medicines and was unable to tolerate it due to side effects.  Dr. Gelblum testified that he described this to Rothman as a "CYA" measure since he needed to document the warning to the patient in case there was an adverse effect.  Since Rothman was not accompanied by anyone on his visits to Dr. Gelblum, Dr. Gelblum had this conversation with Rothman alone, and did not notify any family members.  Dr. Gelblum has also discussed with Rothman the potential progression of his disorder and the medications,

27

and has not discussed this with Rothman's family.  Dr. Gelblum testified that he believes

that Rothman understands the nature of his disease, that the tests confirmed this, and

the need to take medications, but beyond that, Dr. Gelblum does not believe he is able to

understand the complexities.

On December 15, 2008, Dr.  Gelblum prepared a letter entitled "Final Report" which

summarized his treatment and conclusions regarding Rothman (DX 9).  In this report, Dr.

Gelblum opines:

> At the present time patient suffers from persistent cognitive
> and behavioral decline.  He is presently utilizing Namenda 10
> mg bid and Lexapro 20 mg po qd.  He is compliant with these
> medications and with his followup visits.  In light of further
> deficits of memory, word finding and insights, he will be
> started today on a regimen of Aricept 5 mg taken each day by
> mouth.  I have told patient that there is a possibility that he
> will be intolerant to this regimen as well given Aricept impact
> on the gut cholinergic system.
>
> At the present time patient suffers from a progressive neuro-
> degenerative illness of Alzheimer's disease accompanied with
> a supervening depressive affective disorder.  He
> demonstrates considerable difficulty with insights, language
> and overall cognitive functioning.  He is expected to
> demonstrate further decline.

(DX 9).

Dr. Gelblum testified that his initial diagnosis was dementia; that the brain MRI and

the EEG results had ruled out a vascular cause for the dementia, and that is why he

prescribed Namenda.  He then ordered a PET scan since it is considered to be a very

good diagnostic tool for the evaluation of Alzheimer's dementia.  Dr. Gelblum could not

explain whey the PET scan was not performed until April 2008, unless it was the result of

an insurance issue.  The PET scan reflected that the brain cells in the parietotemporal,

mesiotemporal and anterior cingulate gyrus areas of the brain were not metabolizing

glucose the way they should, and this is indicative of an Alzheimer's-like disorder.  Dr. Gelblum testified that he had made a diagnosis of dementia prior to this test; that the purpose of the test was to tell him what type of dementia Rothman had.

Dr. Gelblum testified that Rothman's ability to repeat is intact, but that he would not be able to recount accurately what he had seen or heard in a trial.  With respect to his finding that there were "deficits of memory, word finding and insights," Dr. Gelblum explained that Rothman's fluency was impaired, and that there was a progressive deterioration of a diffuse brain basis.  In addition, stress serves to limit brain function in terms of the executive decision-making function.

4.  <u>Kenneth C. Fischer, M.D.</u>

Dr. Fischer is a neurologist who is a Diplomate of the American Board of Psychiatry and Neurology.  His credentials are set forth in his Curriculum Vitae, which is incorporated herein by reference (DX 6).  He graduated from medical school in 1971, and has practiced in Miami as a neurologist for the past 38 years.  He was employed in various teaching capacities in the Neurology Department of the University of Miami School of Medicine from 1975 through 1992, and presently serves as a voluntary faculty member.  During the course of his practice, he has seen between ten and twenty patients per week who have had some form of dementia or Alzheimer's disease.  He estimated that he has diagnosed and treated between 15,000 to 30,000 patients during the course of his practice; and, he presently has about 3,000 patients with Alzheimer's disease.

Dr. Fischer examined Defendant Rothman on October 31, 2008, at the request of defense counsel.  Dr. Fischer was provided with certain medical records, including a PET scan, prior to his examination.  The PET scan revealed a pattern consistent with a diagnosis of Alzheimer's dementia.  Dementia is a chronic, usually progressive departure

in an individual's cognition, with reduced memory, recall and cognitive functioning. Alzheimer's is the most common form of dementia.  Based upon his examination of Rothman, and his review of the medical records, Dr. Fischer concluded that Defendant Rothman has Alzheimer's disease.  Based upon Rothman's history, Dr. Fischer found that Rothman had the beginning of cognitive dysfunction about 10 years ago, and that is when his Alzheimer's disease likely began.  Dr. Fischer explained that Alzheimer's is a condition of unknown cause where there is a dropping out of brain cells in certain areas of the brain, and a replacement of these normal brain cells with functionless material that prevents normal brain function.  It typically begins with difficulty in cognition, formation of new memories, and immediate recall.  As it progresses, there are motor changes, difficulty with gait; and, ultimately a vegetative state occurs.   There is no cure for Alzheimer's, although there are certain medications that may temporarily delay the progression and to a certain mild extent improve cognition.  Rothman has been on three of  these medications–Exelon, Aricept and Namenda–and they have not restored any cognitive function.  Aricept has caused some nightmares and hallucinatory behavior. Rothman did not report this to him, but he saw evidence of this in Dr. Suarez' report.  Dr. Fischer's testimony regarding Aricept is necessarily based on information he obtained after he saw Rothman; Dr. Gelblum did not prescribe Aricept until Rothman's last visit with him in November 2008[12] (after the date of Fischer's report), and Dr. Fischer's report mentions only Namenda as the medication being used to treat Alzheimer's.

In his report, Dr. Fischer opined that Rothman had mild significant dementia of the

---

[12]  Dr. Gelblum's December 15, 2008 report actually states that Aricept is being prescribed "today," but he testified that the last time he saw Rothman was in November 2008.

Alzheimer's type with cognitive disturbance (DX 7).  Dr. Fischer provided the following explanation of this diagnosis: In the last number of years, a new category of illness called "early cognitive disturbance" has been created, which is a precursor of Alzheimer's disease, and will lead into Alzheimer's disease in a three to five-year time span.  He stated that at a certain point it would become apparent that the person has mild Alzheimer's.  A diagnosis of mild Alzheimer's is significant at that point in terms of the patient's ability to conduct one's affairs, competency, rationality, and so forth.  Dr. Fischer explained that while the diagnosis is "mild" in the sense that he is not in a wheelchair, is not incontinent, and does not have the motor impairments, it is significant in terms of cognitive dysfunction.  This dysfunction is not as easily obvious to a lay person as it is to a neurologist or neuropsychiatrist.

