UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION

CASE NUMBER: 08-CR-20895-UU

UNITED STATES OF AMERICA,
      Plaintiff,
vs.

JORGE LUIS PACHECO
      Defendant,
_____/

### DEFENDANT'S MOTION FOR NEW TRIAL AND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL

**COMES NOW**, the Defendant, JORGE LUIS PACHECO, by and through undersigned counsel, and hereby files this Motion For New Trial and Judge of Acquittal pursuant to Federal Rules of Criminal Procedure 33 and 29, and states the following in support:

The Defendant moves for a Judgment of Acquittal or in the alternative a new trial. No reasonable juror, taking the evidence in the light most favorable to the government, could find the defendant guilty beyond a reasonable doubt. Furthermore, the verdict was against the interest of justice due to each of the following independently and cumulatively: evidentiary errors, improper jury instructions, and insufficient evidence. In addition to the insufficiency of the evidence, a new trial is required based upon : 1) the Government's Brady violations, 2) the admission of improper lay opinion testimony of Luz Borrego, 3) the admission of the expert testimony of Dr. Wohlfeiler, 4) the denial of the Defendant's proposed jury instruction pertaining to the State Medical Statute, 5) the issuance of the Pinkerton instruction, and 6) the admission of overly prejudicial 404(b) evidence pertaining to Tendercare.

In moving for a new trial, the Defendant specifically incorporates its arguments previously made in his Motion to Exclude 404(b) evidence (DE 183), Motion to Exclude Improper Lay Opinion Testimony (DE 297), Motion to Exclude Government's Physician Witness (DE 198), Supplemental

Motion to Exclude Expert Testimony under Daubert (DE 261), his Motions for Judgment of Acquittal and all other objections and motions made during the trial.

I.     EVIDENCE WAS INSUFFICIENT FOR A JURY TO FIND THE DEFENDANT GUILTY

The verdict in this case was so contrary to the weight of the evidence that a new trial is required in the interest of justice.  In determining whether the evidence was insufficient and warrants a new trial, the court may properly consider the credibility of the witnesses. The sole evidence pertaining to Defendant Pacheco came from Tony Marrero.  Although patients could identify Jorge Pacheco as working at M & P, none testified to any illegal acts or statements made by him at M & P.  In fact, other than Marrero's testimony, the only testimony of any other Government witness that even mentioned Pacheco was one patient, Reyes Cruz, who said that Jorge Pacheco was the doctor's side kick.

The Government argued that Defendant Pacheco knowingly put false information on the superbills indicating treatment that was never provided and that he manipulated blood samples to achieve a specific result.  The sole witness testifying to this evidence was Tony Marrero.  The Government argued that Defendant Pacheco manipulated blood samples to make it appear that the treatment was medically necessary. The only person to testify to this was Tony Marrero, who did not actually see the Defendant commit these acts.  The Government argued that Defendant Pacheco advised Tony Marrero of what medications Medicare was paying for in order to assist in fraudulent billing practices.  The only person to testify to this was Tony Marrero.

Tony Marrero's testimony is incredible on its face.  On cross examination Tony Marrero admitted that he would lie to protect his family and to obtain a lesser sentence for his wife.  He admitted that he was hoping that his wife would receive a reduction in her sentence and be able to remain out of jail due to his cooperation and testimony on behalf of the government.  He repeatedly lied, even about seemingly unimportant details, which was revealed by actual physical and testimonial evidence.  Tony Marrero testified that he would discuss medications with Defendant Pacheco weekly to explain how he knew which medications Medicare would pay for and thus which medications should be reflected on the

superbills. However, the Government's own witness, Winnette Sandlin from Medicare, testified that Medicare's policies on what medications they will pay for go through a long review process which takes at least a couple months and usually closer to a year to change. Additionally, Marrero testified that he also got this information from his billing company. Therefore, testimony regarding weekly conversations with Defendant Pacheco about what medications needed to be ordered *for the purpose of defrauding Medicare*, is directly contradicted by the Government's own disinterested and objective witness. Additionally, when testifying about how he funded the start up of M & P, Marrero testified that he purchased all the office equipment and paid for all the bills such as the phone bills from the M & P accounts. However, actual bank records introduced at trial reflect that those bills were not paid from the M&P account. Tony Marrero's testimony was incredible on its face and is not capable of establishing guilt beyond a reasonable doubt. See *U.S. v. Hamilton and Messere*, 334 F.3d 170 (2nd Cir. 2003).

