**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  08-20895-CR-UNGARO/SIMONTON**

**UNITED STATES OF AMERICA,**

>       **Plaintiff,**

**vs.**

**DAVID ROTHMAN,**

>       **Defendant.**

_____/

**ORDER FINDING DEFENDANT DAVID ROTHMAN INCOMPETENT**
**TO PROCEED TO SENTENCING**

  This matter arose upon the Defendant David Rothman's Motion to Determine Competency to Proceed to Sentencing (DE # 452).  The Government has responded in opposition (DE # 469), and the Defendant has replied (DE # 478).  This motion has been referred to the undersigned Magistrate Judge by the Honorable Ursula Ungaro, United States District Judge (DE # 453).

  On March 15 and 16, 2010, an evidentiary hearing was held by the undersigned wherein the Defendant David Rothman presented five expert witness and the Government presented one expert witness.  Both Parties introduced various medical records and tests into evidence.  After the hearing, the Parties both submitted Proposed Findings of Fact and Conclusions of Law Finding (DE ## 590, 591, 592) and the Defendant thereafter filed a Reply (DE # 596).  Based upon the testimony presented at the evidentiary hearing, a thorough review of the relevant medical records and test results, and the record as a whole, the undersigned concludes that Dr. David Rothman is not competent to proceed to sentencing in this matter.

I. <u>BACKGROUND</u>

A.  <u>Pre-Trial Proceedings</u>

On September 25, 2008, David Rothman, a 68 year old physician, was charged in a seven-count Indictment in this case along with several other defendants.  The Indictment alleged that the Defendants conspired to commit health care fraud between August 2004 and November 2006, in violation of 18 U.S.C. § 1349 (Count 1); and with executing and attempting to execute a scheme to defraud the Medicare program, in violation of 18 U.S.C. §§ 1347 and 2 (Counts 2 - 7).[1]

The Indictment alleges that these defendants were involved in various capacities with two medical clinics, M&P Group of South Florida, Inc. and Medcore Group, LLC, which purported to provide injection and infusion treatments to patients diagnosed with HIV/AIDS or cancer; and, which billed Medicare for those services. Not all defendants were involved with both clinics.  According to the Indictment, Defendants Juan Marerro, Orlando Pascual, Jr. and Belkis Marrero owned and controlled both of these clinics, and defendant Rothman was a physician who was employed by both clinics.  However, defendant Borrego was a medical assistant employed only by Medcore.  Defendants Milanes and Pacheco were medical assistants employed only by M&P; and, defendant Russell was a physician employed only by M&P.

According to the Indictment, the defendants conspired to defraud the Medicare program by submitting false and fraudulent claims regarding those purported treatments.  Specifically, the Indictment alleged that kickbacks and bribes were paid to

---

[1]  The Indictment also charged Defendants Juan Marrero, Orlando Pascual, Jr., and Belkis Marrero with various money laundering offenses related to the above health care fraud offenses.

Medicare beneficiaries at both clinics; that the injection and infusion treatments were not medically necessary; and, that medical records were fabricated to show that patients had received specific doses of injection or infusion, when the patients had not actually received the treatments or medications reflected on those documents.

With respect to Dr. Rothman's role in the conspiracy, the Indictment alleged, "David Rothman would conduct a cursory examination of the Medicare beneficiaries and would sign the required documentation, including medical and billing records, in order to make it appear that the injection and infusion treatments billed by Medcore and M&P were medically necessary and provided, when, in fact, they were not."  (DE # 1, at 6 ¶ 9)

The Indictment included six substantive counts which charge the commission of acts in execution of the scheme to defraud Medicare.  These counts listed six specific claims that were submitted to Medicare for payment in connection with medically unnecessary, and non-rendered injection or infusion treatments with respect to two patients–G.B. and R.C.  Defendant Rothman was charged in four of the substantive counts which allege that the following claims were submitted by Medcore as acts committed in execution of the scheme to defraud:

Count 2:      treating patient G.B. with an intramuscular injection of gamma globulin on November 20, 2004;

Count 3:      treating patient G.B. with an injection of Filgrastim on March 19, 2005;

Count 5:      treating patient R.C. with rituximab on July 9, 2005

Count 6:      treating patient R.C. with an intravenous injection of Immune Globulin on September 15, 2005.

The case was set for trial to commence on March 2, 2009 (DE # 295).

### B.  Motion to Determine Competence to Stand Trial

On December 30, 2008, counsel for David Rothman filed a Preliminary Motion to Determine Competency to Stand Trial (DE # 166).  That motion was referred to the undersigned Magistrate Judge by the Honorable Ursula Ungaro, United States District Judge (DE # 174).  After several preliminary hearings were held, the undersigned granted the motion to the extent that it requested a court-ordered competency evaluation, and appointed Enrique M. Suarez, Ph.D, to conduct the evaluation. Thereafter, a competency hearing was held on February 10, 2009, and was continued on February 12, 2009.  Based upon the testimony and exhibits introduced into evidence at the evidentiary hearing, the undersigned concluded that Defendant David Rothman was competent to stand trial (DE # 291).  That determination was based upon a review of the totality of the testimony regarding observations of Dr. Rothman and his communications with the various experts, and a determination that the results of the forensic evaluation conducted by Dr. Suarez, the court-appointed expert, were more credible than the results of Dr. Eisenstein, the defense expert.  The Defendant appealed this order to the District Court. On March 5, 2009, the Court affirmed the finding of competence (DE # 336).

### C.  The Trial

A jury trial was held on March 2-16, 2009.  On March 19, 2009, the jury returned a verdict of guilty against Dr. Rothman as to all five counts of health care fraud for which he was charged (DE # 358).  A sentencing date was set for June 26, 2009 for Dr. Rothman (DE # 360).  A Pre-Sentence Investigation Report was prepared, which consisted of 27 pages and 121 paragraphs setting forth the facts surrounding Dr. Rothman's criminal conviction, and the appropriate calculation of his sentence, including the calculation of the actual loss related to Dr. Rothman's conduct in the underlying offense.  On June 25,

4

2009, Counsel for Defendant Rothman filed a Sentencing Memorandum which seeking a downward departure and raising various objections to the Advisory Guideline Calculations (DE # 476).

### D. Motion to Determine Competency to Proceed to Sentencing

On June 16, 2009, Counsel for Dr. Rothman filed a Motion to Determine Competency to Proceed to Sentencing (DE # 452) based largely on medical reports from Dr. Rothman's physicians which indicated that his mental condition had continued to deteriorate after the determination regarding his competency to stand trial had been made.  On July 16, 2009, the undersigned found, based upon then-recent mental health reports, that there was reasonable cause to believe that Dr. Rothman might be suffering from a mental disease or defect such that he was not competent to proceed to sentencing in this matter, and/or was in need of custody for care or treatment in a suitable facility (DE # 486).  The Court then appointed Ranjan Duara, M.D., Medical Director of The Wien Center for Alzheimer's Disease and Memory Disorders, to conduct a competency evaluation of David Rothman.

On August 8, 2009, Dr. Duara authored a Neurological Summary which concluded, in pertinent part, based upon his review of Dr. Rothman's medical records from several different medical providers, including an MRI and PET Scan, as well as Dr. Duara's own neurological evaluation and examination of Dr. Rothman, that Dr. Rothman was not competent to proceed to sentencing because he suffers from a severe loss of insight and comprehension relating to a degenerative brain disorder, most likely Fronto-Temporal Lobar Dementia, which is irreversible and likely to relegate Dr. Rothman to a completely dependent state over the next several years.  Dr. Duara also noted that an alternative possible diagnosis was atypical Alzheimer's disease.

5

In response to Dr. Duara's Report, the Government requested that the Court order Defendant Rothman to submit to a mental examination pursuant to 18 U.S.C. § 4241 and commit him to the custody of the Attorney General for a period of 120 days to conduct an inpatient examination at a Bureau of Prisons ("BOP") medical facility (DE # 527).  In that Motion, the Government asserted that Dr. Duara's report and the diagnosis contained therein conflicted with the medical reports previously submitted by the Defendant.[2]  Specifically, the Government asserted that the Defendant's expert physicians had concluded that Dr. Rothman was suffering from Alzheimer's Disease, unlike Dr. Duara who concluded, as stated above, that Dr. Rothman was suffering from a different type of dementia.  Finally, the Government contended that Dr. Duara's Report failed to provide enough detail to make an accurate comparison with the findings of the other experts, namely Dr. Enrique Suarez, who was the court appointed expert psychologist in Dr. Rothman's prior competency proceedings.

The undersigned granted the Government's Motion, in part and, pursuant to 18 U.S.C.A. § 4241(b) and § 4247(a)(2), (b), ordered Dr. Rothman to be committed to the custody of the Attorney General for placement in a suitable Bureau of Prison facility for a psychiatric forensic evaluation for a reasonable period of time not to exceed ten (10) days, in order to render an opinion, diagnosis and prognosis regarding Dr. Rothman's psychiatric state (DE # 553).  The Order also permitted the director of the Bureau of Prison facility to request a reasonable extension of time to complete the evaluation of Dr. Rothman in order to reach a comprehensive and accurate assessment of his condition, if necessary.  In addition, the Court noted in the Order that the Government had

---

[2] The previous medical reports were submitted to the Court during the resolution of the Defendant's Motion to Determine Competency to Stand Trial (DE # 166).

6

represented that the Medical Staff at the Mayo Clinic was available for consultation with the Bureau of Prison facility and the Court approved the use of the Mayo Clinic, if deemed appropriate by Bureau of Prison staff.  Further, based upon the particular nature and characteristics of Dr. Rothman's diagnosis and the concerns raised by Counsel for the Defendant, the Court recommended Dr. Rothman be evaluated at the Bureau of Prison facility, located in Rochester, Minnesota.  The Government had previously represented that the Rochester facility was equipped with appropriate medical personnel with the requisite training, including training in forensic psychiatry, as well as the medical equipment and accommodations suitable to provide Dr. Rothman with the medical treatment that he required, including any treatment or monitoring of medical conditions that existed independent of his psychiatric condition.

On November 16, 2009, Dr. Rothman was admitted to the Federal Medical Center in Rochester, Minnesota ("FMC" or "BOP") for an evaluation pursuant to this Court's Order (DE # 553).  While at the FMC, Dr. Rothman underwent daily observation and numerous cognitive and intelligence tests.  Dr. Rothman was released from the FMC on November 25, 2009 (DE # 566).

In mid-December 2009, the BOP provided the undersigned with the BOP's Forensic Evaluation of Dr. Rothman that was signed on December 15, 2009 by Emily E. Wakeman, M.A., Psychology Intern, Daniel Carlson, Psy.D., Staff Psychologist and Daniel J. Shine, Jr., Staff Psychologist.  The Report concluded that Dr. Rothman was not suffering from a mental disease or defect that rendered him unable to understand the nature and consequences of the proceedings against him, or to particpate properly at sentencing.

On March 15 and 16, 2010, an evidentiary hearing was held by the undersigned to

determine whether Dr. Rothman was competent to proceed to sentencing (DE ## 580, 581).  At the hearing, Defendant David Rothman presented five expert witness and the Government presented one expert witness.  Both Parties introduced various medical records and test results pertaining to Dr. Rothman into evidence (DE # 589).

After the hearing, pursuant to the undersigned's direction, the Defendant submitted Proposed Findings of Fact and Conclusions of Law Finding Defendant David Rothman Not Competent to Proceed to Sentencing (DE # 590) and Memorandum of Law in Support (DE # 591).  In response, the Government filed its Proposed Findings of Fact and Conclusions of Law Finding Defendant David Rothman Competent to be Sentenced (DE # 592) and Memorandum of Law in Support (DE # 591).  Thereafter, Defendant filed a Reply (DE # 596).[3]

## II.  FRAMEWORK FOR ANALYSIS

At the outset, it is important to note that the issue in this case regarding the competency of Defendant Rothman is whether he has a mental disease or defect that renders him unable to assist properly in his sentencing proceedings.  There has been no assertion that he does not understand the nature and consequences of these proceedings.

Title 18, United States Code, section 4241, entitled "Determination of mental competency to stand trial to undergo postrelease proceedings," provides,

---

[3] At the conclusion of the hearing, the undersigned indicated that the Court might entertain oral argument on the competency determination depending on the post-hearing submissions made by the Parties.  However, based upon those submissions and a thorough review of the transcript from the hearing, the medical records and the record as a whole, the undersigned concludes that oral argument is not necessary in this matter and would not assist the court in arriving at its ultimate determination.  Therefore, the undersigned resolves the issue of Dr. Rothman's competency based upon the current record.

(a) Motion to determine competency of defendant.--At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, or at any time after the commencement of probation or supervised release and prior to the completion of the sentence, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

(b) Psychiatric or psychological examination and report.--Prior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247 (b) and (c).

(c) Hearing.--The hearing shall be conducted pursuant to the provisions of section 4247(d).

(d) Determination and disposition.--If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility–

(1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward; and

(2) for an additional reasonable period of time until--
(A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or

(B) the pending charges against him are disposed of according to law; whichever is earlier.

The above cited statute does not expressly address the standard for determining

whether a defendant is competent to proceed to sentencing.  However, courts that have evaluated the competency of a defendant to proceed to sentencing have regularly applied § 4241 in arriving at their determinations. *United States v. Gigante*, 996 F. Supp. 194 (E.D. N.Y. 1998); *United States v. Chaudhry*, 646 F. Supp 2d 1140 (N.D. Fla. 2009).

As set forth above, Subsection (a) of that statute provides that the Court shall order a hearing regarding a defendant's competency to stand trial "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  The Court has the authority to order that a psychiatric or psychological examination be conducted, and that a report be filed with the court, prior to the date of such hearing.  18 U.S.C. § 4241(b).  In the case at bar, the undersigned Magistrate Judge determined that such reasonable cause existed, and appointed, Dr. Ranjan Duara, M.D., to conduct the examination.