Dr. Fischer further explained that this meant that Rothman has reduced cognitive function, that his memory is reduced, his judgment and executive functions are reduced, his ability to recall immediately is reduced, and his ability to formulate appropriate decisions is reduced.  He opined that Dr. Rothman has significant reductions of his intellectual and cognitive capabilities which might fluctuate to a certain extent, and worsen at certain times when he is under stress or tired, or suffering from certain illnesses such as the flu or pneumonia.  In Dr. Fischer's opinion, this would interfere with his ability to make rational, intelligent decisions.  Dr. Fischer found that Rothman was not organized in his thinking or his ability to relate matters to him.  He could not follow a logical sequence of events, and could comprehend and assimilate new information only in a very impaired manner.  He can accurately repeat back words, but if you give him a complicated scenario and ask him about it two minutes later, he would not be able to recall it.  Since Alzheimer's patients are more affected in their immediate recall and recent

memory, Rothman may have the ability to more accurately recount events that happened twenty years ago than he can recount events of three or four years ago.   Dr. Fischer further testified that Rothman is not able to focus and process information during a stressful period of time.  Dr. Fischer determined that there had been extensive deterioration over the past two years based on what Rothman told him had been happening during that time with respect to certain financial and other decisions that had been made by Rothman and reflected poor judgment.  Similarly, Dr. Fischer's estimate that Rothman has had Alzheimer's for the past ten years is based upon the interview with Rothman.  Dr. Fischer estimated that Rothman would have a significant deterioration of his cognitive function within the next five years, and would have ten to twelve years before he becomes severely incapacitated and bedridden.  Previously, the estimated lifespan for a person diagnosed with Alzheimer's was approximately 10 years, but because of the increased recognition of the illness, people now survive up to 20 years after the initial diagnosis is made.

        One of the tests that Dr. Fischer administered to Rothman was a mini mental status examination.  This is a standardized form that was developed to determine how significant a patient's dementia is.  Rothman achieved a score of 30, which is a high score, but he had a latency of response, which means that he was laboring to complete the test.  Stated another way, Rothman was only able to do this with extreme hesitation that is not usually experienced by people who obtain that high a score.  The test is not very helpful with respect to persons with high educational achievements because they will not show any change until they have significantly deteriorated.  The way in which Rothman responded, rather than his score, is the basis upon which Dr. Fischer determined that the test evidenced a reduction of cognitive function.

32

5. Hyman Eisenstein, Ph.D.

Dr. Eisenstein is a neuropsychologist and a Diplomate of he American Board of Neuropsychology.  His experience and credentials are listed in his Curriculum Vitae, which is incorporated herein by reference (DX 4).  He earned his Ph.D. from the University of Health Sciences, the Chicago Medical School, in 1982.  After working for a state psychiatric hospital in Connecticut and a rehabilitation hospital in Florida, he entered private practice in 1987.  He has performed forensic evaluations to determine competency approximately 30 to 40 times.

Dr. Eisenstein was retained by defense counsel to perform a neuropsychological evaluation of Rothman.  He examined Rothman for a total of approximately 16 hours on January 8, 15, 21 and February 4, 2009.[13]  He also interviewed Rothman's wife and three children.  Dr. Eisenstein prepared a report of this Evaluation which he testified was abbreviated due to time constraints.  The report, with attached underlying raw data regarding some of the tests was admitted into evidence at the hearing (DX 5).  All of the raw data and the report were provided to Dr. Enrique Suarez, the court-appointed expert.

The report states that Rothman was cooperative and participated fully in all aspects of the evaluation, and that several validity measures indicated sincere effort and ruled against malingering.  On the Wechsler Adult Intelligence Scale, Rothman obtained a

---

[13]  Dr. Eisenstein administered the following tests in his examination: Benton Word Fluency; Boston Naming Test; Category Test; Expressive Vocabulary Test; Grip Strength; Incomplete Sentences; Index Finger Tapping; Lafayette Pegboard; the Minnesota Multiphasic Personality Inventory II; Paragraph Writing; Peabody Picture Vocabulary Test, 3rd edition; Projective Drawings; the Rey-Osterreith Complex Figure - Copy and Delayed Recall; the Stroop Color and Word Test; Tactual Performance Test; Test of Memory and Malingering; Trail Making Test Parts A and B; Validity Indicator Profile; Wechsler Adult Intelligence Scale - 3rd edition; Wechsler Memory Scale - 3rd edition; Wide Range Achievement Test - 3rd edition; and Wisconsin Card Sorting Test.

Verbal IQ score of 118, which is in the High Average range and at the 88th percentile; a Performance IQ score of 92, which is in the Average range and at the 30th percentile; resulting in a Full Scale IQ score of 107, which is in the average range and at the 68th percentile.  The scores varied significantly from each other and revealed his greatest strength in Verbal Comprehension skills and his greatest difficulty in Processing Speed of mental operations.  His achievement scores were all in the post-high school range.  Dr. Eisenstein testified that the disparity in the scores between Rothman's Verbal and Performance IQ indicated a significant discrepancy between his dominant, or left brain functioning, which is represented by a higher verbal score, and his non-dominant, or right brain, functioning, which is represented by the lower performance score.  This is consistent with dementia which results in a substantial decline in nonverbal activities. Dr. Eisenstein also explained that one of the lowest subtest scores for Rothman was a coding test, which demonstrated the lack of ability to learn quickly and assimilate new information.  The IQ score for processing speed, which measure this ability, was an 81. On a verbal comprehension subtest, which primarily measures stored information, Rothman had an IQ score of 120, which is in the superior range of intellectual functioning.  Dr. Eisenstein testified that this difference of 39 points is highly significant, and demonstrates that Rothman is operating at two different levels–one where he is relying on old stored information, and a second level which involves new learning.

Based upon the other tests, Dr. Eisenstein concluded that Rothman's executive functioning revealed profound deficits in information processing, reasoning, judgment and decision making skills.  Perseveration was frequent with an inability to profit from error correcting feedback.  Rothman had difficulty inhibiting a presented stimulus, which is symptomatic of frontal lobe deficit.  His attention and concentration were in the

34

average range for simple tasks, but compromised in more complex tasks.  Learning and memory were generally in the average range, but were lower than expected based on his IQ scores.  His auditory memory was significantly better than his visual memory.  His language functioning revealed severely impaired naming, moderately impaired word fluency, borderline expressive language skills and average receptive language skills.  His gross motor skills were within normal limits.