Considering that this is the only witness who could testify to the Defendant's actions and role at M & P and the witnesses complete lack of credibility on many different aspects of his testimony, there was insufficient evidence upon which a jury could have found that Defendant Pacheco was guilty of any of the counts with which he was charged.

II.  THE GOVERNMENT COMMITTED A *BRADY* VIOLATION WHICH WARRANTS A NEW TRIAL

In *Brady,* the Supreme Court held that the suppression of favorable defense evidence "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *United States v. Brady*, 373 U.S. 83, 87 (1963). This rule covers evidence useful for impeachment of a government witness. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Be it purely exculpatory or valuable for impeachment, though, the evidence must be *material* before it falls within the *Brady* rule. *Id*. at 677-78. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867 (2006). "The prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. at 198. This prevents the difficult task of determining materiality of the non-disclosed material in retrospect. As one court noted, "[T]he root of the problem is the prosecutor's tendency to adopt a retrospective view of materiality.... If and when the evidence emerges after trial, the prosecutor can always argue, with the benefit of hindsight, that it was not material." *United States v. Oxman*, 740 F.2d 1298, 1310 (3rd Cir. 1984) as quoted in *Bagley*, 473 U.S. 667.

To obtain a new trial based upon a *Brady* violation, the Defendant must show: (1) that the Government withheld favorable evidence, including impeachment evidence, (2) that he did not possess the evidence and could not have obtained it with reasonable diligence, and (3) that had the evidence been revealed, there is a reasonable probability that the outcome of the proceedings would have been different. *Id*. The Brady violation are enumerated in detail below.

### A. GOVERNMENT FAILED TO DISCLOSURE CRUCIAL INFORMATION REGARDING LUZ BORREGO

The Government failed to disclose Brady information regarding Luz Borrego which warrants a new trial. The Brady material was discovered through co-Defendant Luz Borrego's Objections to her Pretrial Sentence Investigation Report (PSI). Defendant Borrego's PSI revealed that the Government had been provided reports detailing Luz Borrego's serious abuse and addiction to alcohol and medication, including during the period during which she was testifying at trial (See 08-20895-CR-UNGARO DE 381 pg 3). This information included details regarding Luz Borrego's history of mental illness, suicide attempts, and medication she was taking at the time of trial for these issues. Additionally, in Borrego's testimony and through prior Government disclosures, Luz Borrego met with the Government to discuss her testimony in the trial. This same type of information regarding past drug abuse and taking of medication was discussed with other witnesses who met with the Government

discuss their testimony prior to trial. The information revealed detailed witness Guillermo Belalcazar's drug addiction and ongoing treatment.  Additionally, the Government provided disclosure that Tony Marrero was taking anti-depressants prior to his testimony at trial.

This information would have materially affected the outcome of the trial and the impact of the Government's sole witness regarding a key allegation against the Defendant.  The Government argued that manipulation of blood samples at M&P to achieve a specific result was necessary in order to justify the treatment that was being prescribed.   The Government also argued that the Defendant was paid extra money in exchange for doing this procedure at M & P.  However, the only evidence that this was being done was the testimony of the two cooperating government witnesses, one being Luz Borrego. Furthermore, the only person that could actually testify as to how the manipulation was done was Luz Borrego. Ms. Borrego's testimony amounted to expert testimony about a difficult technical procedure which she stated she performed on an almost daily basis. Contrary to this testimony were the actual lab reports from Tendercare which were reviewed by an expert pathologist and were undisputedly found to reflect what would normally be expected for the patient base Tendercare was serving.[1] Furthermore, the lab reports showed lab work that would not justify the treatment, tending to contradict the testimony of Luz Borrego and Tony Marrero.  The fact that Borrego was daily abusing alcohol and on several different medications would have been important information for the Defendant in preparation of a defense and in conducting a full and complete cross-examination. This Brady material was not simply impeachment of a collateral matter. The material went directly to the witnesses' ability to perform the highly technical procedures which she was stating she regularly did and with the accuracy she claimed was required. See *United States v. Bagley*, 473 U.S. 667, 690-91 (1985). It is entirely possible that the jury would have found Luz Borrego's testimony regarding blood manipulation incredible due to her physical inability to actually perform the procedure and instead rely upon the actual lab reports introduced into evidence. See *Id.*