The statute further provides that this examination, report, and hearing are to be conducted and prepared in accordance with the provisions of 18 U.S.C. § 4247.  18 U.S.C. §§ 4241(b), 4241(c).

Psychiatric and psychological examinations are governed by 18 U.S.C. § 4247(b), which provides in pertinent part:

> A psychiatric or psychological examination ordered pursuant to this chapter shall be conducted by a licensed or certified psychiatrist or psychologist, or, if the court finds it appropriate, by more than one such examiner.  Each examiner shall be designated by the court. . . .

Pursuant to 18 U.S.C. § 4247(c), the report of examination shall include:

> (1) the person's history and present symptoms;

10

>
> (2) a description of the psychiatric, psychological, and medical tests that were employed and their results;
> (3) the examiner's findings; and
> (4) the examiner's opinions as to diagnosis, prognosis, and–
>
> (A) . . . whether the person is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

Once there is an evaluation, the proceedings are governed by 18 U.S.C. § 4241(d), which provides that if, after a hearing, "the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.... for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." Thus, the initial burden of persuasion is on the movant to establish by a preponderance of the evidence that he is not competent.[4]

---

[4] The defendant does not agree that he has the burden of establishing, by a preponderance of the evidence, that he is not presently competent (DE # 270). *United States v. Izquierdo*, 448 F.3d 1269, 1276-77 (11th Cir. 2006). However, the undersigned notes that 18 U.S.C. § 4241(d) was enacted in 1984; the predecessor statute governing competency determinations, 18 U.S.C. § 4244 (1949) did not mention a burden of proof, and had been construed by the former Fifth Circuit Court of Appeals to place the burden of proving competence to stand trial on the government. *United States v. Makris*, 535 F.2d 899, 906 (5th Cir. 1976). As recognized by the government, based upon the new statute which specifically addresses the burden of establishing incompetence, and the Eleventh Circuit's holding in *Izquierdo*, the holding in *Makris*, which construed a different statute, no longer applies. The undersigned recognizes, however, that if it were the government seeking to establish the incompetence of a defendant who claimed to be competent, then the government would have the burden of proof. The present statute

Section 4241 codified the competency principles set forth in *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam), wherein the Supreme Court held that the standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *United States v. Wiggin*, 429 F.3d 31, 36 n. 8 (1st Cir. 2005).  In determining whether the defendant has sufficient present ability to consult with his lawyer, courts have considered the following factors: 1) the state of the defendant's memory, since he should be able to relate pertinent facts, names and events to his attorneys (although the defendant need not remember every fact that trial might encompass);[5]  2) the extent to which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources; 3) an adequate ability to review and evaluate documents and other written evidence bearing on the case; 4) an appreciation of the Government's evidence against him; 5) the ability to consider the wisdom of taking a course other than standing trial on the merits; 6) the ability to decide objectively whether to exercise his constitutional right to take the stand, and if he does take the stand, the ability to testify in an intelligent, coherent and relevant manner; 7) the ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses; and 8) the ability to discuss the testimony with his attorneys and to postulate questions to the witnesses through counsel.  *United*

---

does not speak in terms of whether the government or defendant has the burden of proof; it only mandates that whoever is seeking to prove incompetence has the burden.

[5] Indeed, even defendants with amnesia have been found competent to stand trial. *See e.g., United States v. Rinchack*, 820 F.2d 1557 (11th Cir. 1987); *United States v. Swanson*, 572 F. 2d 523 (5th Cir. 1978).

12

*States v. Passman*, 455 F.Supp. 794 (D.D.C. 1978) (citations omitted).

Further, as to an amnesiac defendant, courts should evaluate the nature and extent of the defendant's impairment and determine its impact by considering the following factors: 1) the defendant's ability to take the stand and testify and otherwise participate in his defense; 2) whether the amnesia is temporary or permanent; 3) whether the crime and the defendant's whereabouts can be properly reconstructed without the defendant's testimony, including any facts giving rise to a defense; 4) whether access to government files would aid in preparing for trial; and, 5) the strength of the government's case against the defendant. *United States v. Rinchack*, 820 F.2d 1557, 1569 (11th Cir. 1987) (*citing United States v. Swanson*, 572 F.2d 523, 526 (5th Cir. 1978)).

This need to evaluate the nature and extent of the defendant's impairment and determine its impact is applicable in the context of defendants who claim other mental defects as well.  As stated in *United States v. Liberatore*, 856 F. Supp. 358, 360 (N.D. Ohio 1994),

> In itself, the mere presence of a mental disease or defect is not sufficient to render a defendant incompetent....the disease or defect must be of sufficient magnitude to compromise defendant's mental capacities to the point that he functions below the level established in *Dusky*. This inquiry is a difficult one because it does not follow a bright line rule that any diagnosis of mental disease or defect is enough to demonstrate legal incompetency. The diagnosis of existence must be coupled with evidence of degree, to wit significant impairment.

In *United States v. Hogan*, 986 F.2d 1364, 1373 (11th Cir. 1993), for example, the Eleventh Circuit Court of Appeals affirmed the district court's finding that minor defects in a defendant's cognitive abilities related to "Alzheimer changes" did not render him incapable of providing rational assistance to his attorney.  In doing so, the Court noted that even perfectly competent defendants often do not fully comprehend the intricacies of

some of the theories offered by their lawyers, and stated, "all that is required is that [the defendant] had a rational as well as factual understanding of the proceedings against him and had sufficient present ability to consult with his attorney with a reasonable degree of rational understanding." *Id.  Accord Median v. Singletary*, 59 F. 3d 1095, 1107 (11th Cir. 1995) (stating neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial); *United States v. Housh*, 89 F.Supp.2d 1227 (D.Kan 2000) (holding head injury alone not enough to find incompetency, evaluation of severity of defendant's deficits resulted in finding defendant competent).  *United States v. Davis*, 166 F.3d 1222 (10th Cir. 1999) (same); *United States v. Robinson*, 253 F. 3d 1065, 1068 (8th Cir. 2001) (holding limited intellectual functioning not sufficient to find incompetence where defendant able to consult with lawyer with reasonable degree of rational understanding).

　　　　In addition, although medical professionals properly determine whether a defendant has a disorder or is malingering, competency is a legal concept.  "In the final analysis, the determination of competency is a legal conclusion; even if the experts' medical conclusions of impaired ability are credited, the judge must still independently decide if the particular defendant was legally capable of reasonable consultation with his attorney and able to rationally and factually comprehend the proceedings."  *United States v. Makris*, 535 F.2d 899 (5th Cir. 1976).

　　　　Further, it is worth noting that the Defendant has already been convicted in this matter and thus the issue presently before the Court is whether the Defendant is competent to proceed to sentencing.  The First Circuit has held that "[t]he need for competency survives trial and extends through the sentencing phase of a criminal proceeding." *United States v. Pellerito*, 878 F.2d 1535, 1544 (1st Cir. 1989).  A defendant

must be able to participate in the adversary process, including "critical evaluation of the presentence investigation report...and allocution at time of sentencing." *Id.* (citations omitted). The sentencing process necessitates that the defendant possess "both a 'present ability to consult with [a] lawyer with a reasonable degree of rational understanding,' and a 'rational as well as factual understanding of the proceedings." ' *Id.* (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)).

Moreover, the Supreme Court has explained that "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 181 (1975). Thus, although the Defendant in this matter was found to be competent to stand trial in February of 2009, that finding does not preclude a subsequent finding that circumstances have changed which render the Defendant unable to meet the standards of competency in additional criminal proceedings in the action.  Accordingly, the instant determination is focused on whether the Defendant's mental and/or medical condition has digressed to the point that the Defendant has become incompetent subsequent to the Court's February 2009 finding of competence.

Finally, in order to provide a framework for evaluating the functions that the Defendant may be required to provide in order to reasonably consult with his attorneys in preparation for sentencing, the Court notes that Federal Rule of Criminal Procedure 32, Sentencing and Judgment, provides, in reference to a defendant's Presentence Report,

> (f) Objecting to the Report.
>
> (1) Time to Object. Within 14 days after receiving the presentence report, the parties must state in writing any objections, including objections to material information,

15

sentencing guideline ranges, and policy statements contained in or omitted from the report.

And, as to sentencing, the Rule provides,

(i) Sentencing.

(1) In General. At sentencing, the court:

(A) must verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report;

(B) must give to the defendant and an attorney for the government a written summary of--or summarize in camera--any information excluded from the presentence report under Rule 32(d)(3) on which the court will rely in sentencing, and give them a reasonable opportunity to comment on that information;

(C) must allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence; and

(D) may, for good cause, allow a party to make a new objection at any time before sentence is imposed.

(2) Introducing Evidence; Producing a Statement. The court may permit the parties to introduce evidence on the objections. If a witness testifies at sentencing, Rule 26.2(a)-(d) and (f) applies. If a party fails to comply with a Rule 26.2 order to produce a witness's statement, the court must not consider that witness's testimony.

Finally, the Rule provides,

(4) Opportunity to Speak.

(A) By a Party. Before imposing sentence, the court must:

(i) provide the defendant's attorney an opportunity to speak on the defendant's behalf;

(ii) address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence; and

> (iii) provide an attorney for the government an opportunity to
> speak equivalent to that of the defendant's attorney.

With respect to subsection (4) of this Rule, the Eleventh Circuit has stated, "Allocution is the right of the defendant to make a final plea on his own behalf to the sentencer before the imposition of sentence." *United States v. Prouty*, 303 F.3d 1249 at 1251 (11th Cir. 2002). The allocution process affords a criminal defendant "an opportunity to plead personally to the court for leniency in his sentence by stating mitigating factors and to have that plea considered by the court in determining the appropriate sentence." *United States v. Gerrow*, 232 F.3d 831, 833 (11th Cir. 2000) (per curiam) (internal quotation marks omitted),  With these precepts in mind, the undersigned turns to the Motion at bar.

### III.   THE CONTENTIONS OF THE PARTIES

The defense contends that Defendant Rothman is suffering from dementia rendering him mentally incompetent to the extent he is unable to assist properly in his defense through the sentencing proceedings.[6]  The Defendant asserts that the expert testimony and the medical reports presented at the hearing demonstrate by a preponderance of the evidence that Dr. Rothman is not competent to proceed to sentencing.

The Defendant urges that the Court should accord great weight to the testimony of the Court-Appointed expert, Dr. Rajan Duara, as well as the other four defense experts: Drs. Crown, Rappaport, Gelblum and Fischer; and, should reject the testimony of the Government's expert witness, Dr. Daniel Carlson.  The Defendant contends that the five expert witnesses called by the Defendant at the evidentiary hearing testified that Dr.

---

[6]  As in the pretrial competency determinations, the defense does not assert that defendant Rothman is unable to understand the nature and consequences of these proceedings.

Rothman does not have the cognitive functions to perform with respect to mitigation and allocution at sentencing.  In addition, the Defendant argues that the objective evidence in the form of neurological imaging confirms that Dr. Rothman has dementia and none of the five witnesses found evidence of malingering.

Conversely, the Government contends that Defendant Rothman is competent to proceed to sentencing because even though Dr. Rothman likely suffers from dementia, the diagnostic reports do not demonstrate the extent of Dr. Rothman's cognitive abilities. The Government asserts that the Defendant's expert witnesses improperly place heavy emphasis on the information provided by the Defendant's family members regarding the Defendant's abilities; and, that information was contradicted by the ten-day observation of Dr. Rothman at the Federal Medical Center in Rochester, Minnesota made by the health professionals at that facility.  Further, the Government asserts that the Defendant is unable to explain the scores obtained by Dr. Rothman on the tests administered at the FMC so far as those scores fell at or below the malingering level.  Finally, the Government contends that Dr. Rothman is sufficiently able to assist his counsel at his sentencing as evidenced by his ability to discuss his case with both the Government's and Defendant's experts.  The Government further contends that there is no requirement that a defendant be able to assist his counsel with every aspect of a proceeding, rather a defendant must simply be able to consult with his attorney with a reasonable degree of rational understanding.  The Government therefore contends that the evidence in this case demonstrates that Dr. Rothman is competent to proceed to sentencing.

### IV.    THE PSYCHOLOGICAL AND NEUROLOGICAL EVALUATIONS

At the evidentiary hearing, the Defendant presented the testimony of the court-appointed expert, Dr. Ranjan Duara, M.D., Medical Director of The Wien Center for

Alzheimer's Disease and Memory Disorders located at Mt. Sinai Medical Center in Miami Beach, Florida.  Dr. Duara was examined by both counsel, and his Biographical Sketch which set forth his education, training, work experience and peer-reviewed publications, as well as his expert report were admitted into evidence (DX 2, DX 3 and DX 3A).

The Defendant also introduced into evidence materials and records received by the BOP (DX 7). Those records include the notes and test results from the evaluation made at the BOP, and medical records and diagnostic reports regarding Dr. Rothman's condition made by other physicians.  Among those records are two Mayo Foundation Diagnostic Radiology Reports; one dated November 30, 2009 signed by Dr. Laurence J. Eckel, and one dated December 1, 2009 signed by Dr. Jolanta M. Durski, which interpreted various MRI and PET scans taken of Dr. Rothman (DX 7, Bates Nos. 000113, 000114).

The Defendant also introduced a June 16, 2009 Order Appointing Plenary Guardian of Person and Property from the Eleventh Judicial Circuit Court in Miami-Dade County, Florida, Probate Division wherein Dr. Rothman's daughter was appointed plenary guardian of David Rothman's person and property (DX 6).[7]

The Government presented the testimony of Dr. Daniel Carlson a psychologist at the Federal Medical Center of the Bureau of Prisons in Rochester, Minnesota.  Dr. Carlson was examined by both counsel and his Curriculum Vitae which was admitted into evidence (GX 1).