Regarding specific areas of competency to proceed in this case, Dr. Eisenstein rated as acceptable Rothman's appreciation of the charges, the possible punishment and the adversarial nature of the legal system.  Rothman was also able to manifest appropriate courtroom behavior.  Dr. Eisenstein rated Rothman's capacity as unacceptable in his ability to disclose pertinent facts to his attorney, noting that he was disorganized, unable to follow a logical sequence, and had great difficulty comprehending and assimilating new information.  He also rated Rothman's capacity as unacceptable with respect to the ability to testify relevantly on his own behalf due to his dementia and compromised mental state; and opined that Rothman would not be able to assist his attorney with the selection of jurors and "instant" trial making decisions.

Dr. Eisenstein summarized his conclusions as follows:

> Over the past several years he has a slowly progressive dementia, Alzheimer's type, that has substantially reduced his premorbid skills.  Due to this dementia process, David Rothman is unable to organize, sequence, or retain new information.  His processing skills and ability to assimilate new data is severely compromised.  He is repetitive and perseverative, symptomatic of frontal lobe impairment.  Often he gets stuck and is unable to move on, which his indicative of a disconnection syndrome of brain mechanism.
>
> Emotional and physical functioning have declined significantly with the onset of his dementia.  David Rothman has become more socially isolated with his decline in

functioning.

(DX 5 at 3).  Dr. Eisenstein gave a present diagnosis of Dementia, of the Alzheimer's Type and Major Depression, and stated that the prognosis was guarded since there is no effective treatment for dementia.  He concluded that Rothman is not competent to proceed.

Dr. Eisenstein's testimony at the evidentiary hearing explained his evaluation in much greater detail than his report.  Dr. Eisenstein elaborated on why he does not believe that Rothman can effectively assist his attorney at trial with respect to specific situations. He testified that he does not believe that Rothman is able to assist in jury selection by providing input into who an appropriate juror might be because he does not possess fluid intellectual abilities, and does not have the capacity to perceive nuances, understand dynamics or engage in critical thinking.

Dr. Eisenstein opined that Rothman has a profound impairment in the way he is able to process information, emphasizing that this is beyond mild, moderate or severe. When it comes to complex thinking, Rothman is not capable of understanding, following, or articulating information.  The IQ tests alone don't measure this, and that is why Dr. Eisenstein administered other tests to measure cognitive abilities.

With respect to executive functioning, Dr. Eisenstein concluded that Rothman was also profoundly impaired.  He defined executive functioning as the brain's ability to process information at a higher level, including reasoning ability, judgment and decision making.  On the Halstead Category test, Rothman made 96 errors out of approximately 200 questions.  A person who makes over 50 errors is considered impaired according to this test.  Dr. Eisenstein did not believe that Rothman was deliberately giving incorrect answers because on certain parts of the test he answered correctly.  Similarly, on the

36

Stroop Color and Word test, Rothman's score was three standard deviations below the mean.  In this test, the patient is shown the words "red," "blue," or "green" which are written in colors different than what they represent.  For example the word "red" may be written in blue.  The patient is then asked to select a designated color.  In order to give a correct response, the patient must suppress what the word says and make a selection based only on the color.  In Dr. Eisenstein's opinion, Rothman's poor performance on this test signifies that Rothman would not be able to respond quickly enough in a trial setting to assist in his defense.

Dr. Eisenstein also testified that the impairment in Rothman's abilities of concentration and attention were compromised, as demonstrated in the Trail Making Test, Part A and Part B.  When asked where Rothman fit in terms of the general population, Dr. Eisenstein initially stated only that there was a level of impairment above what is expected in a normative sample population, and that it showed that Rothman's processes were slowed down.  When further pressed by the Court, he responded that Rothman was somewhere between mild to moderately impaired in this area.

Dr. Eisenstein also testified that one of the signs of frontal lobe impairment is the existence of disinhibition syndrome.  This is the loss of ability to discern what is appropriate versus inappropriate behavior in various situations.  He observed this with respect to Rothman when Rothman left his table in the courtroom during his testimony to use the bathroom without telling anybody before he started to leave.  Another example occurred when Rothman arrived at Dr. Eisenstein's office in forty degree weather wearing sandals, a short sleeve shirt and blue jeans.  Dr. Eisenstein acknowledged, however, that the manifestations he saw of the disinhibition syndrome would not change his opinion that Dr. Rothman was capable of manifesting appropriate courtroom behavior.

In Dr. Eisenstein's opinion, Rothman was compliant with the testing procedures and gave his best effort, and this was demonstrated on the validity tests that were concurrently administered.

On cross-examination, Dr. Eisenstein acknowledged that, in his opinion, Rothman could remember what he did during the relevant time period from 2004 and into 2006 since that is old stored information, and that he would be able to communicate that information to his attorney.  Dr. Eisenstein testified that Rothman is not capable, however, of going through anything more than the basic rudiments of what happened, and would not be able to review boxes and boxes of information and gather data.  Thus, Rothman was able to explain what he was charged with and told Dr.  Eisenstein that his physician's license was used to bill patients without his knowledge.  Rothman also advised him that he was the medical director at several clinics, and that he acted in accordance with what he believed was appropriate for each patient.  Rothman stated that his job was to complete a physical examination of the patient and recommend a treatment.  Dr. Eisenstein acknowledged that Rothman would be able to relay this same information to a jury.  However, Dr. Eisenstein opined that Rothman would only be able to communicate this at a submarginal level, since Rothman tends to talk in circles.

Dr. Eisenstein acknowledged that his opinions were based, in part, upon information related to him by Rothman and members of Rothman's family.  He testified that he did not think that Rothman intended to commit the crimes charged, but that he was taken advantage of.  Dr. Eisenstein opined that Rothman's cognitive decline started at least four years ago, although he admitted he could not be precise.  He later testified that his opinion that Rothman did not intend to commit the crimes charged was not based on the lack of cognitive ability, but was based on his assessment of Rothman's

integrity as a person.

With respect to his diagnosis of Major Depression, Dr. Eisenstein stated that Rothman felt a sense of hopelessness and uselessness since he previously was a very productive individual and he is now facing a life where he cannot be very productive.  Dr. Eisenstein stated that the depression was secondary to the Alzheimer's diagnosis. Depression is a factor, however, which negatively affects Rothman's performance.