---

[1] The Government failed to introduce any evidence or elicit any testimony on cross-examination of Dr. Wright that contradicted or discredited his opinion regarding the results on the lab reports from Tendercare.

Finally, the evidence the Government failed to disclose was not available to the Defendant at the time of trial nor could it have reasonably been discovered with due diligence. The PSI reports written by the U.S. Probation Office are confidential. The only parties who may receive a copy of the PSI are the courts, the defendant and his counsel, and the Government. Furthermore, in seeking this very type of information, the Defendant specifically requested Brady Material on three separate occasions, each time dealing in part with a request for information pertaining to cooperating government witnesses as well as a general request. Therefore, the Defendant did not possess the evidence and could not have obtained it with reasonable diligence.

### III. IMPROPER OPINION TESTIMONY WAS ADMITTED IN VIOLATION OF FRE 701 AND 702.

The Federal Rules of Evidence permit a lay witness's testimony in the form of opinions or inferences which are: (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. See Federal Rule of Evidence 701. In 2000, Rule 701 was specifically amended to add section (c) to prevent the "reliability requirements set forth in Rule 702 from being evaded through the simple expedient of proffering an expert in lay witness clothing. See Rule 701 Committee Note (2000). Therefore, when a lay witness's opinion testimony is based on either specialized knowledge or based upon a process for forming opinions that is employed only by persons with specialized expertise, the testimony is within the domain of expert testimony and controlled by Rule 702, not Rule 701. Furthermore, the lay opinion testimony must be predicated upon concrete facts perceived from their own senses, as distinguished from their opinions or conclusions drawn from such facts.

#### A. ADMISSION OF LUZ BORREGO'S TESTIMONY WAS PREJUDICIAL ERROR IN VIOLATION OF FRE 701

The testimony the Government elicited from Luz Borrego involved scientific, technical, and specialized knowledge regarding a complicated medical procedure and involving multiple explanations of the properties of blood, the effects of centrifuging, and an extraction procedure aimed at removing specific components of the blood sample. Perhaps the best evidence of the scientific complexity of Luz Borrego's testimony was that the Defense needed to call an expert witness to clarify the real scientific process and methodology behind removing platelets from a blood sample to explain to the jury why Borrego's testimony was so confusing and unsupported by any science. Furthermore, this testimony created the false impression for the jury that this type of scientific knowledge would be within the general knowledge of a medical assistant, like Defendant Pacheco. Another level of prejudice was added considering the jury was not instructed as to the Medical Assistant Statute and the limited role of a medical assistant.

In reality, knowledge describing the contents of the blood sample, how the contents relate to each other, how they can scientifically be separated from each other, and the resulting effects such separation would have on the blood sample involves specialized training beyond the common knowledge of even a general medical doctor. Such inferences and opinions are not ones that a normal person would form on the basis of the observed facts. See *United States v. White*, 492 F.3d 380, 401-406 (6th Cir. 2007)(Medicare auditors were prohibited from testifying, without being qualified as experts, about facts pertaining to the application of knowledge and familiarity with Medicare reimbursement procedures beyond what an average lay person would know). Testimony of a lay person's observation of a medical assistant handling a blood sample would not rationally lead to the opinion or inference that the blood is being manipulated in a way that would result in lowering certain types of blood platelets to a specific level notated in a specific Local Medical Review Policy pursuant to Medicare. Yet the Government was permitted to present the testimony of Luz Borrego as to the inferences and opinions from the actions she took. She was able to testify as to the inferences and opinions she drew from what she was doing, whether she was qualified to

draw those inferences or not. Then the jury was asked to apply those inferences and opinions to Defendant Pacheco who had never met or spoken to Luz Borrego. This is exactly the type of prejudice which is sought to be prevented under Rule 701 and 702.