The remaining experts were treating physicians and psychologists.  Specifically,

---

[7]  Although this Order was admitted into evidence, the undersigned has given it no weight in determining the issue of competence to proceed to sentencing.  There is no showing that the same standards apply to these very different determinations; and, it appears that there was no evidence presented to the Judge who entered the Guardianship Order that was not presented at the competency hearing and evaluated by the undersigned.

the Defendant introduced testimony of neuropsychologist Barry Crown, Ph.D.,

psychologist Michael Rappaport, Ph.D., neurologist Jeff Gelblum, M.D., and neurologist

Kenneth Fischer, M.D.  There was no dispute that these witnesses were qualified to

testify as expert witnesses in their respective fields, and the undersigned Magistrate

Judge finds that they are all qualified to do so.

The following is a synopsis of the testimony and reports presented at the

evidentiary hearing held on March 15-16, 2010 (DE ## 582, 583):[8]

1.    Dr. Ranjan Duara

Ranjan Duara, M.D., is the Medical Director of The Wien Center for Alzheimer's

Disease and Memory Disorders in Miami Beach, Florida, whose biographical sketch was

entered into evidence (DX 2).  He is a behavioral neurologist, who was qualified as a

neurologist in 1981.[9]  He completed his residency in neurology and completed a four-

year fellowship in the neurology of aging at the National Institute of Health.  During that

time, he worked with PET scans in elderly individuals with and without Alzheimer's

disease and developed the first definition of how PET scans could be used to diagnose

Alzheimer's disease and other types of dementia.

Thereafter, he began to work at the PET scan center at the University of Miami and

Mount Sinai Medical Center where he helped develop the Center for Memory Disorders.

This Center became the Wien Center for Alzheimer's Disease and Memory Disorders at

Mount Sinai Medical Center in 1986.  Dr. Duara was appointed initially as the associate

_____

[8] Docket numbers 582 and 583 are the docket entry numbers of the transcripts for the hearing held on March 15th and March 16th, 2010, respectively.

[9] At the hearing, the Government did not challenge the validity of Dr. Duara's credentials and did not challenge the Court's determination that Dr. Duara is an expert in Neurology and dementia-type disorders.

director of that Center; and, in 1990, he became the medical director of the Wien Center and continues in that capacity today.  He is the associate director for the National Institute of Health funded Alzheimer's Disease Center for Florida and has been involved in the Alzheimer's Disease Initiative since 1985; and in that capacity he was involved in developing memory disorder clinics in different areas of the state.  He has approximately 205 publications to date.

In his capacity as the Medical Director of The Wein Center, Dr. Duara oversees the Center which evaluates people with memory disorders.  He personally performs the neurological evaluations and is assisted by a behavioral neurologist and a psychiatrist in those evaluations.  The Center has a brain bank that performs specific imaging involving MRI scans to assist with patients' diagnoses.  Dr. Duara estimated that over the course of twenty-five to thirty years, he has read between five and ten-thousand MRI or PET scans in diagnosing Alzheimer's disease or some other form of dementia.[10]   After he testified about his educational qualifications and experience, Dr. Duara was designated by the Court as an expert in Neurology and dementia-type disorders, without objection by the Government.

Dr. Duara initially evaluated David Rothman on August 3, 2009 and his report from that evaluation was submitted into evidence (DX 3).  Dr. Duara first became involved in the case when the Court referred Dr. Rothman to him for a competency evaluation.  At that time, he understood that the issue to be determined was whether Dr. Rothman was "able to understand why he was being sentenced" and "how he could assist his

---

[10] Later in his testimony, after he was qualified as an expert, Dr. Duara estimated that he has evaluated 10,000 new patients at the Center for dementia related diseases, including Alzheimer's and/or frontotemporal dementia.

attorneys in perhaps mitigating any sentence that he would receive." (DE # 582 at 23).  Dr. Duara believed that it was his job to be as objective as possible and to provide the Court with information regarding the possibility of Dr. Rothman's condition being caused by a brain disease as opposed to "malingering or a psychiatric condition that could be the cause of [Dr. Rothman's] behavior."[11]

Overall, Dr. Duara has spent at least ten hours with Dr. Rothman, three of which were his initial evaluation and approximately three or four follow-up appointments of an hour each in duration.  He also reviewed the results of various tests, including two scans performed on Dr. Rothman.  Specifically, Dr. Duara reviewed prior evaluations of Dr. Rothman from Dr. Jeffrey Gelblum, Dr. Kenneth Fischer, Dr. Barry Crown, Dr. Michael Rappaport, Dr. Hyman Eisenstein and Dr. Enrique Suarez.  Further, as indicated in his written report, Dr. Duara reviewed a CD of an MRI scan, an August 5, 2009 PET scan, and an October 28, 2009 FDG brain PET scan (DX 3-A).

During the hearing, Dr. Duara explained that dementia is a generic term which refers to a progressive syndrome of impairment of cognitive function and the impairment of the ability to perform as one did previously.  In elderly individuals the most common cause of dementia is Alzheimer's disease, which is responsible for about 80% of all cases.  However, there are more than one hundred diseases that ultimately can result in dementia, including Alzheimer's disease and frontotemporal dementia.  Both Alzheimer's and frontotemporal dementia are diseases that have specific pathology and are

---

[11]  After Dr. Duara completed his evaluation of Dr. Rothman and rendered a report to the Court, Dr. Duara continued to treat Dr. Rothman as a patient.  Thus, the Court has considered and factored into its evaluation that likelihood that Dr. Duara's testimony and opinions regarding Dr. Rothman's condition are not merely from the perspective of a court-appointed expert who typically maintains no continued ties with the patient, but rather are akin to those provided by a treating physician.

determined through objective evaluations as well as a patient's expression of symptoms.

Dr. Duara testified that one in ten cases of dementia in people over the age of 50 are caused by dementia that affects the frontal lobes of the brain which Alzheimer's disease tends not to affect.  Dysfunction of the frontal lobes as the result of the disease causes behavioral symptoms that are somewhat different than the typical case of Alzheimer's disease, although there are some patients with Alzheimer's disease where the disease affects the frontal lobe of the brain.

He explained that generally however, the memory changes in frontotemporal dementia are different than the memory changes that occur in Alzheimer's.  In frontotemporal dementia, the working memory is affected so that an individual may have memory problems at home, but may perform better than expected when tested.  Also, dementia of the frontal lobes or Alzheimer's that affects the frontal lobes causes a great deal of fluctuation in behavior.  This fluctuation results in good performance and poor performance on different days, due to exaggeration of the normal changes that occur in individuals.  Dr. Duara explained that people with frontotemporal dementia are very sensitive to any extraneous factor that causes anxiety.  For example, the environment that someone is in or the way a question is asked can cause either very good performance or very poor performance.  The fluctuations in behavior can lead to the false conclusion that an individual is malingering because the performance can be so variable from time to time.  Dr. Duara agreed that, because a person suffering from frontotemporal dementia will have good days and bad days, the best way to measure a patient's abilities or extent of decline is to measure it over a period of time instead of in an isolated event.

In addition, Dr. Duara described that a person with frontotemporal disease has primary dysfunction of the frontal lobe which causes apathy, a lack of motivation, lack of

23

insight and difficulty with language function.  Thus, frontotemportal dementia relates to overall performance including memory and language performance, the ability to comprehend and the ability to pay attention to what is asked.

Dr. Duara confirmed that although a PET scan or an MRI can indicate that there is some disease affecting the function of the brain, you cannot tell from those tests what symptoms a particular person will display at a given moment.  Thus, you may have a person whose scans indicate that his/her brain has hypometabolism of the frontotemporal lobe, but that person may act perfectly normal at a given time; whereas, another person with the same brain disease may have a difficult time getting through the day. Therefore, you have to examine other factors to determine where a particular person is in their symptomology.

Dr. Duara agreed that not every person who has either frontotemporal dementia or Alzheimer's disease is necessarily incompetent; rather, that depends on the level of progression.  There are different features that may be used to determine how much worse a person may become over a certain span of time, including determining what other areas of the brain are affected, determining whether there is motor dysfunction, and the appearance of how widespread the disease is on a scan.  However, these features may not result in a one-hundred percent accurate assessment.

In his report which memorialized the August 3, 2009 evaluation conducted of Dr. Rothman, Dr. Duara concluded that Dr. Rothman has impairment of mental cognitive function which is suggestive of dementia primarily manifested with apathy or lack of motivation, and with difficulty of comprehension.  He also concluded that Dr. Rothman's neurological abnormality not only affects his behavior but also affects other aspects of his brain that control movement, which is often seen in people with degenerative

dementia because degeneration causes changes in motor function.  Dr. Duara ruled out these changes as being due to aging.

In the evaluative report, Dr. Duara noted that he reviewed a CD of an MRI scan done in Aventura that was of poor quality but showed evidence of mild medial and lateral temporal atrophy and degeneration which indicated a brain disease.  In addition, he reviewed an August 5, 2009 PET scan that was taken at Mount Sinai which indicated that there was reduced metabolic function of both temporal and parietal regions worse on the left than the right side, which was compatible with Alzheimer's dementia. (DX 3A). While the scan indicated that it was possible that the Defendant has Alzheimer's dementia, Dr. Duara believed that the likelihood is that it is frontotemporal dementia.  The PET Scan demonstrates that there is a brain disease which is consistent with the lack of comprehension (aphasia) which primarily affects the left side of the brain.  Aphasia means impairment of language function, which may be manifested in expression or reception, and which relates to subtle comprehension or insight.

Dr. Duara also reviewed a brain PET scan performed on October 28, 2009, which he noted revealed hypometabolism resulting from a reduced metabolic function due to disease.  (DX 3A). The regions most greatly affected were on the left side of the brain, frontal lobe, which Dr. Duara explained to be the left side of brain just above the ear.  In addition, the PET Scan showed moderate to severe hypometabolism in bilateral anterior-medial temporal regions, which Dr. Duara explained to be the area towards the midline where the nose is located, which is the part of the brain that relates to memory. This area of the brain is affected both in Alzheimer's disease and frontotemporal dementia, and affects the ability of people to remember and relate facts.

Dr. Duara found the MRI and PET scan findings to be compatible with a diagnosis

of frontotemporal dementia, primary progressive aphasia variant.  However, he also provided a differential diagnosis of atypical form of Alzheimer's disease, or another rare degenerative disease of the brain, although he did not believe that either were present in this case.

Dr. Duara also reviewed the reports from Drs. Gelblum and Fischer and although he believes that Dr. Rothman is suffering from frontotemporal dementia rather than Alzheimer's as initially suggested by those doctors, he testified that they all consistently concluded that Dr. Rothman has dementia caused by a brain disease.  Dr. Duara also reviewed the reports of Drs. Crown, Rappaport, Eisenstein and Suarez.  Ultimately, Dr. Duara concluded that Dr. Rothman was suffering from frontotemporal dementia with the alternate possibility of Alzheimer's type dementia.  He stated that an autopsy of the brain would have to be performed in order to fully determine which it was.

During the examination, Dr. Rothman was given several tests by Dr. Duara and/or his staff.  He scored a 21/30 on the Mental Mini Score.  Dr. Duara explained at the hearing that the Mental Mini Score was administered by someone on his staff and the information to obtain the score was given by Dr. Rothman's daughter.  Dr. Rothman achieved a 5 out of 24 on the Physical Self Maintenance Score (PSMS) indicating mild impairment, which again was based on information provided by Dr. Rothman's daughter.  Dr. Duara rated Dr. Rothman's Clinical Dementia Rating (CDR) score as moderate functional impairment.  He explained that the CDR is obtained by going through a list of functional abilities in daily life.

Under the neurocognitive evaluation portion of the Report, Dr. Duara concluded that the cognitive evaluation of Dr. Rothman suggests global impairment in cognitive function with particular impairment in language function, and observed that Dr.

Rothman's behavior suggested that he has an apathetic frontal lobe syndrome with aphasia.  Dr. Duara explained that Dr. Rothman has an impairment of mental cognitive function which is suggestive of dementia, and which is primarily manifested with apathy and difficulty with comprehension.  He further explained that aphasia means impairment of language function which, in Dr. Rothman's case, is not so much a problem with expression but with subtle comprehension because of a lack of insight into what people are saying.

Dr. Duara testified that he was informed by counsel for Dr. Rothman that in anticipation of sentencing Dr. Rothman would have to assist his counsel with ascertaining whether certain statements contained in the PSI were correct or not, including financial statements, witness statements and statements pertaining to the actions of certain persons.  Dr. Duara opined "there's no way that Dr. Rothman would be able to assist you in that way because he's unable to comprehend what those statements really allude to." (DE # 582 at 29).

Dr. Duara concluded to a reasonable degree of neurological certainty that Dr. Rothman has a degenerative brain disorder that has affected him sufficiently so that his lack of insight, loss of memory, and loss of comprehension ability would severely impair his ability to assist his attorney.  According to Dr. Duara, Dr. Rothman can not assist his attorney in a logical, cogent, rational way, and lacks the capacity to reason through a problem to try to find a solution or a strategy.  Dr. Duara also believes that Dr. Rothman is unable to speak to the Court in a cogent and organized manner in an attempt to mitigate the sanction to be imposed by the Court.

Dr. Duara further testified that he does not believe that Dr. Rothman has the ability to relate to his lawyer his role in the crime so that his attorney could provide that

information to the probation officer or the Court, or to assist his attorney in evaluating the loss attributed to his conduct in the crime.

Dr. Duara stated that, to a reasonable degree of neurological certainty, Dr. Rothman is not malingering but rather is suffering from frontotemporal dementia or Alzheimer's disease that is mimicking frontotemporal dementia, which is progressive in nature. He explained that Dr. Rothman's behaviors are very typical of people who present with frontotemporal dementia.  He stated that he has seen a large number of individuals who have been suspected of malingering due to manifesting certain psychiatric types of behavior.