**6.  Enrique Suarez, Ph.D.**

Dr. Suarez is a neuropsychologist who was appointed by the Court to conduct an independent forensic evaluation of David Rothman.[14]  His experience and credentials are contained in his Curriculum Vitae, which is incorporated by reference (GX 1).  He obtained his Ph.D. in psychology from Baylor University in 1974, and thereafter had an internship and residency in Waco, Texas, at the Veterans Administration medical center, which is a large neuropsychiatric hospital.  He then transferred to the Veterans Administration hospital in Miami, Florida.  In 1981, he began his private practice of clinical and forensic neuropsychology.  His forensic work is primarily in the state court system, and involves different types of examinations.  For example, he conducts examinations of criminal defendants to determine competency and sanity; and, he is also on the probate evaluation committee of the state circuit court where he conducts

---

[14]  When the preliminary motion to determine competency was granted, the Court directed the parties to confer with respect to the appointment of an acceptable neuropsychologist.  The person initially proposed by the parties is a professor at the University of Miami School of Medicine who was unable to obtain the approval of the Department Chairperson to serve as a court-appointed expert.  The government then proposed Dr. Enrique Suarez, and the defense did not object.  Defense counsel made clear at the evidentiary hearing that Dr. Suarez would not have been his choice, but that he did not object to the appointment because of time constraints due to the impending trial.

competency examinations of persons who are the subject of guardianship petitions alleging that they are incompetent to handle their own affairs.  He handles at least 40 to 50 of the probate cases a year, and the majority of the probate cases involve allegations of dementia.  Dr. Suarez has conducted between 4,000 and 5,000 competency examinations in connection with state court proceedings, the vast majority of which involve criminal cases.

Dr. Suarez testified that his approach to a competency evaluation is a functional approach, and that if somebody is able to verbalize with a reasonable degree of understanding this meets the standard for competency under *Dusky*, regardless of any underlying diagnosis.  The existence of a mental disease can interfere with competency, but it does not automatically equate with incompetency.  In Dr. Suarez' view, the diagnosis is most important with respect to helping the Court understand why a person has been found to be incompetent.

To put into context the specific tests and analysis performed by Dr. Suarez, it is useful to set forth the ultimate conclusion that he reached.  Dr. Suarez concluded that his test results did not support a diagnosis of dementia, noting that:

>  Dr. Rothman . . . presents a self-reported history of atypical cognitive decline over the past two to three years, and a 15-year history of auditory hallucinations.  Results of Cognitive testing done since 2007 by different evaluators are quite inconsistent and do not appear to reflect a progressive dementia.  Dr. Rothman's reported hallucinations are highly questionable, in that they have never been disclosed until the present evaluation.  A valid neurocognitive assessment is predicated on the assumption that the test taker is motivated to provide his or her best effort on the various neurocognitive tasks.  The current results of the CVLT-II and the VIP suggest that Dr. Rothman did not put forth an acceptable degree of effort to do his best during the current evaluation.  In other words, his reported/claimed memory and cognitive deficits, as well as his test performance on tests of verbal memory and

> nonverbal intelligence, are probably underestimates of his
> actual functioning.

(GX 2 at 12).  However, Dr. Suarez further found that Rothman's "condition is consistent

with a diagnoses of Adjustment Disorder with Mixed Anxiety and Depressed Mood,

Chronic (DSM-IV Code 309.28), which probably involves a depressive and anxiety reaction

to his present legal predicament, and Malingering (DSM-IV Code V65.2)." (GX 2 at 12).  In

addition, Dr. Suarez found that Rothman was competent to proceed.  *Id.*

Dr. Suarez examined Defendant Rothman on February 2 and 3, 2009, and issued a

report which summarized his examination and conclusions (GX 2).[15]  The first day of

testing began at 1:00 p.m., and Dr. Suarez performed his interview, competency

evaluation test, and the MMPI-2.  Dr. Suarez interviewed Rothman's daughter while

Rothman was taking the MMPI-2 test.  Dr. Suarez decided to continue the testing with

respect to the two remaining tests on the following day because he wanted Rothman to

be fresh, especially for the memory tests.  Dr. Suarez reviewed the reports of the experts

described above before preparing his own report.  He administered the following tests:

Test of Nonverbal Intelligence–Third Edition (TONI-3), to assess his abstract reasoning

ability; the California Verbal Learning Test–Second Edition (CLVT-II), to assess his

memory and learning ability, and the Minnesota Multiphasic Personality

Inventory–Second Edition (MMPI-2), to evaluate his current psychological functioning.  In

addition, the Validity Indicator Profile (VIP), a symptom validity test, was administered.

Dr. Suarez chose to give the TONI-3 because it gives an estimate of a person's

ability to reason abstractly, and because the symptom validity test that he administered

---

[15]  These testing dates occurred between the first date that Dr. Eisenstein
performed his tests and the date that Dr. Eisenstein completed his evaluation.

also uses the same stimuli and therefore gives a good cross-check as to the validity of the TONI-3 results.  The TONI-3 revealed an IQ score of 85, which is in the low average range at the 16th percentile.  Dr. Suarez testified that this is a very low score for somebody of Rothman's educational and professional background, but even assuming it is a valid score it does not indicate in and of itself that he is incompetent. This score suggests that Rothman is functioning in the borderline to average range of intelligence, but the symptom validity testing suggests that this score is probably an underestimate of his actual abilities.  In addition, the test performed by Dr. Eisenstein at approximately the same time reflected an IQ that was 20 points higher.

Dr. Suarez chose to give the CLVT-II because it is one of the two best tests of memory–the other being the Wechsler memory scale.  The CLVT-II was selected because it tests the process of how one learns by looking at encoding, memory, memory recall, and memory recognition, both immediate and delayed.  It gives an indication of how well a person is able to recall and retrieve information.   Dr. Suarez viewed this test as particularly valuable due to the opinions of the other experts regarding the presence of cognitive problems and dementia.  He also wanted to give a test other than Wechsler Memory Scale because Rothman had already been given that test, it is a well-known test, and Dr. Suarez wanted to eliminate the possibly of either self-coaching or coaching by others.  In addition, the CLVT-II has a built-in symptom validity component, which is called a forced choice trial.  This provides an internal check on the amount of effort someone may or may not be giving.