Such testimony runs even further afield from the requirements of Rule 701 when taking into account that the Government elicited inference and opinion testimony from the lay witness as to the motivation or modus operandi for these actions – i.e. the typical purpose or goal for the alleged "manipulation" – as it applies to the Defendant. In *United States v. Dulcio*, this Court allowed an agent to offer opinion testimony as a lay witness concerning the modus operandi of people involved in the drug business, specifically tying each co-defendant's role/actions to that typically seen in a narcotics importing business. The Appellate Court found that it was error to admit opinion testimony of the lay witness as it was based on specialized knowledge. See *United States v. Dulcio*, 441 F.3d 1269 (C.A. 11 (Fla) 2006).

Contrary to the present case, in *United States v. Feliciano*, lay witness testimony by an agent was found admissible. The agent testified that a cellular phone call did not originate from the arrest site. The court found that this testimony was not based on scientific or specialized knowledge because the testimony was arrived at simply by reviewing the phone records showing the cellular towers from which the calls originated and pairing that with his personal knowledge of where those towers were geographically located in relation to the arrest cite. Unlike testimony regarding the molecular make up of a blood sample and its properties under certain conditions, a lay person is more than capable of reading phone bills and comparing different locations on a map. In fact, the *Feliciano* court specifically recognized such a factual distinction when it contrasted its factual basis with the one in *United States v. Sepulveda*. In *Sepulveda*, as in the present case, the testimony regarding cell phones was highly scientific and included technical issues pertaining to the "cloning" of cell phones. See *United States v. Sepulveda*, 115 F.3d 882, 884-885 (C.A. 11 (Fla.) 1997.

The Defendant recognizes that a cooperating government witness who is looking to earn a

5K or Rule 35 reduction in sentence may testify to their own personal observations and actions. However testimony regarding the conclusions, inferences, and opinions which may be drawn from their actions requires scientific and technological knowledge that clearly crosses the lines between lay opinion testimony and expert opinion testimony. See *United States v. Henderson*, 409 F.3d 1293 (C.A. 11 (Fla.) 2005). [2] This is exactly what Luz Borrego was allowed to do. However the answers were couched, her testimony amounted to her opinions and inferences drawn from her actions when those inferences and actions required some basis in scientific and technical knowledge.

The prejudicial nature of allowing this lay opinion testimony can not be underestimated. First, the testimony from Luz Borrego regarding blood manipulation was the only witness relied upon by the Government to establish one of the main allegations that constituted Defendant Pacheco's alleged role in the conspiracy. Second, the Government's failure to disclose *Brady* material regarding Luz Borrego's mental illness, substance abuse, and medications which prevented the Defendant from challenging the scientific procedures and deductions about which Luz Borrego testified. Therefore, the Government should have been precluded from introducing testimony from Luz Borrego.

B.  THE ADMISSION OF TONY MARRERO'S LAY OPINION TESTIMONY REGARDING THE DEFENDANT'S STATE OF MIND WAS ADMITTED IN VIOLATION OF FRE 701.

This is not a situation where the witness was offering a lay opinion regarding the meaning of a statement made by the Defendant to him during a conversation. This is an instance where the witness was allowed to testify to observations and then explain what the defendant was thinking to establish an element of the offense, not to aid the jury in understanding some evidence which may need to be explained. In other cases where there is a conversation in code or including terms not in the common understanding of the jury, opinion testimony may be helpful in assisting the jury in understanding what a person meant when they said those words. Tony Marrero did not assist the jury in interpreting any statements. Instead, he flat out told

---

2 A doctor, not qualified as an expert but who had treated the victim, testified that the victim had a fractured jaw. However, the doctor further testified, over objection, regarding his opinion on how the fracture had occurred. The court found that the testimony that the victim had a fractured jaw was permissible lay opinion but that opinion regarding the

the jury the Defendant's intent or knowledge of his role in the fraud. This did not occur once but over and over again through his testimony. Furthermore, this lay witness with no medical training or experience was able to testify to what Defendant Pacheco thought about whether the patients needed the medications. This opinion was offered with absolutely no testimony about statements Defendant Pacheco allegedly made regarding the medical necessity of the medications.