With respect to malingering in persons with frontotemporal dementia, Dr. Duara stated that malingering may be misdiagnosed in persons with frontotemporal dementia because of apathy and other impaired functions of the frontal lobe including judgment, insight and comprehension.  Dr. Duara explained that all of those functions have a bearing on how an individual performs and how much that performance can be interpreted to be malingering by someone on formal tests used to detect malingering.  He further explained that the judgment of the physician plays a large part in evaluating whether a person with frontotemporal dementia is malingering or is exhibiting fluctuations caused by the nature of the condition.  He stated that the first requirement in making that assessment is an awareness that malingering behavior can be a manifestation of frontal lobe dysfunction.  He stated that standardized malingering tests may be used for frontotemporal dementia patients but the interpretation of those test results should be put into the context of that individual, and an assessment as to whether the individual could have a brain disease that could be manifesting those symptoms. Therefore, it is not improper to administer the Test of Memory Malingering (TOMM) to a

28

person with frontotemporal dementia, but the results of that test must be interpreted appropriately.

Dr. Duara did not administer malingering tests to Dr. Rothman, although the possibility that Dr. Rothman was malingering was high on his list of possible differential diagnosis.  He did not administer malingering tests because as a behavioral neurologist he does not use those tests in his evaluations.  He is aware that there are studies that have shown, particularly in frontotemporal dementia, that the tests of malingering in general can be easily misinterpreted.

In reaching his conclusion about Dr. Rothman's competency, Dr. Duara took into account and rejected the opinion that given the nature of sentencing proceedings, Dr. Rothman might be able to, over a series of good days, and with enough time, assist his counsel and digest the information from the presentence report.  Dr. Duara explained that in his judgment, Dr. Rothman is not competent to perform in assisting his attorney based on the fact that even on a good day, Dr. Rothman does not have the mental capacity to do so.

Dr. Duara reviewed Dr. Rothman's evaluation conducted by the Bureau of Prisons and signed by Dr. Daniel Carlson.  Dr. Duara stated that the report concluded that Dr. Rothman was malingering, although it did acknowledge that there was some evidence that he has a neurological condition as evidenced by the PET scan and the MRI.  Dr. Duara stated that his impression is that the persons who made that diagnosis at the BOP, were not familiar with the manifestations of frontotemporal dementia or Alzheimer's disease when it primarily affects the frontal lobes, and the fluctuations and psychiatric symptoms that an individual with that disease might manifest.  He further opined that the evaluators gave insufficient weight to the findings, primarily based on the PET scan

results, that there was a brain disease present.  Dr. Duara concluded that this failure was due to the evaluators' lack of sufficient training in neuropsychology, a discipline that relates brain to behavior.  He stated that clinical psychologists are not trained to understand the relationship between brain disease and its behaviors.  Dr. Duara further explained that the real training for neuropsychology or behavioral neurology comes from years of experience in seeing cases of frontotemporal dementia, Alzheimer's and other brain diseases.

Dr. Duara testified that Ms. Wakeman, who he ascertained to be a psychology intern and who performed, at least a portion of Dr. Rothman's assessment, was not competent to make a decision that Dr. Rothman was malingering given the evidence that he had a brain disease.  He stated that Ms. Wakeman, as a junior intern, likely had no understanding of the relationship of brain diseases to behaviors.

Dr. Duara concluded that the tests used to ascertain that Dr. Rothman was malingering were not applicable to this case and misled Ms. Wakeman, as well as the staff psychiatrist and supervising psychologist who signed Dr. Rothman's evaluation.[12]

Dr. Duara explained that the inconsistencies of Dr. Rothman's test scores while being evaluated at the Bureau of Prisons and, specifically his performance that was characterized as that of a second grade individual, was just a manifestation of the fluctuations and behavior that can been seen in people with frontotemporal dementia or

---

[12]  Similarly, Dr. Duara opined that Dr. Enrique Suarez, the Court-Appointed expert who prepared a report and testified in the pre-trial competency hearing, incorrectly diagnosed Dr. Rothman as malingering due to a lack of understanding of the relationship between a dementia affecting the frontal lobes and a malingering-type behavior (DE # 582 at 37).  He also disagreed with Dr. Suarez's assessment that PET scans and neuroimaging have been disfavored as a basis to assist in the diagnosis of Alzheimer's or dementia (DE # 582 at 34).

any dementia that affects the frontal lobes.  In addition, Dr. Duara stated that an individual

can perform both very well and very poorly on the same day.  He further noted that Dr.

Rothman may have been unaware of his performance because the disease impairs

insight, judgment and motivation and may cause fluctuations.

Sometime after the evaluation, Dr. Duara authored and sent a letter to the Mayo

Clinic suggesting that Dr. Rothman attend a consultation with a behavioral neurologist at

the Clinic. (DX 3C).  A copy of the letter was also contained in the records provided by the

BOP at Bates Number 000140.

### 2. Michael Rappaport

The Defendant also presented the testimony of Dr. Rappaport, an expert

psychologist and Dr. Rothman's treating psychologist.[13]  Dr. Rappaport testified that he is

a clinical and forensic psychologist who spends approximately 75% of his practice

seeing patients in his office, and the other 25% conducting forensic evaluations for either

the Court, private attorneys or the Public Defender's Office.  Dr. Rappaport has seen Dr.

Rothman between two to four times a month since Dr. Rothman's conviction in March of

2009.  He also sees one of Dr. Rothman's children regularly when Dr. Rothman attends a

session because Dr. Rothman is unable to drive and is therefore transported by one of

his children.

Dr. Rappaport testified that Dr. Rothman needs reality testing to help him deal with

his constant cognitive changes.  Dr. Rappaport opined that Dr. Rothman has dementia

and/or Alzheimer's which interferes with his ability to process and memorize information

---

[13]The Government did not object to the Court finding Dr. Rappaport to be an
expert psychologist based upon the Court's previous determination at the pre-trial
competency hearing that Dr. Rappaport was an expert psychologist.

and to solve problems; and, that the brain disease is progressive and incurable.  He stated that Dr. Rothman has regressed and is more childlike than when Dr. Rappaport saw him first in 2006.  He reported that Dr. Rothman is very easily frustrated, is temperamental and becomes very rigid.  Dr. Rappaport's conclusions are based upon conversations that he has with Dr. Rothman where he has to remind him of things they discussed five or ten minutes earlier.  Dr. Rappaport explained that Dr. Rothman's short-term memory will go first, then his long-term memory, and eventually, Dr. Rothman will be unable to recognize people and things that he has known for a very long time.  In arriving at his conclusions, Dr. Rappaport testified that he also took  into account Dr. Rothman's ability to resolve conflicts and problems.

Dr. Rappaport opined that Dr. Rothman's disease is progressing and based that opinion, in part, on the reports of Dr. Duara and Dr. Kenneth Fischer which were prepared after Dr. Rothman's conviction in March of 2009.  Specifically, Dr. Rappaport opined to a reasonable degree of psychological certainty, that Dr. Rothman is currently suffering from a major mental defect or disease.  He stated that Dr. Rothman likely has Alzheimer's disease although Dr. Rappaport is aware that Dr. Duara has diagnosed Dr. Rothman as having frontotemporal lobar dementia.  Dr. Rappaport explained that for purposes of a treating psychologist, whether it is Alzheimer's or frontotemporal lobar dementia, is not significant because the diseases are essentially the same behaviorally and are treated the same from a behavioral standpoint.

Dr. Rappaport reported that Dr. Rothman cognitively functions like a thirteen year old due to the disease.  He stated that Dr. Rothman lacks the ability to reflect and think about process and he becomes impulsive and emotional about certain things and situations.  Dr. Rappaport stated that Dr. Rothman has a handicap in dealing with his

legal, financial and family issues and has a very difficult time processing and dealing with information. He described Dr. Rothman as "insightless" at times.

Dr. Rappaport opined that Dr. Rothman's condition has progressed at a more rapid rate since February of 2009 due to the stress of the legal proceedings, including his trip to Rochester, Minnesota and the separation from his wife due to the fact that he now has to reside with his daughter.

Dr. Rappaport has been involved in hundreds of sentencing proceedings as a psychologist over the course of thirty years.  He is familiar with the defendant's right of allocution and described it as the ability of the defendant to express himself to the court and his "understanding of what's going on," to accept responsibility and to explain his perspective of what occurred.  Dr. Rappaport opined that, to a reasonable degree of psychological certainty, Dr. Rothman cannot exercise in a meaningful, logical, cogent and rational way his right of allocution.  Dr. Rappaport described Dr. Rothman as a "potted plant" in the courtroom at times and stated that Dr. Rothman is unable to remain focused for any length of time.

Dr. Rappaport has observed defendants participate in sentencing proceedings many times and his conclusions about Dr. Rothman's abilities in this regard are based, in part, upon his own experience observing other defendants address the court.

He also has read many presentence investigation reports and opined that it would be difficult if not impossible for Dr. Rothman to assist his attorney in reviewing the twenty-seven page presentence report in this case and preparing meaningful relevant and cogent objections and responses.  Dr. Rappaport further opined that Dr. Rothman is incapable of assisting his counsel in assessing the correct offense level, preparing a recitation of facts related to the offense rebutting the factual statements related to his co-

defendants' conduct and in gathering letters of support from family and community members and identifying witnesses to be presented at the sentencing hearing.  Dr. Rappaport stated that it is very difficult for Dr. Rothman to talk about things in a concrete and non-emotional manner and he is incapable of explaining what is occurring.

Dr. Rappaport does not believe that Dr. Rothman is attempting to fool Dr. Rappaport about his mental condition or that he is malingering.  Rather, Dr. Rappaport believes that Dr. Rothman is "fighting it" and is stoic and tough.  He stated that on a literal level, Dr. Rothman understands that he may end up in a federal penitentiary but does not understand the consequences of that sentence.

On cross-examination, Dr. Rappaport stated that it would be unethical for him to testify specifically as to whether he believes that Dr. Rothman is competent to proceed to sentencing.

### 3. Barry M. Crown

Dr. Barry Crown, a neuropsychologist, was tendered as an expert by the Defendant.  Dr. Crown explained that neuropsychology is the area of psychology that deals with the relationships between brain function and behavior.  Dr. Crown has a Ph.D from Florida State University and was a doctoral fellow in clinical psychology at Harvard Medical School, Massachusetts General Hospital.  He is board-certified by the American Board of Professional Neuropsychology.  Dr. Crown has served on the faculty of several universities throughout the country.  The Court found Dr. Crown to be an expert in neuropsychologist, without objection from the Government.[14]

At the hearing, Dr. Crown explained that amotivation, or the lack of ability to put

---

[14] Dr. Crown previously testified as a treating physician at Dr. Rothman's pretrial competency proceeding.

forth effort, is one of the hallmarks of dementia and particularly, frontotemporal dementia as opposed to Alzheimer's disease.  He stated that it is extremely easy for an inexperienced practitioner to confuse lack of motivation with malingering.  This is particularly true because the majority of effort and motivation tests were not originally normed on a population of people with dementia, but rather were normed for people who had traumatic brain injuries and strokes.

Dr. Crown testified that he had reviewed Dr. Carlson's report and explained that it is inappropriate to use a test of memory and malingering (TOMM) on a dementia population.  He also concluded that the Rey memory 15-item test is not appropriate in trying to determine whether David Rothman was suffering from dementia or Alzheimer's disease.  Similarly, he stated that the Structured Inventory of Malingered Symptomatology Test is not appropriate to determine whether a patient with dementia is malingering or feigning his symptoms, because it was not normed on a dementia population or elderly people who are amotivational.  He further stated that the VIP test and the 21-item test were never normed on a demented population.  Dr. Crown observed that Dr. Carlson's assessment that Dr. Rothman's score of 7 on the 21-item test meant that Dr. Rothman had intentionally suppressed his performance was subjective.  Dr. Crown opined that Dr. Rothman's score demonstrated that there wasn't a high level of motivation.

Dr. Crown acknowledged that a person who is suffering from a form of dementia could also be malingering.  He also stated that there are only two tests that have some normative standards related to people with broadly defined dementia; the Word Memory Test and the Medical Symptom Validity Test. Dr. Crown testified that neither of those tests were administered by Dr. Carlson while conducting his evaluation of Dr. Rothman.

Dr. Crown also explained that malingering is always a subjective diagnosis.  He

stated that the objective components of measurement for malingering are effort and motivation and the problem when assessing malingering for patients with dementia is that as dementia progresses, the patient becomes more amotivational.  He stated that Dr. Carlson's conclusion that Dr. Rothman was malingering based upon Dr. Rothman's low test scores which, according to Dr. Carlson, indicated that Dr. Rothman had the cognitive ability to intentionally falsify answers, was a subjective impression and not based on any factual finding.  He explained that the low scores may indicate that Dr. Rothman is so amotivational that he's dealing with the answers at random, which would yield results well below average the first time.

Dr. Crown opined that after reviewing the reports from Dr. Kenneth Fischer and Dr. Gelblum, based upon a reasonable neuropsychological certainty, those reports suggest that Dr. Rothman's condition has deteriorated since February 2009, when the previous competency hearing was held.  Dr. Crown stated that Dr. Rothman has a degenerative and progressive disorder with progressive deterioration.

Dr. Crown stated that David Rothman doesn't have the capacity or ability to participate in the legal proceedings due to significant processing problems and continuous memory problems as a result of his dementia.

On cross examination, Dr. Crown confirmed that he had not evaluated Dr. Rothman since the time that he drafted his original reports for the prior competency hearing.  He further agreed that his recent conclusions about Dr. Rothman's lack of competence to proceed were based upon the test results and examination performed by the other experts after the initial competency evaluation was made.