Rothman's scores on the CLVT-II were very inconsistent.  His scores on measures of auditory attention, core verbal learning ability, global index of verbal learning, learning slopes, short and long delay recall abilities, proactive interference, clustering and

primacy/recency organization were overwhelmingly in the Average range, with some scores in the High Average, Superior and Very Superior ranges.  Rothman's scores on these tests are not consistent with a diagnosis of dementia.  On the other hand, Rothman's scores on measures of Delayed Recognition Trials are mostly in the Extremely Low range, which is unexpected but results from his exceptionally low score on the Forced Choice Recognition Trial.  Rothman's score on this test was 10, and nobody in the normative sample of 1,087 adults scored below 14 on this test.  This suggested to Dr. Suarez that Rothman was not motivated to do well on the CVLT-II, and that his scores were probably underestimates of his abilities.

At the evidentiary hearing, Dr. Suarez elaborated upon this, and stated that it was inconsistent for Rothman to do significantly better on the recall portions of the test than on the recognition portion since the recall test requires a person to independently recall prior information; whereas the recognition test only requires the person to recognize that information when it is shown to him again.  In the recall test, a list of 16 words is read to a person, and the person is then asked to repeat as many of those words as he can recall.  There are a total of five trials, and Rothman scored in the average range, demonstrating that he is learning like an average person in his age range.  Dr. Suarez testified that with respect to the overall results of his immediate recall abilities, Rothman has good immediate recall memory.  Rothman was also tested with respect to delayed recall, which is testing the ability to recall after a one-half hour interval.  This is much more difficult that immediate recall, and he again scored in the average range.

Finally, Rothman was given two sets of trials called delayed recognition and forced choice.  Delayed recognition is an easier form of memory because you are not being asked to recall what you have learned strictly from memory, but you are shown

something and asked if you recognize it.  On these tests, Rothman was at the very bottom of the distribution range.  Dr. Suarez put this in context in his testimony by explaining that it does not make sense that somebody would score in the average range for delayed recall by naming an item after thirty minutes, and then 15 seconds later be unable to recognize it.  The forced choice test involves presenting a person with two words, one of which is an original target word and one of which he has never seen.  The person is then forced to choose the word he has seen.  On this test, Rothman did worse than any of the over 1,000 people in the United States who comprised the normative sample.  This test is a validity indicator similar to the Test of Memory and Malingering.  However, this test involves verbal stimuli rather than visual stimuli like the Test of Memory and Malingering.  This test is a measure of how the dominant side of the brain is working since it is a verbal stimuli.

Dr. Suarez explained the inconsistency in the portions of the test involving recall as opposed to recognition as analogous to a person being able to sprint but not walk.

Dr. Suarez opined that Rothman's lack of motivation and effort was confirmed by the VIP symptom validity test.  This test is scored by a computer program, which then provides a narrative report based on the results.  With respect to Dr. Rothman, the report notes:

> This individual's performance on the Nonverbal and Verbal subtests of the VIP is probably not an accurate representation of his ability.  There is sufficient evidence to conclude that he was not engaged in the testing process or that he has such poor reasoning ability and word knowledge that the tests cannot validly assess his ability.  This might be the case for individuals with significant mental retardation. Other ability tests that were administered concurrently with the VIP should be interpreted with caution.
>
> ....

> In conclusion, there are conflicting indications regarding this individual's response style.  His performance on the Nonverbal subtest was classified as Irrelevant.  His Performance Curve characteristics indicate that the did not respond with any relevance to the content of the test items on the Nonverbal subtest.  His performance on the Verbal Subtest was classified as Inconsistent.  His Performance Curve characteristics indicate that he intended to do well on at least some of the test items, but his performance was negatively affected by insufficient effort.  Such inconsistent responding can result from many factors, the most probable of which is an insufficient effort to do well.  However, given the irrelevant response style he demonstrated on the Nonverbal subtest, another interpretation of his response style on the Verbal subtest is possible.  He may have tried to do poorly on the Verbal subtest but not poorly enough to be classified as Suppressed or Irrelevant.  A careful evaluation of how he approached the sting session is critical to determine if it would be useful to interpret any tests that were administered concurrently.

(GX 2 at 8-9).

Dr. Suarez stated that the results of the VIP is consistent with the extremely low score on the CLVT-II, which suggests that Rothman did not intend to do well on either of these tasks.  Dr. Suarez noted that Dr. Eisenstein had given the exact same VIP test to Rothman, and that Rothman had done well on that test.  Dr. Suarez found that this inconsistency did not make sense, particularly when the raw data was examined and showed that the estimates of verbal ability and nonverbal abstract reasoning were pretty good on Dr. Eisenstein's test, but were terrible on the test administered by Dr. Suarez.

On the other hand, the results of the MMPI-2 test demonstrated a valid profile.  The MMPI-2 test consists of 567 multiple-choice questions, and takes about one and a half hours to complete.  The test is computer scored, and an interpretive report is generated based upon the results. This is a psychological and personality functioning test, but it does not measure dementia.

Dr. Suarez testified that Dr. Rothman completed the test within the average amount of time, which requires sustained attention and concentration.  There were significant elevations on five of the ten scales, corresponding to depression, paranoia, psychasthenia, schizophrenia and social introversion. The results of the MMPI-2 test were essentially the same when administered by Dr. Suarez and Dr. Eisenstein.  Dr. Suarez opined that if there was anything impinging on Rothman's ability to assist his counsel, it was likely to be the depression and anxiety reflected by this test, rather than dementia. However, based upon his examination of Rothman, Dr.  Suarez did not believe that the severity of these conditions rose to the level of rendering Rothman incompetent.

In reaching his conclusions regarding Rothman's level of impairment and his ability to assist counsel at trial, Dr. Suarez evaluated the nature of the information which Rothman was able to provide in his interview, and the way in which that information was provided.  Dr. Suarez testified that in responding to questions, Rothman was able to recall information and relate it cogently, although sometimes he was slow in doing so. There was no problem in his ability to communicate. To demonstrate Rothman's capacity to relay relevant information, Dr. Suarez included in his report quotations of some of Rothman's answers. For example, he noted that initially Rothman had only described two marriages.  He then learned from Rothman's daughter that there had been a third marriage.  He asked Rothman why he had omitted the third marriage, and Rothman was able to give a rational explanation.  Specifically, the report notes, "Rothman responded that he was married for a six-month period when he was approximately 24 years old. When asked why he did not disclose this marriage, Dr. Rothman noted that this marriage as "annulled" and added, "I was told that it didn't count [as a marriage]."  (GX 2 at 2).