    IV.    ADMISSION OF DR. WOHLFIELER'S EXPERT TESTIMONY WAS IN ERROR UNDER FRE 702 AND DAUBERT AND THE CURATIVE INSTRUCTION REGARDING THE PARTIAL STRIKING OF DR. WOHLFIELER'S TESTIMONY WAS INSUFFICIENT TO CURE THE PREJUDICE

Dr. Wohlfieler's testimony did not meet the *Daubert* standard argued in the Defendants pre-trial motions which have been incorporated into this Motion for New Trial. His testimony was not sufficiently tied to the facts of this case and was not based reliable methodology. Furthermore, his testimony about what type of treatment he believes HIV/AIDS patients should receive and what medications are appropriate or not appropriate were not relevant to a fact at issue in the trial and were further misleading and confusing to the jury.

Once the Court determined that the majority of Dr. Wohlfieler's testimony should be stricken and did so, the prejudice remained and the taint upon the jury could not be cured. Dr. Wohlfieler was the Government's only expert witness and the only witness it called to address medical necessity and the appropriateness of the medications which were prescribed. Additionally, this witness testified for a full day of the trial. He went through numerous medications and their applicability in general to patients with HIV and what should never be prescribed for patients with HIV/AIDS. This witness was presented by the Government as one of only two independent witnesses not involved in any fraudulent activity at the clinics.[3] He also testified about how his clinic ran its daily operations and commented on his opinion on the daily operations of the M & P clinic as described by the Government. In addition to this witness's testimony being a focal point of the Government's case, a venire member during jury selection

---

cause of the injury as not admissible testimony under Rule 701(c).

was allowed to expound upon his belief that Dr. Wohlfeiler was a good, truthful, and credible person.

After the greater part of his testimony was stricken and at the end of the Government's case, the Court gave a very short instruction that some of Dr. Wohlfieler's testimony was sticken and that they were to disregard that testimony. This is the general sum of the attempt to cure the taint caused by an entire day of irrelevant and prejudicial testimony. Such instruction is insufficient considering that expert testimony can be "both powerful and quite misleading because of the difficulty in evaluating it." See *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999), quoting *Daubert*, 509 U.S. at 595(discussing application of FRE 403 on decision to admit expert testimony).

V. THE ADMISSION OF 404(B) EVIDENCE PERTAINING TO TENDERCARE WAS ERROR

The admission of the 404(b) evidence from Tendercare was overly prejudicial. Testimony regarding Tendercare came from Tony Marrero, Reyes Cruz, and Delmar Achuff. Of all of the exhibits submitted by the Government, a great deal of them pertained to Tendercare, including complete medical records of several patients and bank records for Tendercare's accounts. The Government in its closing argument directly argued that the medical records from Tendercare should be used to determine what kind of treatment was being given or not given at M & P. The Government basically asked the jury to supplement its lack of evidence regarding lab reports and other medical documentation with those from Tendercare. The amount of evidence and time discussing Tendercare was disproportionate to the offenses charged.

Furthermore, The Tendercare evidence was not necessary for any proper purpose under Rule 404(b). The evidence was not relevant to an issue other than the defendant's character; the probative value must not be substantially outweighed by its undue prejudice; and the government did not offer sufficient proof so that the jury could find the defendant committed the act. Not a single witness/employee from Tendercare testified at trial. There were only two patients who mentioned

---

3 The other witness not involved in the fraudulent activity in some way was Winnette Sandlin

Tendercare and neither testified to Defendant Pacheco's actions at Tendercare.

Lastly, the evidence introduced at trial was not inextricably intertwined. The evidence pertaining to Tendercare as to the treatment of patients and other aspects of the operation of Tendercare was not necessary to complete the story of the indicted offense. Discussing treatment plans and files as well as other details is not necessary to explain how Defendant Pacheco came to work at M & P

VI. THE JURY INSTRUCTIONS WARRANT A NEW TRIAL

A motion for new trial should be granted where: (1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself. See *U.S. v. Jacques*, 266 Fed.Appx. 824, C.A. 11 (Fla.) 2008, citing *U.S. v. Dean*, 487 F.3d 840, 847 (11th Cir. 2007).