Dr. Crown stated that the TOMM test may be given to persons suffering from dementia, but the results have to be taken "with a grain of salt."  In his own practice, he

has administered the TOMM test to persons with dementia and administered it to Dr. Rothman in 2007, prior to Dr. Rothman's diagnosis of dementia.  He also administered the RBANS test to Dr. Rothman prior to his diagnosis of dementia.  Dr. Crown, did not, however, administer the medical symptom validity test because the results of the test as they related to people with dementia were not available at that time.

### 4.  Jeffrey Gelblum

Dr. Gelblum is Dr. Rothman's treating neurologist and was qualified by the Court as an expert in the field of neurology.[15]  The Defendant entered Dr. Gelblum's notes from visits by Dr. Rothman dated between February 23, 2009 and February 8, 2010 into evidence (DX 4A-4N).  Dr. Gelblum, a board-certified neurologist, has been in practice in the Miami area for almost nineteen years and has extensive experience dealing with neurodegenerative illnesses such a Alzheimer's disease and other forms of dementia.  He sees numerous patients in his practice who are suffering from various forms of dementia and is therefore very familiar with the nuances of dementia illness and how it progresses.

Dr. Gelblum testified that David Rothman is suffering from a major mental disease or defect which may be considered an Alzheimer's-like condition or a frontotemporal dementia condition, which consists of greater involvement of the frontal and temporal lobes.  Dr. Gelblum explained that the frontal lobe involves not only mood, but also impacts on fluency and the ability to express verbal language.  He further explained that the temporal lobe is more involved in receptive, language functioning and temperament disorders, which impairs comprehension abilities.

Based upon his clinical experience, expertise as a board-certified neurologist, and

---

[15]  Dr. Gelblum testified previously at Dr. Rothman's pre-trial competency hearing.

review of Dr. Rothman/s imaging studies, including a PET scan, Dr. Gelblum diagnosed Dr. Rothman as having Alzheimer's-type dementia.  Dr. Gelblum also reviewed reports and scans from Drs. Duara and Fischer, and stated that the findings by those Doctors were consistent with his own.  Dr. Gelblum opined that PET scans are considered to be the "emerging gold standard" in diagnosing dementia.

Dr. Gelblum also reviewed EEGs (electroencephalograms) from the years 2008, 2009 and 2010.  He explained that an EEG is a brain wave test which is used to determine any electrical abnormalities in brain function.  It may be used as part of the evaluation for dementia.  Dr. Gelblum opined, based upon Dr. Rothman's EEGs from 2008, 2009, and 2010, that Dr. Rothman is experiencing diffuse slowing, which is consistent with a degenerative process occurring in the brain, which is consistent with the conclusion that Dr. Rothman is suffering from dementia and is not currently suffering from a seizure disorder.  The diffuse slowing is a pathological finding, not age-related, that indicates that the entire brain is degenerating.

Dr. Gelblum testified that when Dr. Rothman has an office visit, he is typically accompanied by a family member and he discusses Dr. Rothman's treatment and medication with them because he does not believe that Dr. Rothman has the capacity to understand Dr. Gelblum's medical instructions or advice.

Dr. Gelblum has concluded to a reasonable degree of medical certainty that Dr. Rothman is not capable of providing accurate information to his counsel, which would enable counsel to present relevant sentencing materials to the judge on his behalf.  When questioned about Dr. Rothman's ability with respect to preparing a response to the PSI, Dr. Gelblum stated the following:

...just looking at this 27 page document, you've got 120 items here.  I don't

38

> believe that this individual is medically, neurologically qualified, competent or capable to go through paragraph by paragraph and understand the items that are presented.

(DE # 583 at 78).  Further, when Dr. Gelblum was asked whether he believed that Dr. Rothman would be able to assist counsel in making cogent and logical objections to the allegations in the PSI, Dr Gelblum responded,

> At this particular time, no.  And by this particular time, I mean based upon the progressive deterioration of the brain functioning as I've seen it from when I was here last in '09 to the time in '10, there has been a significant decline in his brain functioning.

(DE # 583 at 79).  He further stated,

> the nature of the diagnosis is progressive neurological deterioration and degeneration....He is well within the mid to moderate throes of this disorder.
>
> Basically, at this, particular time, his cognition has declined on a steady curve.  So the situation as it was last year is clearly not the same of the situation as its stands right now, mid-March 2010.

(DE # 583 at 79).  Dr. Gelblum then characterized Dr. Rothman's condition now as being "significantly worse." *Id*.

Dr. Gelblum opined that Dr. Rothman does not have the capacity to allocute or be a witness at sentencing, or to be cross examined and cannot understand questions asked of him and then make a logical response.  Dr. Gelblum explained this is because he does not have the ability to comprehend the information, although he can hear it, because of the temporal lobe disturbance.  Similarly, Dr. Gelblum concluded that Dr. Rothman does not the ability to write an acceptance of responsibility letter.

Dr. Gelblum testified that he does not believe that Dr. Rothman is trying to fool him regarding his dementia and that the positive findings on the PET scan confirm his conclusions in this regard.

5.      **Kenneth Fischer**

Dr. Kenneth Fischer, an expert in the field of neurology testified at the hearing.  Dr. Fischer is Dr. Rothman's treating neurologist, who also testified at Dr. Rothman's pretrial competency hearing.[16]  At the hearing, the Defendant entered into evidence notes from numerous visits that Dr. Rothman made to Dr. Fischer's office, between March 25, 2009 and March 9, 2010 (DX 5A-5O).

Dr. Fischer is an adult clinical neurologist who has been practicing for thirty-five years.  He practices primarily in the area of stroke and vascular treatment and has substantial knowledge and experience in treating patients with dementia disorders and general neurological issues.  Over the course of his career, Dr. Fischer has opined on whether or not someone is suffering from dementia between 100 and 150 times.

Between March of 2009 and March 2010, Dr. Fischer saw Dr. Rothman approximately eight times.  Dr. Fischer also prepared several medical reports regarding Dr. Rothman medical treatment  from March 25, 2009 through February 17, 2010, which were introduced into evidence (DX 5A-5N). The report dated March 25, 2009, stated in significant part, "Alzheimer's disease progressing since last visit with the development of peripheral neuropathy possibly secondary to glucose intolerance." (DX 5A).  Dr. Fischer testified that during the March 25, 2009 visit, Dr. Rothman had a competence disturbance consisting of a global reduction of his memory and cognitive function that was progressing despite taking Alzheimer medication.  In addition, Dr. Fischer reported that Dr. Rothman displayed problems with his balance and gait and had a lack of sensation in

---

[16]The Government did not object to the Court finding Dr. Fischer to be an expert neurologist based upon the Court's previous determination at the pre-trial competency hearing that Dr. Fischer was an expert neurologist.

his feet suggesting peripheral neuropathy, possibly caused by early diabetes.

At a follow-up appointment on April 9, 2009, Dr. Fischer's assessment, as stated in the corresponding medical Report, was that Dr. Rothman was suffering from "progressing Alzheimer's disease with secondary depression."(DX 5B)  At the hearing, Dr. Fischer noted that many people experience depression when they realize their cognitive function is slipping and their memory function is worsening.

Dr. Fischer next saw Dr. Rothman on June 2, 2009 and assessed that he had "Moderate Alzheimer's disease."[17] (DX 5C).  At the evidentiary hearing, Dr. Fischer characterized the progression of Dr. Rothman's disease based upon his observation during that visit as follows: "When I first saw Dr. Rothman in the latter part of 2008, his deficits were present but on the mild end of the stick.  Over the course of...about nine months since his initial evaluation by me, he had definitely progressed and worsened in his cognitive dysfunction, his memory function, executive function to carry on normal activities." (DE # 583 at 103).  Dr. Fischer testified that during that visit, one of Dr. Rothman's daughters, who accompanied him to the visit, expressed concerns about Dr. Rothman's capability to make appropriate financial decisions and noted that Dr. Rothman was impulsive and his judgment was poor.  Dr. Fischer confirmed that a progressive loss of complex functions like decision-making is consistent with the progression of Alzheimer's disease or dementia.

Three weeks later on Dr. Rothman's June 26, 2009 visit, Dr. Fischer assessed Dr. Rothman's condition to be "stable Alzheimer's disease, development of early peripheral neuropathy." (DX 5D).  Dr. Fisher confirmed at the hearing that over the three-week period

---

[17]  Dr. Fischer also noted that he agreed that Dr. Rothman should obtain a guardian for financial and other decisions.

between visits, Dr. Rothman's condition had gotten worse and it was becoming more apparent that his equilibrium functioning was worse than it had been earlier in the year as manifested in his balance and gait.[18]

On Dr. Rothman's July 29, 2009 visit, Dr. Fischer noted the following assessment: "Known Alzheimer's disease, recent sensory peripheral neuropathy, possible a remote effect of neoplasm, possible cerebral metastatic lesion versus infarct." (DX 5F).  In addition, prior to the visit, Dr. Rothman consulted with an oncologist who, among other things conducted a brain MRI scan which showed a left frontal cystic lesion.  Dr. Fischer noted that the lesion was new from the previous MRI scan in 2007.  Dr. Fischer stated that the differential diagnosis for the lesion was either a stroke, an infarct or a metastatic lesion, either of which may have been contributing to the deterioration that Dr. Rothman was exhibiting clinically.  Dr. Fischer referred Dr. Rothman for additional tests that were conducted on July 31, 2009, and the results of the test confirmed that Dr. Rothman's lower extremities demonstrated significant abnormalities consistent with a diagnosis of peripheral neuropathy (DX 5G).

On August 8, 2009, at Dr. Fisher's direction, Dr. Rothman underwent a full body PET scan in an effort to locate any occult cancer.  The radiologist who read the scan noted, among other things, that there was a "question of relative lateral temporal parietal hypometabolism, possibly reflecting Alzheimer's dementia." (DX 5H).

Over the course of the next two visits, Dr. Fischer noted that Dr. Rothman's dementia was stable and the changes were very slow and incremental. (DX 5I, 5J).  On the

_____

[18] Dr. Fischer also noted that Dr. Rothman had monoclonal gammopathy which is the excretion of an abnormal protein in the urine.  However, Dr. Fischer concluded that it was unlikely that this finding was related to Dr. Rothman's dementia, although it may have been indicative of an underlying yet undiagnosed cancer. (DE # 583 at 107, 108).

December 11, 2009 visit, however, Dr. Fischer noted and confirmed at the hearing, that after his evaluation at the BOP in Minnesota, Dr. Rothman was much worse than he had been in September 2009 in terms of his behavior and his overall cognitive functioning. (DX 5K).  Dr. Fischer testified that exogenous factors like stress will aggravate and cause progression of underlying dementia.

In the December 11, 2009 notes from Dr. Rothman's visit, Dr. Fischer observed that another PET scan performed at Mount Sinai in November demonstrated significant progression with more prominent frontal and temporal changes of reduce metabolism. Dr. Fischer confirmed that this result was consistent with frontotemporal dementia.  He also explained that early on it is difficult to differentiate between frontotemporal dementia and Alzheimer's-type dementia because they look very similar.  However, frontotemporal dementia progresses more quickly, is a more aggressive illness and has certain aspects that are more prominent including behavioral disturbances and dysnomia, which means "getting names wrong."  Further, in cases of frontotemporal dementia radiographically there is a specific drop of the brain substance in the frontotemporal regions as opposed to Alzheimer's which is more global.  Dr. Fischer testified that the findings from the PET scan that the disease was progressing more rapidly and the prominent frontal and temporal changes was more indicative of frontotemporal dementia rather than Alzheimer's dementia.  He stated that it takes a trained neurologist to discern the difference between the two diseases and noted that until five years ago, prior to the advent of the PET scan, the differences were unknown.  He stated that although the medicine that Dr. Rothman was taking, Namenda and Aricept, had kept his condition from progressing more rapidly, they had not prevented him from getting worse and there is no other effective treatment.

At Dr. Rothman's January 22, 2010 visit, Dr. Fischer noted that Dr. Rothman was suffering from "progressing dementia likely frontotemporal-temporal based on the finding expressed by Dr. Duara". (DX 5L).  Dr. Fischer explained that his assessment on that date meant that Dr. Rothman's condition was "getting worse" and "getting faster." He stated that only six weeks after his December visit, Dr. Rothman was "visibly worse" to his examination, the "progression was becoming more obvious" and the "disease was more aggressive than it had been." (DE # 583 at 122).

Dr. Fischer also testified regarding a February 18, 2010 final report from Mount Sinai Medical Center related to an MRI scan which noted several abnormalities (DX 5M). Dr. Fischer observed that the report concluded that Dr. Rothman's brain had a lot of vascular change and generalized evolutional changes consistent with dementia and also showed atrophy of the brain.

Dr. Fischer saw Dr. Rothman again on February 17, 2010 and his assessment was again progressive dementia (DX 5N).  Dr. Fischer confirmed that Dr. Rothman's condition again had gotten worse.

Dr. Fischer reviewed the BOP evaluation of Dr. Rothman and explained that the notation in the report regarding the April 2009 PET scan which was conducted by Elite imaging was "normal" which Dr. Fischer found "impossible" and "not compatible with the reading of the previous scan", so Dr. Fischer recommended that another PET scan be conducted at a different facility.  An additional PET scan was then conducted at Mount Sinai and Dr. Fischer relied on the additional PET scan in reaching his conclusions regarding Dr. Rothman's condition.

Dr. Fischer testified that he completely disagreed with the conclusions reached in Dr. Carlson's report regarding Dr. Rothman's competency to participate in proceedings.

44

Specifically, Dr. Fischer explained.

> This psychologist, he's not a medical doctor. He said that the patient does not have a dementing illness. I have seen this man 14 times over a period of a year-and-a-half. I've looked at his scans. I've reviewed the reports of his EEGs. I've seen him clinically, and I can tell you unequivocally the man is severely impaired and has a progressive dementia. He is not malingering. This is an organic process. The idea that he's malingering, has no neurological illness, which is what Dr. Carlson suggests erroneously, it's just incorrect.