When asked about his education and employment history, Rothman provided

information from high school through 2005.  With respect to the time-frame of the

charges alleged in the present indictment, Rothman provided the following information,

as stated in the report:

> He states that in 2004 he began working for a series of "HIV
> clinics" in the capacity of "medical director."  Dr. Rothman
> relates that, in the time period between 2004 and 2005 he
> worked for "Coral Way something" on a part-time basis for a
> year and a half, "Medcore" for less than a year and a half, and
> "New Beginning" for approximately three months.  Dr.
> Rothman noted that there were "several more [clinics] but I
> can't remember - Some I would work for one to four days, or
> six weeks and then I would leave because I didn't like it."  he
> noted that, in addition to the clinics he had named, there were
> "four to six more" clinics, the names of which he could not
> recall.

(GX 2 at 2).

When asked about why he had sought mental health treatment from Dr. Rappaport,

Rothman stated that it was for "problems."  When asked what kind of problems, Rothman

was able to follow up and provide specific details about events that had occurred in 2006.

Some of the problems that Rothman mentioned that prompted him to seek treatment

were not significant in terms of a dementia diagnosis, such as going to the supermarket

and forgetting his wallet, or leaving the garage door open at night.

Dr. Suarez also found Rothman's statements about auditory hallucinations where

his deceased mother told him to take care of the family and that everything will be okay,

were not credible.  Rothman stated that he had experienced this several times a month

since 1993, and Dr. Suarez said that if this were the case it is unlikely that this would be

the first time Rothman would disclose it to anybody; or that the first time it would be

noticed would be in his evaluation.  Dr. Suarez explained that although it is not atypical

for this to happen shortly after the death of a loved one, it is atypical to last for fifteen

years.  In addition, hallucinations are symptoms of another illness or problem, and it is

unlikely that the other disease would go unnoticed for that period of time.  Finally, Dr.

Suarez stated that a person is typically asked about hallucinations in any psychological

examination or evaluation, and yet none of the other reports mention this.  Rothman

specifically stated that he had not disclosed this to any of his doctors.  When asked why,

he responded, "Because I don't like to talk about it."  Rothman also stated that he had not

disclose this to his attorney or his family, but noted, "I told my dad, but he hears voices

too." (GX2 at 4).

Rothman was also able to explain his mental health treatment and medical

conditions, stating:

> Dr. Rapport sent me to a neuropsychologist, Dr. Crown - he
> tested me for three to four hours.  He said I had something in
> my frontal brain, that I should see a neurologist.  Dr. Gelblum
> said we needed to do some tests and ordered scans - He told
> me I might have Alzheimers – I got a second opinion from Dr.
> Fischer, who also thought I might have Alzheimers.

(GX 2 at 4).

During the interview, Rothman's affect was blunted and apathetic for the most

part, although his speech was fluent and clear.  He did not struggle to remember details,

and was able to relay information to Dr. Suarez readily.  Rothman had a list of

medications that he was taking, and was able to readily provide Dr. Suarez with

information regarding what they were for.  This type of information, however, is "old"

learning for a physician, and Dr. Suarez would expect even a patient with dementia to be

able to recall this information.  However, Rothman's reference to Aricept and Namenda

being prescribed for "deterioration of my brain" was atypical and indicated an attempt to

portray himself as more simple-minded since Rothman had previously referred to his

"Alzheimer's" diagnosis, and as a physician this would be old learning that he should remember.

Rothman was alert and attentive and oriented as to person, place and time. Initially, Rothman presented himself as mildly dazed, and voiced no spontaneous speech, although he spoke clearly, fluently and coherently. His affect was blunted. Dr. Suarez included in his report the fact that Rothman's affect changed when he received a call on his cellular telephone during the interview. The significance of this is that it demonstrated that Rothman retained the capacity for a broader range of affect. Persons with serious impairments and dysfunctions, whether due to psychiatric problems or dementia, sometimes have a narrowed range of affect and abilities. Dr. Suarez considered this only one small piece of information with respect to his ultimate conclusions.

Dr. Suarez noted that Rothman did not appear to have any language or intellectual deficits, and that his thinking was organized and goal directed. Specifically, Dr. Suarez testified that he answered the questions directly, and did not respond with irrelevant information.

Dr. Suarez also used a competency interview to evaluate Rothman's ability to proceed in this case. His report describes this interview and concludes that Rothman has an appreciation of the charges, an appreciation of the potential penalties, an understanding of the adversarial nature of the legal process, and an ability to manifest appropriate courtroom behavior. Those findings are not disputed, and therefore the basis for those conclusions is not recounted in this order.

With respect to whether Rothman has the ability to disclose pertinent facts to his attorney, Suarez opined that, "Based on his responses during the current evaluation, Dr.

49

Rothman clearly has the capacity to communicate with and assist his attorney."  (GX 2 at

11).  This determination was based in part on information given to him by Rothman which

is included with respect to his appreciation of the charges.  Specifically, the report states:

> When asked about the charges that he is facing, Dr. Rothman
> responded, "They said I was conspiring and defrauding the
> government." When asked how he is alleged to have been
> conspiring to defraud the government, he replied in the
> following manner:
>
> > That I gave orders for medications, but now I find that
> > they were giving partial water, half-does, or nothing - It
> > seems like all the clinics were all crooked.  I signed
> > blank [billing forms] because I don't know billing codes
> > - Now I find they were cheating the government - I
> > wouldn't do that - the first thing is the patient - feel
> > really bad they were deceiving me.
>
> Dr. Rothman acknowledged that he is facing multiple counts
> of health care fraud.  When asked about the degree of fraud
> that is alleged to have been perpetrated, Dr. Rothman
> answered, "In the millions."

(GX 2 at 10).  In addition, Dr. Suarez stated that Rothman had provided him with other

details that he did not disclose in the report because he felt it related more to the facts of

the case in terms of a defense and it would not be appropriate to disclose to the

government.  The defense did not object to these disclosures at the evidentiary hearing,

and Dr. Suarez elaborated that Rothman had told him a little bit about the things that were

going on with the clinics, what he thought was going on, and described his own

reasoning for becoming involved in the situation, which was because he was too trusting.

Dr. Suarez did not go into depth with Rothman but obtained enough information to

determine that Rothman had a basic knowledge of what happened, how he got involved,

and some of his personal reasoning for becoming involved.

Dr. Suarez also opined that Rothman has the ability to testify relevantly: "Based on

his responses to questions about his charges, his version of how he became involved with the codefendants, and his understanding of the role of witnesses, Dr. Rothman has the capacity to testify with relevance."  (GX 2 at 12).