    A.    DENIAL OF THE DEFENDANT'S SPECIFIC REQUEST FOR A JURY INSTRUCTION WARRANTS A NEW TRIAL

In the present case, the proposed jury instruction by the Defendant was a copy of the State statue pertaining to medical assistants. Therefore, it is clearly a correct statement of the law as it pertains to that statute. Secondly, the knowledge of a medical assistant and his/her duties and responsibilities was not mentioned or covered in any other jury instruction. In fact, the Pinkerton instruction erroneously given to the jury suggested an interpretation other than the one established under State law regarding medical assistants.

Secondly, the issue of the Defendant's knowledge was one of the most contested issues at trial. Knowledge of the treatment that was being prescribed, the amount of treatment being prescribed and other medical information was directly attributed to the Defendant as evidence of his guilty knowledge. One of the specific arguments made by the Government was that defendants at M & P knew that the

treatment was medically unnecessary and were guilty of conspiracy because of what the medical records and documentation from Tendercare reflected. The Government discussed the results in the lab reports as significant and relied upon that throughout the trial and even in closing argument. Therefore there is a great probability that the jury found that the Defendant knew about the fraud at M & P because of what the medical records reflected. However, Defendant Pacheco was not a medical doctor at M & P or Tendercare. He was a medical assistant who is not tasked with reviewing medical records and making judgments on the course of treatment prescribed. When this is combined with the Court's giving the jury the Pinkerton instruction, it was also highly probable that the jury attributed medical knowledge beyond that attributed to a medical assistant to Defendant Pacheco as to the substantive charges in the indictment.

As the denial of the Defendant's requested jury instruction fulfills all the requirements for a new trial, a new trial should be granted on this basis alone and in conjunction with the others.

    B.    THE JURY INSTRUCTIONS SHOULD NOT HAVE INCLUDED THE PINKERTON INSTRUCTION

Including the Pinkerton instruction as part of the jury instructions was error and warrants a new trial. It was overly prejudicial to the Defendant and confusing to the jury. It improperly conflated the Conspiracy count with the substantive offenses. Based on the instruction given, there was no opportunity for the jury to find the Defendant guilty of Conspiracy and not guilty of the substantive counts. It also shifted or eliminated the Government's burden of proof.

## CONCLUSION

The Defendant should be granted a new trial or in the alternative a Judgment of Acquittal. The verdict was against the interest of justice due to each of the following independently and cumulatively: evidentiary errors, improper jury instructions, and insufficient evidence. There were Brady violations. Improper lay opinion testimony of Luz Borrego was admitted in error. The admission of the expert testimony of Dr. Wohlfeiler was in error. The denial of the Defendant's proposed jury instruction pertaining to the State Medical Statute and the issuance of the Pinkerton instruction was error. Finally, the admission of overly prejudicial 404(b) evidence pertaining to Tendercare was error. Furthermore, no reasonable juror, taking the evidence in the light most favorable to the government, could find the defendant guilty beyond a reasonable doubt. When combining all these issues, the errors caused great prejudice and resulted in verdict against the interest of justice. Therefore, the Defendant's Motion should be granted.

**WHEREFORE**, the Defendant respectfully requests this Honorable Court to grant the Defendant's Motion

Respectfully Submitted,

By:____s/Brittney Horstman_____
Brittney Horstman
Kubiliun & Associates
SunTrust International Center
One SE 3rd Ave., Suite 1700
Miami, Florida 33131
Florida Bar No.: 0604798
(305) 577-0227 fax: (305) 577-4229

<u>CERTIFICATE OF SERVICE</u>

  I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via CM/ECF on this 15th day of April, 2009, to AUSA John Darden, United States Department of Justice, United States Attorney's Office, Washington D.C. and to:

Nelson Alfaro
Richard Klugh
Joel Hirschhorn
David Howard
Keith Pierro

                By:____s/Brittney Horstman_____
                Brittney Horstman