> I feel very certain having seen him this period of time, having experience with thousands of patients, looking at all of his materials, objective materials, not just patient or the patient has findings which in my mind are very controvertible, and you can use, not just by me but by two other Board-certified neurologists in the community, and this is accompanied and confirmed by PET scans. He's had four EEGs over the course of three years by Board-certified neurologists which have shown progressive slowing, progressive increase abnormality. Plus abnormal MRI scans. So these are incontrovertible objective findings which unfortunately confirm the fact the man has a significant dementing process.

(DE # 583 at 129). Dr. Fischer concluded to a reasonable degree of medical certainty that Dr. Rothman does not have the ability to provide accurate information to his counsel to present to the court in mitigation of sentencing, does not have the ability to review the PSI and spot errors and assist his attorney in correcting those errors, and does not have the ability to draft a letter of acceptance of responsibility or otherwise make a cogent rational statement to the court in an effort to mitigate his sentence. Dr. Fischer further concluded that Dr. Rothman does not have the ability to make suggestions to his attorney with regards to questioning witnesses or locating witness who may speak on his behalf, and does not have the ability to withstand questioning or cross-examination at a proceeding. Dr. Fischer stated that Dr. Rothman is incapable of performing those functions because he is "severely cognitively impaired" and he has lost the degree of cognitive function necessary to complete those tasks.

On cross-examination, Dr. Fischer testified that Dr. Rothman had an additional

visit with him on March 9, 2010. (DX 5O)  During that visit, Dr. Fischer assessed that Dr. Rothman's mental status had reduced over the last several months and he received a current Mini mental score of 26, which was lower than the score of 30 that he had received in previous reports.  Dr. Fischer explained that Dr. Rothman answered several questions incorrectly on the mini mental evaluation that resulted in the lowered score. Specifically, Dr. Rothman answered four questions incorrectly including the date, recalling a list of objects named to him several minutes earlier, and incorrectly drew interlocking pentagrams.  Dr. Fischer stated that determining whether a patient puts forth appropriate amount of effort is subjective.

Dr. Fischer was asked to review that portion of the BOP report which discussed Dr. Rothman's October 28, 2009 PET Scan where the results of the scan were characterized as showing "slight hypometabolism of the brain in a pattern that is non-specific but could be seen in early Alzheimer's dementia." (GX 2 at 8).  Dr. Fischer observed that the portion of the BOP report varied from the report issued by the radiologist at Mount Sinai who initially read the October 28, 2009 PET scan.  However, Dr. Fischer confirmed that the November 13, 2009 radiology report, issued by Dr. Laurence J. Eckel of the Mayo Foundation, contained in the documents obtained from the BOP, reflected that Dr. Rothman's scans indicated that there was mild diffuse parenchymal atrophy  (DX 7, Bates No: BOP 000113).  Dr. Fischer stated that finding is consistent with an Alzheimer's or frontotemporal dementia diagnosis and it means that shrinkage of the brain has occurred caused by some form of dementia.  Dr. Fischer noted that is unclear whether it was Dr. Rothman's PET scans or his MRIs that were the source of the conclusions made in that report.

Dr. Fischer described Dr. Rothman's progression in his dementia disease as early

moderate and explained that in the advanced moderate stage patients tend to experience incontinence, belligerence and more wandering.  When Dr. Fischer first saw Dr. Rothman he was mild, but in the more recent visits, Dr. Rothman approached the moderate stage.

### 6.    Dr. Daniel Carlson

At the evidentiary hearing, the Government presented the testimony of Dr. Daniel Carlson, a staff psychologist at the Federal Medical Center located in Rochester, Minnesota.[19]  His experience and credentials are listed in his Curriculum Vitae (GX 1), which is incorporated herein by reference.  Dr. Carlson holds a bachelor's degree in behavioral science, a master's degree in school psychology and a doctorate of psychology in clinical psychology.  He has held his doctorate in psychology for nineteen (19) years.  Dr. Carlson explained that clinical psychology is the practice of psychology in the clinical setting which requires dealing with the patients directly.  He has been a staff psychologist at FMC, Rochester since March of 1988 and estimates that he has preformed 70 to 80 competency evaluations on defendants during that time.  Approximately 10 to 15 of those defendants have been diagnosed with Alzheimer's disease of some other form of dementia.  Through the course of those evaluations that he has become familiar with the legal standard for competency.  In addition, in his capacity as staff psychologist, he performs forensic evaluations including those used to assess sanity and dangerousness, or to ascertain whether a defendant should be placed at a hospital in lieu of sentencing. Dr. Carlson also provides counseling, crisis management and supervision of interns in his position.

Dr. Carlson has been declared an expert in clinical psychology by various federal

---

[19] At the hearing, Dr. Carlson, the Government's witness, testified as the second witness and thus "out of turn" to accommodate his travel schedule.

courts including the Minnesota District Court, the Federal District Courts in Concord, New Hampshire; Chicago, Illinois; Los Cruces, New Mexico, and, Little Rock, Arkansas. Three or four of those cases involved the diagnosis of person suffering from a form of dementia.

During voir dire by Defendant's Counsel, Dr. Carlson admitted that the Wisconsin School of Professional Psychology where he received his doctorate degree was not accredited by the American Psychological Association until a few years ago. He further admitted that he has not taken any formal academic courses in forensic psychology but rather has obtained his forensic skills from on-the-job training and continuing education courses.  Dr. Carlson has, however attended a variety of continuing education programs over the years including forensic psychology, dementia, neuropsychology and malingering assessment.

Dr. Carlson is one of five staff psychologists at the FMC in Rochester, Minnesota. Dr. Carlson explained that at the FMC, there are two different dementia units; a mental health unit and a medical unit.  Dr. Carlson works in the mental health unit where he has contact on almost a daily basis with eight to ten patients who have a form of dementia, most commonly Alzheimer's disease.  In addition to his duties in the mental health unit, he is the psychologist specifically tasked with covering the demented patients in the medical unit, as well. The Government offered Dr. Carlson as an expert psychologist in administering competency evaluations (DE # 582 at 124). The Court found Dr. Carlson to be an expert in the field of forensic psychology based upon his formal training and experience.[20]

_____

[20]Although Dr. Carlson was cross-examined about his education credentials, the undersigned found no real evidence to support a finding that Dr. Carlson inaccurately

Dr. Carlson was then questioned about the forensic evaluation of Dr. Rothman performed at FMC in Rochester, that was written and signed by him[21] on December 15, 2009, that concluded in significant part,

> In summary, Dr. Rothman displayed no symptoms of mental illness or cognitive deficit that would compromise his ability to participate in sentencing.  While it is possible he has mild cognitive deficits of some kind, no precise statements about his comprehension and memory abilities can be made, given the very obvious evidence for Malingering.  As explained above, clear evidence of feigning does not prove a complete absence of cognitive deficits.  However, it can be said that if the defendant has cognitive impairment of any kind, it is of significantly less severity than he attempted to demonstrate during the present evaluation.  It should be noted that Dr. Rothman's Malingering behavior suggests awareness of his legal predicament, indicates motivation to obtain a reduced sentence, and demonstrates the ability to formulate a rational defense strategy.

> It is the professional opinion of the undersigned evaluators that the defendant does not presently suffer from a mental disease or defect that renders him unable to understand the nature and consequences of the proceedings against him, or to participate properly at sentencing.

(GX 2 at 15-16).  In addition, the Report stated,

> Dr. Rothman has received various diagnoses in the past, including Alzheimer's Dementia and Frontotemporal-Temporal Lobe Dementia.  No statements can be made presently whether he suffers from either of these conditions; however, it is noteworthy that the CT/PET scan from October 28, 2009 suggested "slight hypometabolism of the brain in a pattern that is non-specific but could be seen in early Alzheimer's dementia," according to the Mayo Clinic radiologist.

(GX 2 at 13-14).  Dr. Carlson testified that as part of Dr. Rothman's evaluation he reviewed a number of documents submitted to him including prior medical and psychological

---

reported his credentials either on his CV or in his testimony before the Court.

[21]  The Forensic Evaluation is also signed by Emily E. Wakeman, M.A., psychology intern, and Daniel J. Shine, Jr., M.D., staff psychologist.

evaluations of Dr. Rothman, medical progress notes and charts, as well as this Court's

Orders.  Dr. Carlson also acknowledged that on November 25, 2009, he received Dr.

Duara's letter dated November 9, 2009, regarding a request that Dr. Rothman be evaluated

by a behavioral neurologist at the Mayo Clinic (DX 7 at Bates No. 000140).  Dr. Carlson

confirmed that he received the letter one day before Dr. Rothman was scheduled to be

released from the FMC and thus, he testified that it was too late to have him consult with

a physician at the Mayo Clinic.

      Dr. Carlson confirmed that Dr. Rothman arrived at FMC on November 16, 2009 and

participated in interviews and/or psychological testing on November 16, 17, 18, 19, 20, 23

and 24, 2009.  Dr. Rothman's testing was conducted over the course of several days so as

not to exhaust the patient and examiner and to observe changes in the patient's behavior,

cooperation and mental status during separate interactions to develop a broader picture

of him.

      Dr. Carlson testified that Dr. Rothman was fairly consistent during the evaluative

process at FMC, although there were times when he was able to do some things that he

was unable to do on other days.  In his initial interview, Dr. Rothman told Dr. Carlson that

he began experiencing difficulties with his memory approximately ten (10) years ago,

which influenced him to make bad financial decisions.  Dr. Carlson found this to be

significant because it demonstrated that Dr. Rothman had insight into his memory

problems which people with dementia often lack.  Dr. Carlson stated that people with

dementia many times insist that they don't have memory problems.

      Dr. Rothman also told Dr. Carlson that Dr. Enrique Suarez had misunderstood him

when Dr. Suarez claimed that Dr. Rothman said he heard his deceased mother's voice,

but rather, Dr. Rothman explained that he told Dr. Suarez he was capable of imagining her

voice.  Dr. Rothman also denied hearing other voices.  Dr. Carlson concluded that Dr. Rothman's statement to him regarding Dr. Suarez's misunderstanding was significant because it demonstrated Dr. Rothman's ability to articulate something that he thought was a misunderstanding and to deny a present symptom and to comprehend that specific issue.

In addition, the report from the BOP indicates that Dr. Rothman met with the BOP examiners for approximately nine hours and was polite, cooperative and pleasant during those interviews.  The report notes that during the ten days that Dr. Rothman was at  FMC Rochester, he displayed no difficulties caring for himself or attending meals independently in a separate building and did not need prompting to eat meals, shower or shave. (GX 2 at 10). Dr. Rothman did not engage in noticeable wandering behavior while at the facility and displayed appropriate independent functioning.  The report noted that Dr. Rothman's behavior was inconsistent with the information provided by Dr. Rothman's daughter which characterized Dr. Rothman as needing prompting to engage in his daily activities and as being unable to feed himself.  According to the report, Dr. Rothman's daughter also stated that he is "socially inappropriate", "verbally aggressive" and has on one occasion "wandered off".

During the evaluation, Dr. Rothman was administered a number of tests designed to evaluate malingering, including the 21-Item test, the Ray Memory Test (RMT), the Test of Memory Malingering (TOMM), the Validity Indicator Profile (VIP test) and the Structured Inventory of Malingered Symptomatology (SIMS test).  Many of the tests taken by Dr. Rothman were administered by the psychological intern, Elizabeth Wakeman and others were administered by Dr. Carlson or in his presence.  The competency interviews where Dr. Rothman was asked questions regarding the legal system were conducted by and in

the presence of both Dr. Carlson and Elizabeth Wakemen.  The BOP reports states that

Dr. Rothman's results on those cognitive tests "cannot be considered credible due to the

very strong evidence Dr. Rothman intentionally suppressed his performance." (GX 2 at

12).

      The BOP Report further states that Dr. Rothman was also administered the

Cognitive Capacity Screening Examination (CCSE) where he  obtained a score of 15 out

of 30, which is indicative of moderate to severe cognitive impairment when given to an

individual who is putting forth good effort.  He was also given the Reading-Level Indicator

(RLI) where he earned a score comparable to a second grade reading level.  Dr. Rothman

obtained a full Scale IQ score of 65 (1st percentile) on the Wechsler Adult Intelligence

Scale-Fourth Edition (WAIS-IV), which falls within the extremely low range of intellectual

ability.  The Report additionally noted that Dr. Rothman obtained a Full Scale IQ score of

107 when he was administered the test in early 2009, and concluded that it was likely that

his actual current abilities were substantially higher than the WAIS-IV results he obtained

while at the BOP. (GX 2 at 12).

      Further, Dr. Rothman was administered the Repeatable Battery for the Assessment

of Neuropsychological Status (RBANS) which measures the function in areas of memory,

visuospatial skills, language and attention.  The BOP report characterized the RBANS test

as being sensitive to cognitive dysfunction, e.g. dementia.  Dr. Rothman obtained a total

index score in the extremely low range, either at or below the 1st percentile.  Again the

BOP report concluded that the scores substantially underestimated Dr. Rothman's true

abilities.  Dr. Rothman was also given the Geriatric Depression Scale (GDS), which

measures depressive symptoms.  The BOP report states that he scored within the normal

range which suggests that he was not currently experiencing significant problems with

depression.

Based upon the results of the tests, Dr. Carlson concluded that Dr. Rothman was malingering because he scored in the malingering range on all of the tests. Dr. Carlson explained that when people approach a malingering test with the mind set of trying to portray something, they obtain different scores than non-malingering people. He stated that Dr. Rothman's test results could not be explained by apathy, because Dr. Rothman scored worse on the malingering tests than someone would if they were apathetic. He testified that the VIP test was the best example of this because on the non-verbal component of that test, Dr. Rothman obtained an invalid/inconsistent result, indicating that he did not give his best effort to do well; but, on the verbal test, he scored noticeably lower, which Dr. Carlson characterized as "so low that you can't score that low unless you try to." Dr. Carlson stated that there was only a three percent probability of obtaining such a low score. He testified that if a person truly did not know the answer to a question or truly did not care about the answer, they would get approximately half of the answers correct.