Dr. Suarez testified that his conclusions regarding Rothman's competence to stand trial are not altered by whether or not Rothman is suffering from Alzheimer's disease.  He explained that Alzheimer's disease is a progressive disease, that there are various degrees of Alzheimer's disease, and that one does not lose all of one's memory functions at the outset.

Dr. Suarez testified that his opinion that Rothman does not appear to be suffering from a progressive dementia due to inconsistent results of cognitive testing was based both on inconsistencies between his results and that of the other evaluators, and inconsistencies among the other evaluations.  As examples, he pointed to the inconsistent results on the VIP test he administered as opposed to the one that Dr. Eisenstein administered.  In addition, although some of the evaluators emphasized a tremendous inability to perform abstract reasoning, the results obtained by Dr. Eisenstein on the WAIS-III test showed very good scores.  Dr. Suarez reviewed the WAIS-III manual which reports the results for a sample of patients with mild Alzheimer's disease, and Rothman's scores were four standard deviations above those scores, which encompasses basically a 99 percent improvement over a group with mild Alzheimer's disease.  Dr. Suarez testified that this was true for basically every index of the WAIS-III scores obtained by Dr. Eisenstein.  The result was the same when Dr. Suarez looked at the Wechsler memory scale results obtained by Dr. Eisenstein and compared those scores with the sample of mild Alzheimer's patients.  In addition, the DSM-IVTR provides that an essential element of an Alzheimer's diagnosis is an impairment in memory, and

51

the results of Dr. Eisenstein's testing shows good memory scores.  Dr. Suarez testified that with respect to his own testing, Rothman appeared to have good memory.

With respect to the intelligence tests, Dr. Suarez noted that Dr. Crown's test of arithmetic on the Wide Range Achievement Test reflected a score equivalent to the 53rd percentile, which is average; whereas, in Dr. Eisenstein's testing in January 2009, Rothman jumped to a score of 121, which puts him in the 92nd percentile.  This is inconsistent with the report of Dr. Gelblum that Rothman manifested discalculia.

With respect to the results of the PET scan, Dr. Suarez noted that the American Academy of Neurology has stated that a PET scan cannot be used to diagnose Alzheimer's disease because there is not sufficient data to validate its use for that purpose.  At present, the PET scan is a research tool, and it can show the level of metabolic activity in various parts of the brain, but it cannot tell you if that metabolic activity is causing memory impairments.

On cross-examination, Dr. Suarez acknowledged that Rothman may have some mild disturbance in executive functioning, *i.e.*, planning, organizing, sequencing and abstracting.

The defense sought to impeach the testimony of Dr. Suarez by demonstrating a bias in favor of the prosecution.  Since this was a key subject of the post-hearing pleadings, it is addressed in some detail here.  Dr. Suarez stated that in the last three years most of his work in state court has been by court appointment, followed by work for the State Attorney's Office, and lastly for the defense.  When asked to provide "the names of three defense lawyers that you have worked for in the past year," Dr. Suarez responded, "Steve Pinkard, Laura Susan  Bozorgi, Jose Quinon and the – there is one public defender Steven Taylor."  In the defense rebuttal case, with the agreement of

counsel, the undersigned called Jose Quinon from the courtroom and asked whether he had ever hired or consulted with Dr. Suarez on behalf of anybody he represented.  Mr. Quinon responded that "He is a doctor in a state case that I have, where he was actually retained by my co-counsel in that case.  I have never met Dr. Suarez.  I have never talked to him.  Not only about that client but about any client."  Mr. Quinon identified his co-counsel as Susan Bozorgi.  Based upon this testimony, the undersigned finds that Dr. Suarez' testimony is not impeached by the testimony of Mr. Quinon since Dr. Suarez was retained by co-counsel for the same client, and if he was performing work for one co-counsel he was logically performing work for the other.

In addition, the defense announced a stipulation that if called as a witness, Raquel Rothman, the defendant's daughter, would testify that on the first day of testing, Dr. Suarez left the office where he was administering tests to defendant Rothman on three or four occasions, during the last of which he interviewed her.

## V.    LEGAL ANALYSIS AND CONCLUSIONS

As previously stated, the task at hand is to determine whether, in light of the above evidence, Defendant David Rothman has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of proceedings against him.  For the reasons set forth below, I conclude that he does.

At the outset, the undersigned notes that Dr. Rothman did not seek treatment for any mental disease or defect until after he was advised that he was the subject of the investigation which led to this Indictment, and that he sought treatment from Dr. Rappaport at that time only upon the request of counsel. This of course does not mean that Dr. Rothman did not need treatment; and the undersigned has no reason to question

the fact that Dr. Rothman does not display the same intellect and cognitive functioning as he did when he began his practice of medicine.  This is a factor, however, which has some bearing on the ultimate decision of the undersigned to credit the testimony of Dr. Suarez that Dr. Rothman was malingering with respect to certain tests he administered, and to discount to some extent Dr. Rothman's subjective complaints of impairment.

Based upon the totality of the medical evidence, the undersigned concludes that Dr. Rothman is suffering from a mental disease or defect.  Dr. Eisenstein and the treating professionals have opined that it is dementia of the Alzheimer's variety; and, even though Dr. Suarez states that his test results did not support a diagnosis of dementia, he has opined that Rothman's condition is consistent with a diagnosis of Adjustment Disorder with Mixed Anxiety and Depressed Mood, Chronic.  The undersigned also finds that Rothman's abilities have declined from their prime, and he has a cognitive impairment of some type.  As emphasized by the government, however, it is not the diagnosis that renders a defendant incompetent to stand trial; rather, it is the ability of the person to function that is the critical inquiry.  Thus, the undersigned does not need to resolve whether Dr. Rothman is in fact suffering from mild Alzheimer's dementia as diagnosed by Dr. Fischer and Dr. Gelblum; but, will assume for the purposes of this analysis that he is.

The critical question is whether a preponderance of the evidence establishes that Rothman's mental degradation and  impairment have diminished his abilities to the point where he does not have a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, considering various factors pertinent to the criminal proceedings.  In this regard, the undersigned finds that the testimony of Dr. Suarez was the most credible.  The discussions held with Dr. Rothman by the various treating physicians and evaluators corroborate the conclusion by Dr. Suarez that Dr.