Dr. Carlson also testified that, as noted in the BOP report, Dr. Rothman's scores on the Miller forensic assessment symptoms test, the cognitive capacity screening examination, and the Wechsler adult intelligence scale, 4th edition, WAIS, IV, scores could not be considered credible due to very strong evidence that Dr. Rothman intentionally suppressed his performance.

When asked by the Court whether in his opinion someone who was not malingering, who had obtained the test scores that Dr. Rothman did, would be competent to proceed to sentencing Dr. Carlson replied,

I wouldn't base an opinion on competence to proceed to sentencing just

based on these cognitive scores, because the other really important part, of course, is the interview as to just asking him the basic comment and questions about his case and the legal system and so on.

Now, assuming these were accurate scores, valid scores, in an individual, you know, it's very unlikely, it's unlikely that I would find that person competent, and it's also extremely unlikely that a person who scored at that level on the cognitive test would be able to answer questions regarding his case in the legal system the way Dr. Rothman did.

(DE # 582 at 148-49).

Dr. Carlson testified that Dr. Rothman earned a grade equivalent score of 2.6 in his reading skills which was an underestimate of Dr. Rothman's reading ability because he was able to complete other tests that require a greater reading ability, without assistance. Dr. Carlson specifically pointed to Dr. Rothman's completions of the verbal or vocabulary portion of the VIP test but where he obtained significantly less than half correct. Dr. Carlson stated, "you can't get either more than half correct or less than half correct on a reading test of this type without being able to read and understand and knowing how to respond." Dr. Carlson also testified that on the written component of the competency specific area, that Dr. Rothman was able to complete the test without assistance and got most of the questions correct. Dr. Carlson concluded that although the results of those cognitive tests could not be considered evidence of malingering because that is not what those tests were designed to measure, that Dr. Rothman's test results on those tests "didn't really make sense."

Dr. Carlson also was questioned about Dr. Rothman's results on the WAIS, IV test which Dr. Carlson identified as an intelligence test and not a malingering test. Dr. Carlson testified that on the digit span subtest of the WAIS examination, (where an examiner states digits to a person and the person has to repeat them back to the examiner in either a forward or backward manner), especially low scores, e.g., less than

seven, are indicative of malingering.  Dr. Carlson reported that Dr. Rothman correctly recalled a total of four forward and backward digits, and two forward digits, which is well below the cutoff for malingering.

Dr. Carlson also testified that Dr. Rothman provided vague and evasive answers to general questions orally posed to him, but when the questions were given in a written format, two days later, Dr. Rothman provided 18 out of 25 correct answers, or 72%.  In the report, Dr. Carlson stated that the contradiction in those scores and Dr. Rothman's evasive responses during the interview, gave further support to the determination that malingering was an important aspect of Dr. Rothman's evaluation.

Dr. Carlson testified, as indicted in the BOP report, that Dr. Rothman initially responded evasively when questioned about his specific legal case but as the interview continued, provided additional information which suggested that Dr. Rothman had a better understanding of the legal charges than he initially portrayed.  Based upon the interview, Dr. Carlson concluded that Dr. Rothman had an understanding of his case and of court proceedings generally, including the role of his attorney, the judge and the date of his sentencing.  Dr. Carlson also provided written questions to Dr. Rothman regarding the legal process and concluded from Dr. Rothman's responses that his understanding was adequate.  Specifically, Dr. Carlson stated that Dr. Rothman's "ability to discuss was good and compromised...somewhat by the evasiveness, but overall he was able to demonstrate an adequate knowledge, both generally and related [to] his case." (DE # 582 at 158).

Dr. Carlson confirmed that he held the same conclusion about Dr. Rothman's competency at the hearing that he did at the time that he evaluated Dr. Rothman; that to a reasonable degree of professional certainty, Dr. Rothman did not suffer from a mental

disease of defect that rendered him unable to understand the nature and consequences of the proceeding against him or to participate properly at sentencing.

During cross-examination, Dr. Carlson admitted that he did not ask Dr. Rothman any questions about acceptance of responsibility, loss potential for his sentence, actual or intended loss calculations, his right to gather and submit letters of support to submit to the court during sentencing, or his right of allocution. However, Dr. Carlson opined that Dr. Rothman could have the loss potential issue explained to him and would be able to develop a comprehension of that without a great deal of difficulty. Dr. Carlson stated that he did not recall what was said when he and Dr. Rothman discussed Dr. Rothman's ability to consult with counsel. Dr. Carlson recalled that he had a general conversation with Dr. Rothman about what a sentence is, but does not recall having any conversations about what specifically occurs at sentencing.

Dr. Carlson was unfamiliar with whether the tests that were administered to Dr. Rothman where Dr. Carlson concluded that Dr. Rothman was malingering had been criticized as not being appropriate for people with some form of dementia. Dr. Carlson stated that the 21-Item test has been normed against people with dementia (DE # 582 at 192).[22] He also denied that patients with dementia were not included in the study during the RBANS standardization and stated that the RBANS was intended to be a dementia test. Dr. Carlson agreed that not all instances of insufficient effort are indicative of malingering and agreed that patients with dementia may perform at varying levels

---

[22] Dr. Carlson was cross-examined by Counsel for the Defense on several texts and studies. However, the texts were never identified as authoritative by any of the experts and, in fact, Dr. Crown specifically discounted those texts as merely books written by people. Therefore, the undersigned does not consider the findings in the texts in arriving at her ultimate determination is this matter.

throughout the day.

V.    LEGAL ANALYSIS

At the outset, the undersigned notes that although Dr. Rothman was found competent to proceed at trial, that determination does not foreclose a subsequent finding based upon recent medical tests, and updated opinions from the medical experts, that Dr. Rothman's cognitive abilities have declined to the point that he is no longer legally competent to proceed to sentencing.  Thus, as previously stated, the task at hand is to determine whether, in light of the above evidence presented to this Court, Defendant David Rothman has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, considering various factors pertinent to the criminal proceedings, and specifically to the sentencing proceedings.  For the reasons set forth below, I conclude that he does not.

A.    Diagnosis

First, based upon the totality of the medical evidence, the undersigned concludes that Dr. Rothman is suffering from a mental disease or defect, likely to be frontotemporal dementia.  However, there is also the possibility that Dr. Rothman is suffering from Alzheimer's disease that is primarily affecting his frontal lobes.  For purposes of these proceedings, it does not matter which form of dementia is present since the critical inquiry is whether that mental disease results in a lack of competency.  Moreover, it is undisputed that an unequivocal diagnosis cannot be made unless the brain is examined in an autopsy.  In addition, the undersigned finds that Dr. Rothman's cognitive condition since the Court's previous finding of competency in February of 2009, has significantly deteriorated.

These conclusions are based primarily upon the thorough and credible testimony

57

presented at the hearing from Dr. Ranjan Duara, M.D., the court-appointed expert in this matter, which is supported by the testimony of the three experts retained by the defense. Dr. Duara's educational credentials, training and overall experience of over twenty-five years in the field of behavioral neurology, and specifically in dealing with persons with dementia and Alzheimer's disease, including conducting over 10,000 evaluations on patients for dementia related diseases and reviewing between five and ten thousand MRIs or PET Scans in order to diagnose dementia-related conditions, well qualified him to opine on Dr. Rothman's diagnosis related to his brain disease in this matter, as well as the effects of that disease in terms of cognitive functioning. After reviewing the objective evidence, including two PET Scans and an MRI, as well as numerous medical records, and personally conducting an evaluation of Dr. Rothman, Dr. Duara concluded that Dr. Rothman is suffering from frontotemporal dementia with primary progressive aphasia variant.

This conclusion is supported by the findings of the other defense experts in this case, although there is some variation in the diagnosis as to whether Dr. Rothman is suffering from frontotemporal dementia or Alzheimer's disease mimicking frontotemporal dementia. However, it bears noting that as Dr. Rothman's disease has progressed, it appears that the objective findings more clearly support the conclusion reached by Dr. Duara, that Dr. Rothman is suffering from frontotemporal dementia rather than Alzheimer's disease. Dr. Fischer, for example, who initially diagnosed Dr. Rothman as having Alzheimer's disease, has based upon a December 11, 2009, PET scan, confirmed that Dr. Rothman's diagnosis is frontotemporal dementia rather than Alzheimer's disease. This modification in diagnosis is consistent with the testimony of Drs. Duara and Fischer, that frontotemporal dementia has features that mimic Alzheimer's disease, particularly

early on in the development of the disease.  Thus, the defense experts provided

substantial testimony that Dr. Rothman is suffering from a medical disease or defect.

<strong>B.     Competency to Assist Counsel in Sentencing Proceedings</strong>

As to Dr. Rothman's competency to proceed to sentencing, Dr. Duara and three of

Dr. Rothman's treating physicians concluded that he is not competent to proceed.  Again,

in this area, the testimony of Dr. Duara was particularly credible and persuasive.  Dr.

Duara opined that Dr. Rothman's brain disease has caused an impairment of mental

cognitive function which is primarily manifested with apathy and difficulty with

comprehension.  In addition, Dr. Duara testified that in conducting his evaluation of Dr.

Rothman, Dr. Duara understood the issues to be determined were whether Dr. Rothman

was "able to understand why he was being sentenced," and "how he could assist his

attorneys in perhaps mitigating any sentence that he would receive." In response to these

inquiries, Dr. Duara concluded that:

1. There is "no way" that Dr. Rothman could assist his counsel in

ascertaining whether certain statements contained in the PSI were correct or not,

including financial statements, witness statements and statements pertaining to the

actions of certain persons "because he's unable to comprehend what those statements

really allude to," (DE # 582 at 29);

2. To a reasonable neurological certainty, Dr. Rothman has a degenerative

brain disorder that has affected him sufficiently so that his lack of insight, loss of

memory, loss of comprehension would severely impair his ability to assist his attorney;

3.  Dr. Rothman cannot assist his attorney in a logical, cogent, rational way,

and lacks the capacity to reason through a problem to try to find a solution or a strategy;

4.  Dr. Rothman is unable to speak to the Court in a cogent and organized

59

manner in an attempt to mitigate the sanction to be imposed by the Court;

       5.  Dr. Rothman lacks the ability to convey to his lawyer Dr. Rothman's role in the crime so that his attorney can provide information to the probation officer or the Court, or to assist his attorney in evaluating the loss attributed to his conduct in the crime;

       6.  Even if Dr. Rothman experienced a series of "good days" related to his condition, Dr. Rothman does not have the mental capacity to assist his counsel in evaluating the  information contained in the presentence report.

       Dr. Duara reached these conclusions based upon his review of the various objective tests, as well as the scores that Dr. Rothman achieved on the Mental Mini test, the Physical Self Maintenance Score, the Clinical Dementia Rating, and in the neurocognitive evaluation administered by Dr. Duara.

       Moreover, these conclusions were consistent with the findings of the other defense experts.  Specifically, Dr. Rappaport reported that Dr. Rothman cognitively functions like a thirteen-year old due to the disease, lacks the ability to reflect and think about process, has a very difficult time processing and dealing with information and has a handicap in dealing with his legal, financial and family issues.  He further described Dr. Rothman as "insightless" at times.

       In addition, Dr. Rappaport who has been involved in hundreds of sentencing proceedings as a psychologist, opined that, to a reasonable degree of psychological certainty, Dr. Rothman cannot exercise in a meaningful, logical, cogent and rational way his right of allocution. He additionally concluded that it would be difficult if not impossible for Dr. Rothman to assist his attorney in reviewing the twenty-seven page PSI in order to prepare meaningful and cogent objections and responses to that report.  He

further concluded that Dr. Rothman is incapable of assisting his counsel in assessing the correct offense level, preparing a recitation of facts related to the offense, rebutting the factual statements related to his co-defendants' conduct, gathering letters of support from family and community members and identifying witnesses to be presented at the sentencing hearing.

Similarly, Dr. Crown testified that David Rothman doesn't have the capacity or ability to participate in the legal proceedings due to significant processing problems and continuous memory problems as a result of his dementia.

In addition, Dr. Gelblum concluded to a reasonable degree of medical certainty that Dr. Rothman is not capable of providing accurate information to his counsel to present to the judge on his behalf, and is not competent or capable of reviewing and understanding his PSI to assist counsel in making cogent and logical objections to the PSI.  Further, Dr. Gelblum concluded that Dr. Rothman does not have the capacity to allocute or be a witness at sentencing, to be cross examined and cannot understand questions asked of him in order to make a logical responses.  Finally, Dr. Gelblum concluded that Dr. Rothman does not the ability to write an acceptance of responsibility letter.

Wholly consistent with these opinions, Dr. Fischer concluded to a reasonable degree of medical certainty that Dr. Rothman does not have the ability to provide accurate information to his counsel to present to the court in mitigation of sentencing, does not have the ability to review the PSI and spot errors and assist his attorney in correcting those errors, and does not have the ability to draft a letter of acceptance of responsibility or otherwise make a cogent rational statement to the court in an effort to mitigate his sentence.  Dr. Fischer further concluded that Dr. Rothman does not have the ability to

make suggestions to his attorney in regards to questioning witnesses or locating witness

who may speak on his behalf, and does not have the ability to withstand questioning or

cross-examination at a proceeding.  Dr. Fischer stated that Dr. Rothman is incapable of

performing those functions because he is "severely cognitively impaired" and he has lost

the degree of cognitive function necessary to complete those tasks.