Rothman has the capability of understanding facts and communicating them to others, including facts regarding the crimes alleged in this Indictment.  In addition, Dr. Suarez appeared more objective than Dr. Eisenstein in several respects.  Dr. Suarez was forthcoming in admitting that Rothman had certain deficits as revealed by the MMPI-2 test, and that Rothman might have a mild disturbance in executive functioning.  On reviewing  Dr. Eisenstein's testimony, the undersigned was struck by the fact that he focused intently on depicting Dr. Rothman's abilities as profoundly impaired, and appeared reluctant to admit upon questioning by the Court that the level of impairment on the Trail Making Test was only mild to moderate.  In addition, the undersigned questions the objectivity of Dr. Eisenstein due to his expressed opinion that Dr. Rothman did not intend to commit the crimes charged and that others had taken advantage of him, which was based on his assessment of Rothman as a person of integrity.

Dr. Suarez' extensive review and critique of the tests which were administered by Dr. Eisenstein, and the various comparisons of inconsistencies that Dr. Suarez described in his testimony, provided convincing evidence that Dr. Eisenstein's conclusions are not credible.  This includes the variation in the IQ tests, and the fact that Dr. Rothman performed so differently on the same VIP test administered by Dr. Suarez, which objectively indicated lack of motivation and effort, as opposed to the VIP results obtained by Dr. Eisenstein.

Moreover, Dr. Suarez convincingly explained why the discalculic abnormality noted by Dr. Gelblum did not make sense in view of Dr. Rothman's subsequent the high score on a measure of arithmetic abilities.  In addition, the undersigned notes that  Dr. Gelblum had minimal contact with Dr. Rothman–he saw him once in March 2007, and Dr. Rothman did not return until September 2007, after which he saw him only one every

month or two until November 2008.  When Dr. Gelblum saw Rothman, did not treat him as though he had significant cognitive impairments.

Dr. Fischer also has spent little time with Dr. Rothman, and his diagnosis and opinion seemed to be based on the general nature of Alzheimer's disease rather specifically on Dr. Rothman.  The primary screening test used to diagnose Alzheimer's reflected no impairment, although the length of time Dr. Rothman took to complete the test led Dr. Fischer to opine that there was "a reduction of cognition for an individual of his intellectual achievements."  (DX 7).  Dr. Fischer's report was much more general than his testimony at the evidentiary hearing.  Moreover, his treatment plan states, "I would like to review the previous neuropsychological evaluation performed by Dr. Crown in 2007.  He may need a repeat evaluation to discern the extensive deterioration in the past two years."  Dr. Fischer acknowledged that his opinion regarding extensive deterioration was based on historical information he had obtained from Rothman, rather than on objective tests.  Dr. Fischer also planned to have the PET scan reviewed by a neuroradiologist to confirm the previous interpretation.[16]

Dr. Rappaport's testimony corroborated the existence of some impairment, but his letter to defense counsel on October 27, 2008, casts doubt on whether the impairment is sufficiently severe to render him incompetent to stand trial.  In that letter, Dr. Rappaport stated that "Dr. Rothman is an extremely bright man who has learned to compensate for his impaired judgment," but that he feared the continued stress of his current problems could cause Dr. Rothman to decompensate into a state where he will not be able to assist

---

[16]  The undersigned notes that neither Dr. Fischer nor Dr. Gelblum mentioned that the PET scan has not been approved by the American Academy of Neurology as a diagnostic tool for Alzheimer's disease, as testified to by Dr. Suarez.

counsel.  Although at the evidentiary hearing, Dr. Rappaport could not ethically opine on competence, it appears that at least as of the end of October 2008, Dr. Rothman was able to compensate for his impaired judgment, and had not yet decompensated to the point where he could not assist counsel.

Finally, although Dr. Crown's initial evaluation showed evidence of cognitive impairments, he testified that he had not evaluated Dr. Rothman to determine his competence in March 2007, and that he could not give an opinion now as to whether Dr. Rothman was competent to stand trial at that time.  He has not seen Dr. Rothman since the initial evaluation, and his present opinion is based on the other medical records, including the evaluation performed by Dr. Eisenstein.  Dr. Crown's opinion regarding competency, therefore, is not given much weight.

Dr. Suarez testified in excruciating detail, which the undersigned has already repeated in excruciating detail, about his observations of Dr. Rothman which led him to the conclusion that Dr. Rothman has the ability to relate pertinent facts, names and events to his attorneys, testify in a cogent and relevant manner, remain alert and responsive, and make rational choices regarding key decisions at trial.  In this regard, it is important to note that although the trial involves complicated issues of medical necessity in treatment, the government's theory of the case is that the treatments given were all inappropriate for HIV/AIDS patients, and is not dependent upon a review of any patient charts, or expert opinion with respect to any one patient, since there are no such charts.  Dr. Rothman apparently became certified to treat HIV patients, and the type of medical knowledge relevant to the trial appears to be the type of "old learning" that even the defense experts agree Dr. Rothman has retained.  It is also significant that this is not expected to be a long trial.  The government provided an estimate at the conclusion of the

evidentiary hearing that it expected its case in chief to last four or five days, and that it intended to call approximately ten to twelve witnesses, including at least two of the clinic owners who have pled guilty, the medical assistant who worked with Dr. Rothman and has pled guilty, an expert witness on medical necessity, a Medicare witness, and Medicare beneficiaries.  Through various hearings, as well as in the factual bases to support the guilty pleas, the government has provided a virtual outline of its evidence to the defense.  Defense counsel has access to all of the billing records with respect to all of the patients treated by Dr. Rothman, which provide information concerning the diagnosis and treatments for which Medicare was billed.  Most significantly, Dr. Rothman has articulated a cogent defense to these charges to his treating physicians and to Dr. Suarez, and has even persuaded Dr. Eisenstein that he is not guilty.

In sum, the undersigned concludes that although Defendant David Rothman has a mental disease or defect, and has declined in intellectual and cognitive abilities as he has aged, he retains the present ability to reasonably assist counsel in his own defense and participate in the trial.  Evaluating the totality of factors set forth above in the Framework for Analysis, the undersigned finds and concludes that David Rothman is competent to stand trial in these proceedings.

Therefore, based upon a careful review of the record, and for the reasons stated above, it is hereby

**ORDERED AND ADJUDGED** that David Rothman is competent to stand trial in these proceedings.

**DONE AND ORDERED** in chambers in Miami, Florida, on February 19, 2009.

*Andrea M. Simonton*
ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

Copies to:
The Honorable Ursula Ungaro, United States District Judge
All counsel of record via CM/ECF