Moreover, and of great significance to the determinations to be made in the instant

proceeding, all of Dr. Rothman's treating physicians opined that Dr. Rothman's cognitive

abilities have declined substantially over the twelve months prior to the hearing held in

March 2010.  Dr. Rappaport opined that Dr. Rothman's disease has progressed at a more

rapid rate since February of 2009 due to the stress of the legal proceedings, including his

trip to Rochester, Minnesota, and the physical separation from his wife.[23]

Similarly, Dr. Crown opined based upon a reasonable neuropsychological

certainty, that Dr. Rothman's condition has deteriorated since February 2009, when the

previous competency hearing was held.  Dr. Crown stated that Dr. Rothman has a

degenerative and progressive disorder with progressive deterioration.[24]

Consistent with those conclusions, Dr. Gelblum concluded that Dr. Rothman is

suffering from a degenerative process occurring in his brain and noted that Dr.

Rothman's brain functioning has significantly declined between 2009 and 2010.  Dr.

---

[23] The undersigned recognizes that Dr. Duara did not observe the same decline
between his pre-BOP and post-BOP sessions with Dr. Rothman.  However, this can be
explained by the variability of the disease on a given day.  Moreover, the key point here
is the significant deterioration between the February 2009 determination by the Court
and the present.  The objective findings clearly support this deterioration.

[24] Dr. Crown's opinion is given less weight, however since it is based on his
review of the reports prepared by the other experts, and he has not examined Dr.
Rothman since the pre-trial competency proceedings.

Gelblum further described Dr. Rothman's cognitive condition as declining on a steady curve and described his condition as significantly worse in Mid-March of 2010 than it was in the previous year.

Finally, throughout his testimony, Dr. Fisher characterized Dr. Rothman's cognitive deterioration as progressive and described how over the course of one and one-half years, beginning in the latter part of 2008, Dr. Rothman's condition had continued to worsen.  Dr. Fischer testified that over that period of time, Dr. Rothman has suffered loss of cognitive functioning and memory and executive function to carry on normal activities. Notably, in January of 2010, Dr. Fischer assessed Dr. Rothman's condition as "getting worse" and "getting faster," and observed that only six weeks after his December 2009 visit with Dr. Rothman, the "progression was becoming more obvious" and the "disease was more aggressive than it had been." (DE # 583 at 122).

Thus, the defense experts agree that not only is Dr. Rothman unable to assist his attorney in preparing for the sentencing proceedings including meaningfully reviewing his PSI report, but he is also unable to properly allocute to the Court, and unable to identify facts and witnesses to support any mitigating evidence that could be presented to the Court.  In addition, all of the defense experts concluded that Dr. Rothman's disease has continued to progress.  Finally, Drs. Gelblum, Rappaport and Fischer, three of Dr. Rothman's treating physicians, have observed that Dr. Rothman's cognitive condition has significantly deteriorated since the time of the February 2009 competency determination.

The undersigned therefore credits the testimony of the defense witnesses and finds that the evidence presented at the hearing by those experts demonstrates that Dr. Rothman is not competent to proceed to sentencing and that his brain disease and manifestations thereof have substantially progressed since February 2009.

C. <u>Government's Expert Witness</u>

The testimony presented by the defense experts stands in stark contrast to the testimony presented by the Government's witness, Dr. Carlson.  However, for the following reasons, the undersigned finds that Dr. Carlson's testimony cannot be credited in this matter.

First, it is significant that all of the Defendant's expert physicians disagreed with the conclusions reached and expressed in the BOP evaluation of Dr. Rothman.  In addition, despite Dr. Carlson's significant experience in working with patients housed at the BOP who have dementia-related conditions, he lacks the educational background and relevant experience in dealing with the diagnosis, implications and manifestations of specific dementia-related diseases particularly when compared to the expertise of Dr. Duara in this area.[25]  In addition, although Dr. Carlson has this experience, the number of dementia patients with whom he has interacted pales in comparison with the experience of Drs. Duara, Fischer and Gelblum.  Moreover, Dr. Carlson does not have a medical degree, but rather holds a doctorate in medical psychology, and thus does not have nearly the same medical training in evaluating the pathology of brain disease as the other experts who hold medical degrees.  In addition, Dr. Carlson has taken no formal

---

[25]  The undersigned notes that the Court's October 16, 2009 Order granting the Government's Motion to Conduct an Inpatient Evaluation of David Rothman provided, *inter alia*, that additional time could be requested beyond the ten day period, if it was deemed necessary in order to obtain a more comprehensive evaluation and accurate assessment of Dr. Rothman's condition (DE # 553).  The Government did not request additional time and did not seek to have Dr. Rothman evaluated by a behavioral or other neurologist, thus the only expert testimony before the Court from the Government is from Dr. Carlson.

academic courses in forensic psychology.[26]  As a result of these limitations, it appears

that Dr. Carlson did not appreciate the implications of the objective evidence that

supported the conclusion that Dr. Rothman likely was suffering from frontotemporal

dementia or Alzheimer's disease at the time of his evaluation at BOP.  Rather, in the BOP

report, the Case Formulation section describes Dr. Rothman's condition as follows:

> Dr. Rothman has received various diagnoses in the past,
> including Alzheimer's Dementia and Frontotemporal-Temporal
> Lobe Dementia.  *No statements can be made presently*
> *whether he suffers from either of these conditions*; however, it
> is noteworthy that the CT/PET scan from October 28, 2009
> suggested "slight hypometabolism of the brain in a pattern
> that is non-specific but could be seen in early Alzheimer's
> dementia," according to the Mayo Clinic radiologist.
> (emphasis added).

There is no further indication either in the BOP report or in Dr. Carlson's testimony that

Dr. Carlson considered the likely implications of a determination that Dr. Rothman had

either frontotemporal or Alzheimer's-type dementia on the BOP's assessment of Dr.

Rothman's cognitive functioning.

Second, based upon the unequivocal testimony of the experts presented by the

Defendant, the undersigned finds that Dr. Carlson's interpretation of the results of the

tests administered to Dr. Rothman at the BOP failed to appropriately account for Dr.

Rothman's dementia-related mental defect, whether it was frontotemporal dementia or

Alzheimer's disease that affected his frontal lobes.  In particular, Dr. Duara made clear

that in assessing the results of a malingering test administered to a person with

---

[26] Although Dr. Carlson, unlike Dr. Duara, has substantial experience in forensic psychology, the role of the experts in this proceeding is to provide data to the Court from which the Court can make the ultimate legal determination of competency.  Thus, Dr. Duara's lack of experience in forensic psychology is not a significant impediment to the Court's determination in this case.

frontotemporal dementia, the first requirement is an awareness that "malingering behavior can be a manifestation of frontal lobe dysfunction." There is no indication that Dr. Carlson or the other persons who signed the BOP report generally considered and weighed the significance of such a diagnosis in assessing Dr. Rothman's sub-par scores on the malingering tests and other tests administered by the BOP.

In addition, Dr. Crown testified that several of the tests that were administered to Dr. Rothman by the BOP had not been normed on a population suffering from dementia-related diseases. He further stated that there were two tests that have normative standards with respect to people identified as suffering from dementia, the Word Memory Test and the Medical Symptom Validity Test, neither of which were administered to Dr. Rothman.  Dr. Crown further explained that the "low" scores obtained by Dr. Rothman, that Dr. Carlson deemed to be so low as to be indicative that Dr. Rothman intentionally falsified the answers, may simply be representative of random answers that would yield results well below average the first time they were taken.

Further, the medical professionals at the BOP failed to appreciate the specific manifestations of Dr. Rothman's disease which included apathy and amotivation and which likely account for the fluctuations in his performance on certain tests administered to him.  Rather, Dr. Carlson concluded that such fluctuations could only be the result of Dr. Rothman's intentional suppression of his performance.  However, Dr. Duara explained that the inconsistencies in Dr. Rothman's score were just a manifestation of the fluctuations and behavior in persons who suffer dementia-type diseases that affect the frontal lobes.  Dr. Duara further concluded that the persons at the BOP who determined that Dr. Rothman was malingering were not familiar with the manifestations of frontotemporal dementia or Alzheimer's disease when it primarily affects the frontal

lobes, likely because the BOP evaluators lacked sufficient training in neuropsychology. Finally, Dr. Duara concluded to a reasonable degree of neurological certainty that Dr. Rothman is not malingering but rather is suffering from frontotemporal dementia or Alzheimer's disease that is mimicking frontotemporal dementia, which is progressive in nature. Thus, the undersigned finds Dr. Duara's testimony regarding malingering was more persuasive than that of Dr. Carlson. It appears that Dr. Carlson, in interpreting the results of Dr. Rothman's malingering and cognitive function tests administered by the BOP, failed to account for the specific brain defect that Dr. Rothman is suffering from and its effect on the outcome of those tests. Therefore, the undersigned finds that Dr. Rothman was not malingering in his cognitive performance during the BOP evaluation.

In the absence of malingering, even Dr. Carlson's testimony supports a finding that Dr. Rothman is not presently competent to proceed. When asked by the Court whether in his opinion someone, who was not malingering, obtained the test scores that Dr. Rothman did would be competent to proceed to sentencing Dr. Carlson replied,

> I wouldn't base an opinion on competence to proceed to sentencing just based on these cognitive scores, because the other really important part, of course, is the interview as to just asking him the basic comment and questions about his case and the legal system and so on.
>
> Now, assuming these were accurate scores, valid scores, in an individual, you know, it's very unlikely, it's unlikely that I would find that person competent, and it's also extremely unlikely that a person who scored at that level on the cognitive test would be able to answer questions regarding his case in the legal system the way Dr. Rothman did.

(DE # 582 at 148-49). Similarly, as set forth in great detail above, three of the defense experts, including Dr. Duara, concluded that Dr. Rothman is not competent to proceed to sentencing in this matter. Specifically Drs. Duara, Fischer, and Gelblum all concluded that Dr. Rothman lacked the ability to assist his attorneys in preparation for sentencing and to

speak to the Court in a cogent manner during allocution.  While the undersigned agrees with the Government that the Defendant does not have to be able to assist his counsel with every aspect of the sentencing hearing,  the evidence provided by the Defendant's experts in this matter establishes that Dr. Rothman lacks the ability to engage in consultation with his attorneys with a reasonable degree of rational understanding.

Finally, the undersigned finds that the Government's argument that the Defendant's expert witnesses improperly relied upon the anecdotal information reported by Dr. Rothman's family, which was in direct contradiction to the observations made by the staff at the FMC, is without merit.  Despite the Government's assertion, the record does not reflect that the defense experts placed undue emphasis on the information provided by Dr. Rothman's family in determining the cognitive impairment that Dr. Rothman suffers as a result of his brain disease.  In addition, Dr. Duara's scores on several of the tests where input was received from Dr. Rothman's family, are not necessarily inconsistent with the observations made at the BOP regarding Dr. Rothman's ability to physically care for himself.  Specifically Dr. Duara rated Dr. Rothman as having mild impairment on the Physical Self Maintenance Scale (PSMS) and as having mild impairment on the Clinical Dementia Rating Score (CDR).  However, even with those scores, Dr. Duara still concluded that Dr. Rothman is not able to assist his attorneys at trial and therefore is incompetent to proceed to sentencing.

Similarly, the Government's contention that because Dr. Rothman was observed for ten days while housed at the FMC, the observational findings made by the staff during that time provide stronger evidence of Dr. Rothman's competence than the observations made by his treating physicians is without merit.  The Government assumes that the testimony regarding the day to day fluctuations of patients with frontotemporal dementia

is best observed on consecutive days.  However, although such observations may be better than a one-time evaluation, there is no indication that monthly periodic observations over a long period of time, akin to those performed by Dr. Fischer and Dr. Gelblum are not reliable, and in fact, may provide better insight to Dr. Rothman's overall cognitive functioning and particularly, the decline of the cognitive functioning, in assessing the competency of a patient with frontotemporal dementia.  Thus, the Government's argument does not persuade the undersigned that the BOP's assessment of Dr. Rothman's competence is more valid than that made by the Defendant's experts.

In sum, the undersigned concludes that Defendant David Rothman has a mental disease or defect, has declined significantly in intellectual and cognitive abilities as the disease has progressed since February 2009, and no longer retains the present ability to reasonably assist counsel in his own defense and participate in the sentencing proceedings.  This is particularly true in a complex case such as the one at bar, in view of Dr. Rothman's inability to organize his thoughts and allocute cogently at his own sentencing, and present to his attorney facts regarding his activities, vis-a-vis those of his co-defendants, in connection with medical clinics which submitted the fraudulent claims.

## VI.   CONCLUSION

Based upon a careful review of the record, and for the reasons stated above, evaluating the totality of factors set forth above in the Framework for Analysis, the undersigned finds and concludes that David Rothman is not competent to proceed to sentencing in this matter.

In addition, although both Parties have cited to 18 U.S.C. § 4241 as the basis for the competency determination in this matter, neither Party has addressed the issue of

commitment of the Defendant following a determination of incompetency, including whether the provisions of 18 U.S.C. § 4244 or the provisions of 18 U.S.C. § 4241 should apply where the determination of incompetency is made at this juncture in the proceedings; nor have they addressed the implications of the apparently uncontroverted evidence that dementia is progressive and irreversible.  Therefore, the undersigned has made no determination in this regard.

Accordingly, it is therefore,

**ORDERED AND ADJUDGED** that David Rothman is incompetent to proceed to sentencing in this matter. It is further

**ORDERED** that the Parties shall file appropriate motions regarding further proceedings and/or commitment with respect to David Rothman within fourteen (14) days from the date of this Order.

**DONE AND ORDERED** in chambers in Miami, Florida, on August 18, 2010.

*Andrea M. Simonton*
_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

**Copies to:**
**The Honorable Ursula Ungaro, United States District Judge**
**All counsel of record via CM/ECF**